SANFORD L. MICHELMAN, ESQ. (SBN 179702)
smichelman@mrllp.com
ROBERT D. ESTRIN, ESQ. (SBN 260402)
restrin@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA 90024
Telephone:   (310) 564-2670
Facsimile:    (310) 564-2671

TODD H. STITT, ESQ. (SBN 179694)
tstitt@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, 10th Floor
Irvine, California 92614
Telephone: (714) 557-7990
Facsimile: (714) 557-7991

Attorneys for Plaintiff
WESTERN AIR CHARTER, INC. dba JET EDGE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN AIR CHARTER, INC., doing business as JET EDGE INTERNATIONAL, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>PAUL SCHEMBARI, an individual; ACP JET CHARTERS, INC., doing business as PHENIX JET, a Florida corporation; PHENIX JET LLC, a Guam Limited Liability Company, COSA DI FAMIGLIA HOLDINGS, LLC, a Guam Limited Liability Company, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-00420-JGB (KSx)<br>Honorable Jesus G. Bernal<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Separate Statement of Undisputed Facts; Six Supporting Declarations; and Application to File Under Seal]<br><br>**Trial Date:  January 15, 2019**<br><br>Date:  September 10, 2018<br>Time:  9:00 a.m.<br>Dept:  Courtroom 1<br>Judge: Hon. Jesus G. Bernal |

## NOTICE OF MOTION

Notice is hereby given that on September 10, 2018, at 9:00 a.m., or as soon thereafter as this matter may be heard, before the Honorable Jesus G. Bernal, in Courtroom 1 of the United States District Court for the Central District of California, at 3470 Twelfth Street, Riverside, CA 92501, Plaintiff Western Air Charter, Inc., doing business as Jet Edge International, ("Jet Edge" or "Plaintiff") will move the Court seeking the entry of summary judgment as to certain claims in this action pursuant to Federal Rules of Civil Procedure Rule 56.

The Court should grant summary judgment as to Plaintiff's first claim against Defendant and Cross-Complainant Paul Schembari ("Schembari") for breach of contract. The undisputed facts show that Schembari breached several provisions of his employment contract, including:

- Section 3: "Exclusivity";
- Section 6.2: "Restrictions" on Confidential Information;
- Section 6.4: "Return of Property and Confidential Information.";
- Section 7.3: "Non-disparagement"; and
- Section 7.4: "Prohibition on Planning."

Schembari's breaches of these provisions of his employment contract with Schembari has caused Plaintiff harm in the form of losing several customers to Schembari's competing business, as well as Jet Edge having to pay his salary during a time when Schembari was not working exclusively for Jet Edge.

In the alternative, Plaintiff moves for partial summary judgment that Schembari has established the first three elements of breach of contract for each of the following provisions:

- Section 3: "Exclusivity";
- Section 6.2: "Restrictions" on Confidential Information;
- Section 6.4: "Return of Property and Confidential Information.";
- Section 7.3: "Non-disparagement"; and
- Section 7.4: "Prohibition on Planning."

1

In addition to the foregoing, the Court should dismiss Schembari's first counterclaim for unfair competition under Cal. Bus. & Prof. Code Section 17200 as a matter of law.  The undisputed facts show that this counterclaim fails as a matter of law for at least the following reasons:

- Schembari lacks standing to sue;
- Schembari's counterclaim is barred by the *Noerr-Pennington* Doctrine and the California Litigation Privilege;
- Schembari has improperly changed his theory of damages after the close of discovery and cannot recover damages based on the allegation in his Second Amended Counterclaim or his new theory of damages;
- Jet Edge did not cause Schembari harm; and
- Edge did not act unlawfully, unfairly, or fraudulently as required under Cal. Bus. & Prof. Code Section 17200.

Additionally, the Court should enter summary judgment dismissing Schembari's second and third counterclaims for intentional interference with prospective economic advantage and negligent interference with prospective economic advantage.  The undisputed facts show that these counterclaims fail as a matter of law for at least the following reasons:

- Schembari lacks standing to sue;
- Schembari's counterclaims are barred by the *Noerr-Pennington* Doctrine and the California Litigation Privilege;
- Schembari has improperly changed his theory of damages after the close of discovery and cannot recover damages based on the allegation in his Second Amended Counterclaim or his new theory of damages;
- Jet Edge did not have knowledge of Schembari's claimed relationships;
- Jet Edge did not cause Schembari harm; and
- Jet Edge did not commit an independently wrongful act

PLAINTIFF'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    This motion is based upon this Notice of Motion, the following Memorandum

2  of Points and Authorities, the filings and record in this case, arguments of counsel,

3  and such other evidence as may be allowed at the hearing on this motion.

4    This motion is made following the conference of counsel pursuant to L.R. 7-

5  3 which took place on July 25, 2018.

6

7  Dated:  August 6, 2018          **MICHELMAN & ROBINSON, LLP**

8

9                                 By:  */s/ Robert Estrin*

10                                     Sanford L. Michelman

11                                     Todd Stitt

                                       Robert Estrin

12                                     *Attorneys for*

13                                     *WESTERN AIR CHARTER, INC.*

                                       *dba JET EDGE INTERNATIONAL*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1

# **<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ......................................................................................... 1

    A.     Plaintiff Jet Edge's Complaint ........................................................ 1

    B.     Schembari's Counterclaim ............................................................... 2

II.    FACTUAL BACKGROUND ....................................................................... 3

    A.     Undisputed Facts Relating To Schembari's Breaches Of His Contract With Jet Edge ........................................................................................................... 3

        i.     Jet Edge Enters Into Contracts With Five Jet Owners. .............................. 3

        ii.     Jet Edge and Paul Schembari Enter Into an Employment Agreement ....... 3

        iii.     Schembari Disparages Jet Edge To Its Clients, Laying the Groundwork for Defendants To Steal the Jet Edge Customers .......................................... 4

        iv.     Schembari and Defendants Actively Compete with Jet Edge and Interfere with Jet Edge's Client Relationships During Schembari's Employment with Jet Edge. .................................................................. 4

        v.     Schembari Knew His Actions Were Improper and Timed His Departure on the Status of the Jet Edge Customers Leaving Jet Edge. ..................... 6

        vi.     Schembari, While Still Employed by Jet Edge, Along with Defendants and Sojitz, Took the Additional Step To Get the Necessary Certification To Allow the Jet Edge Customers To Move from Jet Edge to Phenix Jet. ............................................................................................. 7

        vii.     Schembari Takes Jet Edge Confidential Information and Trade Secrets To His New Company. ....................................................................... 7

        viii.     Schembari Resigns from Jet Edge, and the Jet Edge Customers Follow Him To Phenix Jet. .......................................................................... 8

    B.     Undisputed Facts and Procedural Posture Related to Schembari's SACC. ............ 9

        i.     Schembari's SACC Alleges Disruption of Schembari's Relationship with the Jet Edge Customers. .......................................................... 9

        ii.     Schembari's Discovery Responses and SACC Base His Causes of Action on the Non-Compete Clause in Schembari's Contract. .............. 9

        iii.     Schembari Changes His Damages Theory. ............................................. 9

        iv.     Jet Edge Never Knew PJHK Existed, Let Alone That PJHK Had the Prospective Clients Claimed by Schembari. .................................... 10

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT ............................... 10

i

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT THAT SCHEMBARI
     BREACHED SEVERAL TERMS OF HIS CONTRACT WITH JET EDGE. ................ 11

     A.  Schembari and Jet Edge Entered into a Valid Employment Contract. ................ 11

     B.  Jet Edge Performed Its Contractual Obligations. .................................................. 12

     C.  Schembari Breached Several Provisions of His Employment Contract. ............. 13

         i.    Schembari Breached Section 3: "Exclusivity." ........................................ 13

         ii.   Schembari Breached Section 6.2: "Restrictions" on Confidential
               Information. ................................................................................................ 16

         iii.  Schembari Breached Section 6.4: "Return of Property and Confidential
               Information." ............................................................................................... 18

         iv.   Schembari Breached Section 7.3: "Non-disparagement." ........................ 18

         v.    Schembari Breached Section 7.4: "Prohibition on Planning." ................ 19

     D.  Schembari's Breaches Harmed Jet Edge. ............................................................. 21

V.   THE COURT SHOULD DISMISS SCHEMBARI'S SACC. ........................................ 22

     A.  Schembari Lacks Standing To Sue. ...................................................................... 22

     B.  Schembari's SACC Is Barred by the *Noerr-Pennington* Doctrine and
         California's Litigation Privilege. .......................................................................... 23

     C.  Schembari's Last Minute Switch In His Theory Of Damages Bars Any
         Recovery. .............................................................................................................. 25

     D.  The Undisputed Facts Show That Jet Edge's Alleged Action Has Not Caused
         PJHK Or Schembari Any Harm. ........................................................................... 26

     E.  Schembari Cannot Maintain His Interference Claims Because the Undisputed
         Facts Show That Jet Edge Did Not Have Knowledge of PJHK's Claimed
         Prospective Economic Relationships. ................................................................... 27

     F.  The Undisputed Facts Show That Jet Edge Did Not Commit an Independently
         Wrongful Act. ........................................................................................................ 28

     G.  Schembari Cannot Show That Jet Edge Engaged in Unlawful, Unfair, or
         Fraudulent Conduct. .............................................................................................. 29

VI.  CONCLUSION ............................................................................................................... 30

ii

TABLE OF CONTENTS

# **TABLE OF AUTHORITIES**

## **Cases**

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
    2011 WL 13214315 (C.D. Cal.)...................................................................19

*Banga v. Equifax Info. Servs. LLC*,
    2016 WL 741963 (N.D. Cal.)....................................................................29

*Bd. of Trustees of Laborers Health & Welfare Tr. Fund for N. California v.
CEM Builders, Inc.*,
    2018 WL 1071171 (N.D. Cal.)...................................................................11

*Demeter v. Taxi Computer Servs., Inc.*,
    21 Cal.App.5th 903 (2018)........................................................................27

*Edwards v. Arthur Andersen LLP*,
    142 Cal.App.4th 603 (2006)......................................................................18

*Fields v. QSP, Inc.*,
    2012 WL 2049528 (C.D. Cal.)...................................................................12

*Fowler v. Varian Assocs., Inc.*,
    196 Cal.App.3d 34 (1987).........................................................................16

*Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*,
    2013 WL 3803911 (E.D. Cal.)...................................................................26

*Greenwich Ins. Co. v. Media Breakaway, LLC*
    2009 WL 2231678 (C.D. Cal.)...................................................................11

*Hilderman v. Enea TekSci, Inc.*,
    551 F.Supp.2d 1183 (S.D. Cal.) .........................................................22, 23

*Huong Que, Inc. v. Luu*,
    150 Cal.App.4th 400 (2007)......................................................................20

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134........................................................................................29

*Luck v. OTX Acquisition Corp.*,
    2010 WL 11595817 (C.D. Cal.)................................................................16

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990)..................................................................................11

*Moss v. Infinity Ins. Co.*,
    197 F.Supp.3d 1191 (N.D. Cal. 2016) ......................................................29

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990).............................................................................24

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993)..............................................................................29

ii

*Silberg v. Anderson,*
        50 Cal.3d 205 (1990) ...................................................................... 24

*Sosa v. DIRECTV, Inc.,*
        437 F.3d 923 (9th Cir. 2006) ....................................................... 24

*Sutrisno v. WebMD Practice Services, Inc.,*
        2005 WL 8154571 (C.D. Cal.) ............................................... 25, 26

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
        546 F.3d 991 (9th Cir. 2008) ....................................................... 24

*Two Jinn, Inc. v. Gov't Payment Serv., Inc.,*
        233 Cal.App.4th 1321 (2015) ..................................................... 27

*UMG Recording, Inc. v. Global Eagle Entertainment, Inc.,*
        117 F.Supp.3d 1092 (C.D. Cal. 2015) ...................................... 28

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.,*
        117 F.Supp.3d 1092 (C.D. Cal. 2015) ...................................... 24

*Westside Center Associates v. Safeway Stores 23, Inc.,*
        42 Cal.App.4th 507 (1996) ...................................................... 27, 28

*Zajicek v. Kool Vent Metal Awning Corp. of America*, 283 F.2d 127,
        133 (9th Cir. 1960) ...................................................................... 12

**Rules**

F.R.C.P. Rule 26(a) ........................................................................... 25

F.R.C.P. Rule 37(c)(1) ...................................................................... 25

F.R.C.P. Rule 56(a) ........................................................................... 10

iii

TABLE OF AUTHORITIES

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   INTRODUCTION

### A.   Plaintiff Jet Edge's Complaint

Defendant and Counterclaimant Paul Schembari ("Schembari") used his position at Jet Edge to secretly create his own competing jet management company ("Phenix Jet")[1] with the help of a Japanese conglomerate Sojitz Corporation ("Sojitz").  While Jet Edge thought it was entering into a joint venture with Sojitz, in reality Sojitz was working with Schembari to syphon Jet Edge's customers and confidential information for the benefit of Phenix Jet.  Before Jet Edge knew of Schembari's and Sojitz's plan, five private aircraft that had entered into contracts with Jet Edge cancelled their contracts and left for Phenix Jet.

To accomplish this heist, Schembari disregarded and breached his employment agreement with Jet Edge.  Jet Edge wanted to ensure that its employees were not working on businesses designed to compete with Jet Edge while still employed by Jet Edge, so it included two clauses in its employment contracts to prevent employees from competing, or planning to compete, with Jet Edge during an employee's employment.  Schembari not only prepared to compete with Jet Edge while still employed by Jet Edge, but he actually did compete with Jet Edge.  As a result of Schembari's improper competition while still employed by Jet Edge, Schembari arranged to steal five Jet Edge clients before resigning from Jet Edge.

Perhaps most disturbing is Schembari's blatant breach of Section 7.3 of his employment agreement which prevented Schembari from disparaging Jet Edge to Jet Edge's clients, potential clients, or business partners.  Schembari made multiple disparaging remarks regarding Jet Edge to Jet Edge clients.   For example, Schembari told a Jet Edge client that "[f]lights dispatched by JEI [Jet Edge] never go smoothly as there are always mistakes, oversights, and lack of communication."

---

[1] Schembari named his competing entity Phenix Jet.  Defendants ACP Jet Charters dba Phenix Jet and Phenix Jet LLC will hereinafter be referred to as "Phenix Jet."

In addition to these breaches, Schembari also breached his contract by using Jet Edge's confidential information to create nearly identical documents for Phenix Jet.   For example, Schembari took Jet Edge's confidential Initial Operation Experience Completion documents, which relate to Jet Edge's training of pilots, and removed the Jet Edge logo and placed Phenix Jet's name on the documents.

Schembari will claim that his employment contract with Jet Edge is invalid. Schembari never made this claim while collecting his $220,000 salary plus benefits. Moreover, Schembari actually copied his Jet Edge employment contract to create his own employment contract with Phenix Jet unconcerned with any of the clauses.

## B.   Schembari's Counterclaim

In response to Jet Edge's complaint, Schembari filed three meritless counterclaims for unfair competition and intentional and negligent interference with prospective economic advantage.   Schembari clearly had no basis for filing these counterclaims when he did in 2017.   As discussed herein, there are multiple reasons why the Court should grant summary judgment  as to Schembari's Counterclaim.

First, the damages claimed belong to Phenix Jet Hong Kong ("PJHK"), not Schembari.   Schembari does not have standing to bring a claim for damages on behalf of PJHK.  Second, the damages claimed by PJHK clearly stem from Jet Edge bringing this lawsuit, which is a protected activity under the *Noerr-Pennington* doctrine and the California Litigation privilege.   Third, Schembari abandoned his initial theory of damages contained in his Second Amended Counterclaim ("SACC") and discovery responses in exchange for a new theory first advanced in his damages expert's report.   Since Schembari failed to supplement his discovery responses to include this new theory of damages he is estopped from relying on his new theory of damages at this stage of the litigation.

Fourth, the undisputed facts show Schembari cannot establish the elements for his intentional and negligent interference claims.   As set forth in three separate declarations, the undisputed facts show that Jet Edge had no idea that PJHK even

existed, let alone had potential relationships with the claimed entities. Furthermore, the undisputed facts show that Jet Edge did not engage in any independent wrongful act and that Schembari did not suffer damages based on any action by Jet Edge.

Based on the foregoing, the Court should grant summary judgment as to Jet Edge's breach of contract claim and dismiss Schembari's three counterclaims.

## II.   FACTUAL BACKGROUND

### A.   Undisputed Facts Relating To Schembari's Breaches Of His Contract With Jet Edge

#### i.   Jet Edge Enters Into Contracts With Five Jet Owners.

Jet Edge provides charter, maintenance, and management services for private aircraft, including providing pilots and crew to fly the jets it has under management. In 2013 and 2014, Jet Edge entered into Aircraft Charter Management Agreements ("ACMAs") to manage jets for five different owners. (Statement of Undisputed Facts ("SUF") No. 81.)

#### ii.   Jet Edge and Paul Schembari Enter Into an Employment Agreement.

On or about February 14, 2014, Schembari entered into an employment agreement with Jet Edge to act as lead pilot in command of an aircraft belonging to one of the Jet Edge Customers. (SUF No. 1.) Schembari's employment contract contained several provisions that Schembari breached during his time at Jet Edge and after he left. These provisions include: (1) Section 3: "Exclusivity"; (2) Section 6.2: "Restrictions" on Confidential Information; (3) Section 6.4: "Return of Property and Confidential Information"; (4) Section 7.3: "Non-disparagement"; and (5) Section 7.4: "Prohibition on Planning." (SUF No. 1.)

//
//
//
//

MEMORANDUM OF POINTS AND AUTHORITIES

### iii.     Schembari Disparages Jet Edge To Its Clients, Laying the Groundwork for Defendants To Steal the Jet Edge Customers.

Schembari never had Jet Edge's best interests at heart.  Within a year of beginning his employment with Jet Edge, Schembari informed Sojitz and one of the Jet Edge Customers (who Schembari eventually stole), that "working with JEI [Jet Edge] ops *is continually challenging* due to time zone differences and their workload with US domestic fleet.  If this is the case you will become *frustrated* in only a short time."  (SUF No. 71.)  The next day, Schembari told Sojitz and the same Jet Edge customer that "*[f]lights dispatched by JEI [Jet Edge] never go smoothly* as there are always mistakes, oversights, and lack of communication." (SUF No. 72.)  Schembari concluded by saying "[p]lease keep my comments between us, as I don't want David to feel like I am undermining him."  (Id.) Importantly, Schembari sent these disparaging e-mails from his personal e-mail account.  (SUF Nos. 71-72.)

### iv.     Schembari and Defendants Actively Compete with Jet Edge and Interfere with Jet Edge's Client Relationships During Schembari's Employment with Jet Edge.

Schembari testified he had a meeting with Sojitz representatives in November 2015, during which time he opted to work with Sojitz to create a new aviation management company.  (SUF No. 10.)  Further, Schembari never informed Jet Edge that he was going to work on a competing company with Sojitz.  In fact, by the end of November 2015, Schembari had already named his competing business that would eventually steal the Jet Edge Customers Phenix Jet.  (SUF No. 12.)

Schembari accelerated his efforts to steal the Jet Edge Customers at the end of 2015 and beginning of 2016.  On or about December 3, 2015, Schembari met with Rodney Webb to discuss concrete plans on how to run Schembari's competing business.  (SUF No. 21.)  Over the next few months, Schembari and Rodney Webb

developed a detailed business plan to compete against Jet Edge.  (SUF No. 26.)  On February 18, 2016, Rodney Webb e-mailed this business plan to Schembari.  (Id.)  The business plan's "financial plan" section shows that it would receive management revenue and charter sales revenue from the ***same airplanes*** (as seen by the tail numbers) currently under management by Jet Edge.  (SUF Nos. 26-27.)  Also attached to Rodney Webb's February 18, 2016 e-mail were detailed financial projections about these same airplanes currently under Jet Edge management.  (SUF No. 25 & 28.)  Schembari also testified that a document, which was incorporated into the business plan, named as customers jets managed by Jet Edge.  (SUF No. 29.)  Clearly, while Schembari was still employed by Jet Edge, he had a deal in place with the Sojitz to steal the Jet Edge Customers.  Indeed, the mere existence, and success, of Schembari's new business relied entirely on the airplanes under Jet Edge management.

Phenix Jet was set up to compete with Jet Edge.  Indeed, the business plan discussed above labelled Jet Edge as a key competitor of Phenix Jet in the Asian region.  (SUF No. 22.)  Furthermore, Schembari admitted at his deposition that Phenix Jet was "either a similar operator or a regional competitor to Phenix Jet."  (SUF No. 18.)  Phenix Jet's Chief Operating Officer, Elsie Quenga, also testified that she considered Phenix Jet and Jet Edge to be competitors in the charter business.  (SUF No. 19.)

Additional evidence reveals the depth of Schembari's interference with Jet Edge customers.  On January 18, 2016, Rodney Webb e-mailed Schembari with notes from a January 13, 2016 meeting.  (SUF No. 15.)  These notes show that Schembari had confirmation that the Jet Edge Customers would leave Jet Edge for his new company Phenix Jet.  Bullet point six of the notes states: "Phenix will enter into a business relationship with the Sojitz company based in Japan.  The new business will manage 6 jets on behalf of Sojitz.  The 6 planes under management will be housed in hangers in Japan (but only four aircraft will be available for

charter).”  (Id.)  At her deposition, Elsie Quenga confirmed that those six jets were "***under Jet Edge Management . . . at the time***."  (Id.)

To ensure that Schembari could steal the Jet Edge Customers, he previously assured the Jet Edge Customers that they could separate from Jet Edge without a problem, telling one such owner that "authorizations belong to the aircraft owner and would allow Pocket Corp. to operate the aircraft in the event of a separation from JEI [Jet Edge] without any disruption."  (SUF No. 73.)

> **v.** **Schembari Knew His Actions Were Improper and Timed His Departure on the Status of the Jet Edge Customers Leaving Jet Edge.**

When Yohei Sakurai, a representative of Sojitz, asked if Schembari could sign a broker agreement that compensated Schembari for helping steal the Jet Edge Customers, Schembari stated: "Yes, I can sign as I don't believe the details of this agreement will become known to anyone outside of our circle."  (SUF No. 31.) Schembari signed this broker agreement while employed by Jet Edge, wherein a Sojitz subsidiary eventually paid Schembari's wholly owned company Cosa di Famiglia Holdings LLC ("CDF") approximately $300,000 to broker a deal that allowed the Jet Edge Customers to leave Jet Edge for Phenix Jet.  (SUF No. 39.)

Consistent with his approach to ensure the Jet Edge Customers would leave Jet Edge, Schembari asked Sakurai on February 29, 2016 about the status of moving the Jet Edge Customers from Jet Edge to Schembari's new company so that he knew when to resign from Jet Edge.  (SUF Nos. 42-43.)  In particular, there was a new Sojitz jet, tail number N2020Q, that needed management services, which Schembari and Sakurai diverted away from Jet Edge and eventually to Schembari's new company.  (SUF No. 41.)  Schembari testified at deposition that he "did not decide to resign [from Jet Edge] until I was assured that the aircraft management agreement for that particular aircraft [N2020] would be signed."  (SUF No. 43.)  Thus, Schembari actively competed with Jet Edge by stealing the Jet Edge Customers

from Jet Edge and placing them with his new company all while employed by Jet Edge.  Further, Schembari actively competed with Jet Edge by preventing additional jets, like N2020Q, from signing management agreements with Jet Edge.

### vi.    **Schembari, While Still Employed by Jet Edge, Along with Defendants and Sojitz, Took the Additional Step To Get the Necessary Certification To Allow the Jet Edge Customers To Move from Jet Edge to Phenix Jet.**

A major step Schembari took to ensure he could steal the Jet Edge Customers also occurred while still employed by Jet Edge.  Specifically, to manage and fly jets, a jet management company requires a 14 CFR Part 135 Air Carrier and Operator Certificate on which to register its jets.  Schembari explored various options for obtaining this certificate, ultimately deciding to purchase ACP Jet Charters, Inc.'s certificate ("ACP").  (SUF Nos. 33-39.)  On March 10, 2016, Schembari told Bob Seidel, the president of the company that owned the certificate, that "[o]ur aircraft are currently under management at another aircraft management company and require 90 days notification for termination of the management contracts." (SUF No. 37.)  Mr. Seidel's response shows that both he and Schembari knew that these jets, which would switch to the ACP's certificate, were the Jet Edge Customers.  (Id.)  Mr. Seidel testified that in his discussions with Schembari, he told Mr. Seidel he had four aircraft that he was going to bring to his new company. (SUF No. 40.)  Mr. Seidel testified that he later learned these aircraft Schembari referred to in early March 2018 were managed by Jet Edge.  (Id.)

### vii.    **Schembari Takes Jet Edge Confidential Information and Trade Secrets To His New Company.**

Schembari did not just take the Jet Edge Customers with him, he also took Jet Edge's confidential information and trade secrets.  Noticeably, many of Phenix Jet's documents contain identical language as Jet Edge's documents.  (e.g., SUF Nos. 50 & 56).  The fact Schembari used Jet Edge's Employee Handbook to develop

Phenix Jet's is undeniable and admitted to.  Of note, Schembari even forgot to remove Jet Edge's name from the Phenix Jet handbook under the Employee Property section on page 45 which states "possession of Jet Edge property . . . ." (SUF No. 51.)  The similarities between Schembari's Jet Edge employment contract and his Phenix Jet employment contracts are also unmistakable.  (SUF. Nos. 50 & 54.)  Also, the ACMAs that Phenix Jet entered into with the Jet Edge Customers mirror the ACMAs that Jet Edge previously entered into with these customers. (SUF Nos. 59 & 61.)  In fact, on May 24, 2016, Elsie Quenga told Yohei Sakurai that the Phenix Jet "AMA mirrors Jet Edge."  (SUF No. 61.)  Schembari also admitted "Phenix Jet used Jet Edge's AMA as a form document."  (SUF No. 59.)

Schembari went out of his way to ask Jet Edge employee Mattias Rosen to send him Jet Edge information for Schembari to use at his new company.  Mattias Rosen sent Schembari documents related to Jet Edge's Initial Operation Experience Completion, which relate to Jet Edge's training of pilots.  (SUF No. 64.)  Schembari then rebranded these materials under the Phenix Jet name, showing that he had no problem copying Jet Edge confidential material to save Phenix Jet money in generating its own documents.  (SUF No. 66.)

### viii.   Schembari Resigns from Jet Edge, and the Jet Edge Customers Follow Him To Phenix Jet.

Once Sojitz assured Schembari that the Jet Edge Customers would leave Jet Edge and become customers of Phenix Jet, Schembari felt comfortable to officially resign from Jet Edge on March 14, 2016.  (SUF No. 8.)  The inevitable followed. One by one, the Jet Edge Customers sent cancellation letters to Jet Edge and, after the 90-day notice of termination period, moved their business to Phenix Jet.  (SUF Nos. 82, 84, 86, 88, & 90.)  This started with Pocket Corporation which sent its termination letter to Jet Edge on March 23, 2016 and entered into a contract with Phenix Jet on June 20, 2016.  (SUF Nos. 82-83.)  The rest of the Jet Edge Customers

soon followed and left Jet Edge for Schembari's competing company.  (SUF Nos. 83, 85, 87, 89, & 91).

## B. Undisputed Facts and Procedural Posture Related to Schembari's SACC.

### i. Schembari's SACC Alleges Disruption of Schembari's Relationship with the Jet Edge Customers.

On October 20, 2017, Schembari filed his SACC against Jet Edge. Schembari based his SACC on the allegation that the non-compete provision included in his employment agreement with Jet Edge violated Cal. Bus. & Prof. Code Section 16600.  (SUF No. 106.)  Schembari alleged in the SACC that this non-compete provision disrupted his economic relationships with SAM Cayman, Fast Retailing, Sega Sammy Holdings, Pocket Corporation (i.e., the Jet Edge Customers) and Sojitz.  (SUF No. 107.)  As stated below, Schembari changed the actual relationships which he claims Jet Edge interfered with, as well as the nature of the interference.

### ii. Schembari's Discovery Responses and SACC Base His Causes of Action on the Non-Compete Clause in Schembari's Contract.

Throughout written discovery, Schembari only identified the non-compete provision in his contract as the cause of his damages.  (SUF Nos. 108, 111, & 112.) Furthermore, Schembari never mentioned any relationships that were disrupted other than with Sojitz and the Jet Edge Customers.  (SUF No. 107.)

### iii. Schembari Changes His Damages Theory.

Schembari recognized that he could not base damages on losing the relationships with the Jet Edge Customers because he actually took these relationships from Jet Edge and maintained them.  Thus, in his damages expert's report, Schembari abandoned his previous theory of damages and adopted a new theory not disclosed in his SACC or written discovery.  First, his damages expert's

report is clear that the "wrongful" action Schembari believes caused him damage was not a non-compete provision but the fact Jet Edge sued Schembari.  (SUF Nos. 104-105.)   For example, Schembari's damages expert claims that Schembari's damages are based on a three-year delay and one-year cooling off period in the launch of operations of the 'AOC Charter Services' of Phenix Jet Hong Kong.  (SUF Nos. 101 & 104.)

Even more troubling is that Schembari's damages expert's report was the first time Jet Edge learned that Schembari was not suing based on an interference with the relationships Schembari claimed to have with Sojitz and the Jet Edge Customers.  (SUF No. 134.)  Instead, Schembari's claimed damages were based on his status as a shareholder of PJHK, and the alleged interference of claimed relationships between Andrew Svoboda and Sino Jet, Metro Jet, HK Bellawings, and Hongkong Jet. (SUF No. 135-136.)  Importantly, these relationships were not Schembari's relationships.   (SUF No. 103.)   Between filing his SACC and his damages expert's report, Schembari completely changed his damages theory.

### iv.    Jet Edge Never Knew PJHK Existed, Let Alone That PJHK Had the Prospective Clients Claimed by Schembari.

Schembari's damages expert's report, for the first time, informed Jet Edge that his damages were based on PJHK, a small jet charter business that has yet to launch.  (SUF No. 115.)  Unsurprisingly, Jet Edge had never heard of PJHK before June 2018.  (SUF Nos. 119-121.)  Naturally, Jet Edge also did not know that PJHK or Mr. Svoboda had any potential economic relationships with Sino Jet, Metro Jet, HK Bellawings, or Hongkong Jet.  (SUF Nos. 122-127.)  Finally, it is undisputed that Jet Edge never made any statements to these entities regarding Schembari or Phenix Jet.  (SUF Nos. 128-133.)

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FRCP Rule 56(a), a party may move for summary judgment on all or part of a claim or defense.  "If the moving party has sustained its burden, the

1   non-moving party must then identify specific facts, drawn from materials on file,
2   that demonstrate that there is a dispute as to material facts on the elements that the
3   moving party has contested." *Greenwich Ins. Co. v. Media Breakaway, LLC*, 2009
4   WL 2231678 at *4 (C.D. Cal. July 22, 2009).  The non-moving must do more than
5   make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n*,
6   497 U.S. 871, 888 (1990).

7   **IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT THAT**
8   **SCHEMBARI BREACHED SEVERAL TERMS OF HIS**
9   **CONTRACT WITH JET EDGE[2].**

10          "Under California law, to establish a prima facie case for a breach of contract,
11   a plaintiff must show (1) a contract, (2) plaintiff's performance or excuse for
12   nonperformance, (3) defendant's breach, and (4) damage to plaintiff." *Bd. of*
13   *Trustees of Laborers Health & Welfare Tr. Fund for N. California v. CEM Builders,*
14   *Inc.*, 2018 WL 1071171 at *5 (N.D. Cal. Feb. 27, 2018).

15          Schembari breached several provisions of his contract with Jet Edge,
16   including Sections 3, 6.2, 6.4, 7.3, and 7.4.  These breaches are discussed below.

17      **A.   Schembari and Jet Edge Entered into a Valid Employment**
18           **Contract.**

19          On February 14, 2014, Schembari signed an employment contract with Jet
20   Edge to act as the lead pilot on N650PH, beginning on March 3, 2014.  (SUF No.
21   1.)  David Erich signed this contract on behalf of Jet Edge on February 25, 2014.
22   The contract includes consideration from both sides, services provided by
23   Schembari and payment to Schembari by Jet Edge.  (SUF Nos. 2, 3, & 5.)  Thus, a
24   valid contract between Schembari and Jet Edge existed.  Of note, Schembari used a
25   nearly identical employment contract to the one he signed at Jet Edge.

26
27

---

28   [2] Alternatively, in the event there is a disputed fact as to whether Plaintiff suffered damages (which there is not), Plaintiff's seek partial summary judgment on the first three elements of breach of contract as to Sections 3, 6.2, 6.4, 7.4, and 7.4 of Schembari's employment agreement.

Despite using the Jet Edge employment agreement he took from Jet Edge to develop the Phenix Jet employee agreements, Schembari will argue that certain sections of his employment contract are invalid as an improper restraint of trade. Jet Edge vehemently disagrees.  However, even if the Court agrees with Schembari regarding the validity of a section of the contract, the contract as a whole is still valid and enforceable.  First, the contract contains a "Severability Provisions" at Section 12.1  Furthermore, well established caselaw holds that noncompete provisions are severable and do not render an agreement invalid.  In *Zajicek v. Kool Vent Metal Awning Corp. of America*, 283 F.2d 127, 133 (9th Cir. 1960), the Ninth Circuit reasoned that "[i]f the portion of the contract restraining trade can be severed, it is the apparent policy of the California courts to rule that it shall be, and the part not so tainted enforced."

In *Fields v. QSP, Inc.*, 2012 WL 2049528 at *10 (C.D. Cal. June 4, 2012), the court concluded that the existence of an illegal restraint of trade clause does not mean an employment contract is "permeated with illegality."  The court relied on the fact that "the offending provisions are contained in separate subsections within the contract"  in determining that the remainder of the contract was enforceable. *Ibid.*  Just as in *Fields*, any invalid clause in Schembari's contract (which there is none) is quarantined to its own separate clause, and thus does not invalidate the rest of the contract.

**B.    Jet Edge Performed Its Contractual Obligations.**

Jet Edge's obligations under the employment agreement with Schembari were contained in Sections 4 and 5 titled "Compensation" and "Employee Benefits."  (SUF Nos. 3 & 5.)  Jet Edge performed its obligation to pay Schembari at the rate of $220,000 during his employment pursuant to Section 4.1.  (SUF No. 4.)  Jet Edge provided Schembari with the benefits pursuant to Section 5.  (SUF No. 6.)  Thus, Jet Edge performed its obligations under the employment contract.

12

## C.     Schembari Breached Several Provisions of His Employment Contract.

Unlike Jet Edge, Schembari failed to live up to his obligations under his employment agreement with Jet Edge.  Schembari's many breaches of the agreement are set forth below.

### i.     Schembari Breached Section 3: "Exclusivity."

Section 3 of Schembari's contract states:

> "[w]ithout the prior authorization of the Company, Employee shall not, directly or indirectly, during the term of this Agreement: (a) render services to any other person or entity for compensation, or (b) engage in any activity competitive with or adverse to the Company's business, whether alone, as a partner, or as an officer, director, employee, consultant of investor."  (SUF No. 7.)

As to the foregoing, Schembari admitted at deposition he did not work exclusively for Jet Edge.  Indeed, Schembari breached both part (a) and part (b) of Section 3.  In regards to part (a), Schembari breached this provision by entering into a broker agreement on behalf of his wholly owned company CDF wherein he provided services for Sojitz subsidiary TSI including to "[id]entify AOC holding companies, research the suitability of the AOC being held by identified companies, contact authorized representatives of AOC holdings companies . . . ."  (SUF No. 32.)  In return, TSI paid CDF $300,000.  (SUF No. 39.)  Schembari entered into this agreement on February 15, 2016 -- a month before he resigned from Jet Edge.  (SUF No. 30.)  Schembari knew he was breaching his contract as he stated: "Yes, I can sign as I don't believe the details of this agreement will become ***known to anyone outside of our circle***."  (SUF No. 31.)

Schembari performed the services set forth under Section 4.1 of the broker agreement, as he engaged in serious discussions with Bob Seidel about purchasing an AOC in February 2016.  (SUF Nos. 35-38.)  Negotiations progressed to the point where the parties signed an NDA on February 23, 2016.  (SUF No. 35.)  Schembari signed a letter of intent to purchase the AOC on March 15, the day after he resigned

from Jet Edge.  (SUF No. 38.)   Thus, Schembari provided services to TSI for compensation while still employed by Jet Edge in violation of Section 3(a).

As discussed in detail above, Schembari engaged in activity competitive with and adverse to Jet Edge while employed by Jet Edge in violation of Section 3(b). Schembari developed a company to steal the Jet Edge Customers.   The actions Schembari took in competition with Jet Edge while still employed by Jet Edge included, but were not limited to:

- A December 3, 2015 meeting with Rodney Webb to create a business plan for Schembari's new competing venture.  (SUF No. 21.)
- The creation of a detailed business plan for Phenix Jet in February of 2018. (SUF No. 26.)
- The business plan's financial projections show that Phenix Jet's projected revenue was based on the *same airplanes* (as seen by the tail numbers) currently under Jet Edge management showing that Schembari already had a deal in place to steal these jets from Jet Edge.  (SUF Nos. 26-27.)
- Schembari testified that a document, which was incorporated into the business plan, named as customers jets managed by Jet Edge.  (SUF No. 29.)
- Attached to Rodney Webb's February 18, 2016 e-mail were detailed financial projections about these same airplanes currently under Jet Edge management.  (SUF Nos. 25 & 28.)
- On January 18, 2016 Rodney Webb e-mailed Schembari with notes from a January 13, 2016 meeting.  (SUF No. 15.)  These notes show that Schembari had confirmation that the Jet Edge Customers would leave Jet Edge for his new company Phenix Jet.  Bullet point six of the notes states: "Phenix will enter into a business relationship with the Sojitz company based in Japan. The new business will manage 6 jets on behalf of Sojitz."  (Id.)   At her deposition, Elsie Quenga confirmed that those six jets were "*under Jet Edge management . . . at the time*."  (Id.)

14

- A March 10, 2018 e-mail in which Schembari told Bob Seidel, from whom Schembari eventually acquired the AOC, that "[o]ur aircraft are currently under management at another aircraft management company and require 90 days notification for termination of the management contracts." (SUF No. 37.)

- On February 16, 2016, a month before resigning, Schembari entered into a broker agreement on behalf of his wholly owned company CDF wherein he provided services for Sojitz subsidiary TSI including to "[id]entify AOC holding companies, research the suitability of the AOC being held by identified companies, contact authorized representatives of AOC holdings companies ...." (SUF Nos. 30, 32.) CDF was paid $300,000. (SUF No. 39.)

- Schembari, with Sojitz's help, made sure that Jet Edge did not manage a jet with the tail number N2020, and instead that jet ended up under Phenix Jet's management (SUF Nos. 41 & 44.)

Schembari performed all of these competitive acts (and more) while still employed by Jet Edge in violation of Section 3(b) of his employment contract.

Furthermore, Schembari and Sojitz created Phenix Jet to compete with Jet Edge. During and after Schembari's employment with Jet Edge, Phenix Jet directly competed with Jet Edge. For example, the business plan discussed above named Jet Edge as Phenix Jet's competitor. (SUF No. 22.) Also, Schembari admitted that Phenix Jet was "either a similar operator or a regional competitor to Phenix Jet." (SUF No. 18.) Elsie Quenga testified that she considered Jet Edge to be Phenix Jet's competitor in the charter business. (SUF No. 19.)

The most obvious evidence that Phenix Jet was set up to, and did compete with Jet Edge, is the fact that all of the Jet Edge Customers cancelled their ACMAs with Jet Edge and entered into ACMAs with Phenix Jet. (SUF Nos. 82–91.) Thus, Schembari breached Sections 3(a) and 3(b) of his Jet Edge employment agreement.

ii.      **Schembari Breached Section 6.2: "Restrictions" on Confidential Information.**

Section 6.1 of Schembari's employment agreement defines "Confidential Information" to include "client contracts," "forms, policies and procedures," "legal documents," and "training materials." (SUF No. 45.)  Restrictions on the use of confidential information does not violate California law.  "[T]he 'right of free competition does not include the right to use confidential work product of others." *Luck v. OTX Acquisition Corp.*, 2010 WL 11595817 at *12 (C.D. Cal. Aug. 3, 2010) (citation omitted) (holding that allegations that the Luck used confidential information to solicit business from OTX is sufficient to state a claim for unfair competition).  *See also Fowler v. Varian Assocs., Inc.* 196 Cal.App.3d 34, 44 (1987) ("agreements designed to protect an employer's proprietary information do not violate section 16600").

Section 6.2 states that both during and after an employee's employment with Jet Edge, the employee is "not to acquire, disclose, or utilize any Confidential Information for purposes other than those purposes approved by Company during the course and scope of Employee's employment with Company." (SUF No. 46.) Schembari breached Section 6.2 in several ways, including, but not limited to:

- Schembari took Jet Edge's Employee Handbook and utilized it for his company. (SUF No. 50.)  The employee handbook for Phenix Jet is nearly identical to Jet Edge's. (SUF Nos. 50-51.)  Schembari even forgot to remove Jet Edge's name from the Phenix Jet handbook under the Employee Property section on page 45 which states "possession of Jet Edge property . . . ." (SUF No. 51.)  Jet Edge's employee handbook is both a "form, policy, and procedure" and a "legal document." (SUF Nos. 52-53.)  Thus, Schembari's use of Jet Edge's employee handbook to develop Phenix Jet's handbook violated Section 6.2.

- Schembari used his employment contract with Jet Edge to create virtually identical employment contracts for Phenix Jet's employees. (SUF No. 56.) The similarities between Schembari's employment contract with Jet Edge and the contracts employees of Phenix Jet signed are unmistakable, including that the Phenix Jet employment contracts contain the very non-compete clause Defendants claim is invalid. (SUF Nos 54-55.) Jet Edge's employment contracts are "legal documents." (SUF No. 58.) Thus, Schembari's use of Jet Edge's employment contracts to develop Phenix Jet's contracts violated Section 6.2.

- The ACMAs that Phenix Jet entered into with the Jet Edge Customers mirror the ACMAs that Jet Edge entered into with these customers, including the format and language. In fact, Elsie Quenga told Yohei Sakurai that the Phenix Jet "AMA mirrors Jet Edge." (SUF No. 61.) Also, at Schembari's 30(b)(6) deposition, he admitted that "Phenix Jet used Jet Edge's AMA as a form document." (SUF No. 59.) Jet Edge's ACMAs are "client contracts." (SUF No. 63.) Thus, Schembari's use of Jet Edge's ACMAs to develop Phenix Jet's ACMAs violated Section 6.2.

- Mattias Rosen sent Schembari, presumably at Schembari's request, Jet Edge information for Schembari to use at his new company. (SUF No. 64.) Mattias Rosen sent Schembari documents related to Jet Edge's Initial Operation Experience Completion, which relate to Jet Edge's training of pilots. (Id.) Schembari then rebranded these materials under the Phenix Jet name showing that he had no problem copying Jet Edge confidential material to save Phenix Jet money in generating its own documents. (SUF Nos. 65-66.) Jet Edge's Initial Operation Experience documents are "training materials." (SUF No. 68.) Thus, Schembari's use of these documents violated Section 6.2.

Schembari breached Section 6.2 in at least the above four ways.

17

### iii.    Schembari Breached Section 6.4: "Return of Property and Confidential Information."

Section 6.4 states that "[f]ollowing termination or a request to return Confidential Information, Employee will not acquire, use, maintain, copy, or disclose any materials containing Confidential Information." (SUF No. 69.) At deposition, Schembari admitted that he retained his employment agreement and his employee handbook after he resigned from Jet Edge. (SUF No. 47.) Furthermore, as discussed in Section C(ii), Schembari acquired, used, and copied Jet Edge Confidential Information including, but not limited to, Jet Edge's employee handbook, employment contracts, ACMAs, and Initial Operation Experience documents. Schembari used and copied these materials after his employment with Jet Edge ended to help Phenix Jet save resources. Thus, Schembari breached Section 6.4 of his employment agreement.

### iv.    Schembari Breached Section 7.3: "Non-disparagement."

Section 7.3 of Schembari's contract states:

> "Both during and after Employee's employment with Company, Employee will not make any representation of statement, whether written or oral, to any person or entity, including, but not limited to, former, current and potential clients, vendors, business partners, employees, or competitors of Company or any of Company's affiliates, which reflects any opinion, judgment, observation or representation that may defame, disparage, harm, or otherwise reflect negatively on Company or its officers, directors or employees." (SUF No. 70.)

A non-disparagement clause such as Section 7.3 is enforceable. "[N]ondisparagement clauses appear to have become fairly common, both to protect employers and employees when an employment relationship ends. . . . Certainly, we discern nothing inherently unlawful about a party generally agreeing not to disparage another." *Edwards v. Arthur Andersen LLP*, 142 Cal.App.4th 603, 811 (2006). *See also Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at

*40 (C.D. Cal. Mar. 7, 2011) ("CMH cannot argue that it had a free speech right to disparage Bakst in the face of a valid non-disparagement provision in the Settlement Agreement").  As to the foregoing section, Schembari made at least two disparaging remarks regarding Jet Edge to Jet Edge's clients and business partners.  (SUF Nos. 71-72.)   Schembari told Hideto Shimooka, who was the contact for Jet Edge customer Private Wings, as well as Sojitz representative, Yohei Sakurai, that "working with JEI [Jet Edge] ops *is continually challenging* due to time zone differences and their workload with US domestic fleet.  If this is the case you will become *frustrated* in only a short time." (SUF No. 71.)  The next day, Schembari told these same two people that "*[f]lights dispatched by JEI [Jet Edge] never go smoothly* as there are always mistakes, oversights, and lack of communication." (SUF No. 72.)  Schembari knew he was acting improperly as he told the recipients "[p]lease keep my comments between us, as I don't want David to feel like I am undermining him."  (Id.)

Hideto Shimooka was the agent for one of Jet Edge's customers, Pocket Corporation.  (SUF No. 74.)  Schembari's statements are clearly an opinion that disparaged Jet Edge and reflected negatively on Jet Edge.  Schembari also made these disparaging statements to Yoehi Sakurai of Sojitz.  (SUF Nos. 71-72.)  Therefore, Schembari breached Section 7.3 of his employment agreement.

v.   **Schembari Breached Section 7.4: "Prohibition on Planning."**

Section 7.4 states:

"During Employee's employment with Company, Employee will not, either alone or in combination with other employees or agents of the Company, plan or organize any business, entity, organization, or activity competitive with the Company."  (SUF No. 137.)

The Court already ruled in its October 10, 2017 order that Section 7.4 is valid. (*See* pages 13-14 of Dkt. No. 89.)  Case law supports the Court's order.  "[A]n

19

employee, while employed, owes undivided loyalty to his employer." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007). All of the acts that Schembari took, as described in Section C(i), discussed above, are acts he took to compete against Jet Edge. Therefore, these acts constitute a plan to compete with Jet Edge. Not surprisingly, at his 30(b)(6) deposition, Schembari admitted that he planned to set up Phenix Jet to compete with Jet Edge while still employed by Jet Edge.

> Q. Okay. But you did, in fact, plan, while being employed with Jet Edge, setting up Phenix jet, correct?
>
> A. I did plan to set up Phenix Jet International. (SUF No. 14.)

Later Schembari testified:

> A. Okay. And while at Jet Edge, you did plan to have a competitive business with Jet Edge, correct?
>
> Q. And I would say that I prepared to compete.
>
> A. Okay. Same as planning, right?
>
> Q. I don't know if there's a legal difference between the two, but I would say I prepared to plan – or I prepared to compete. (SUF No. 13.)

Putting aside Schembari's semantics, it is clear that Schembari started his plan to develop a competing company with Sojitz at least as far back as November 2015. (SUF No. 11.) At Schembari's April 25, 2018 deposition, he testified that he had a meeting with Sojitz representatives in November 2015 during which he opted to work with Sojitz to create a new company. (SUF No. 12.) In fact, Schembari testified that by the end of November 2015, he had already come up with the name Phenix Jet for his competing business that would eventually steal the Jet Edge Customers. (Id.)

Schembari's interrogatory responses also show that he planned to compete with Jet Edge months before resigning from Jet Edge.

> Interrogatory No. 2 – "Identify the date You first started planning to form a company to compete with Jet Edge.

Response to Interrogatory No. 2 – He "started planning to form a start-up aviation management services company in or around December 2015." (SUF No. 16.)

Schembari also admitted in response to Requests for Admission Numbers 27, 28 and 30 that "during his employment with Jet Edge, Schembari communicated with Sojitz on a future business endeavor that would ultimately involve ACP in some manner." (SUF No. 17.)

Finally, Schembari admitted that his actions were inconsistent with the language of Section 7.4 of his employment agreement:

Q.  Your actions of planning Phenix Jet while you were employed b Jet Edge, and organizing Phenix Jet while were at Jet Edge, would you agree that that is not consistent with the language of 7.4?

A.  I don't know, but I don't believe that it is.

Q.  It is not consistent, correct?

A.  Not consistent.  (SUF No. 138.)

The undisputed facts show that Schembari planned to compete with Jet Edge while employed by Jet Edge (he actually competed as well), thus breaching Section 7.4 of his contract.  Any argument otherwise is without merit.

**D.    Schembari's Breaches Harmed Jet Edge.**

Each of Schembari's several breaches of contract had a similar impact.  Since Schembari, with Sojitz's help, created a business designed to compete with Jet Edge, Schembari offered the Jet Edge Customers an alternative jet management company.  Even worse, Schembari and Sojitz had pre-arranged that these Jet Edge Customers would leave Jet Edge for Phenix Jet before Schembari resigned from Jet Edge.  Schembari not only took the Jet Edge Customers, but also its Confidential Information.   As a result of Schembari's breaches, the Jet Edge Customers terminated their relationships with Jet Edge and signed ACMAs with Phenix Jet. (SUF Nos 82-91.)  Losing these customers has cost Jet Edge millions of dollars in

lost profits as set forth in the expert report of Jeff Kinrich.  (SUF No. 92.)  To its benefit, Phenix Jet signed ACMAs with these former Jet Edge Customers, as well as at least three other Sojitz jets (SUF No 93.)[3]

## V.      The Court Should Dismiss Schembari's SACC.

### A.      Schembari Lacks Standing To Sue.

Schembari is the only counterclaimant in this action.  (SUF No. 99.)  PJHK is not a counterclaimant.  (SUF No. 100.)  However, the damages set forth in Schembari's expert damages report are clearly damages suffered by PJHK. Plaintiff's damages expert based her calculations of damages on the alleged lost profits related to a three-year delay in the launch of operations of the AOC Charter Services business of Phenix Jet Hong Kong, of which Schembari is an 18.75% owner  (SUF No. 101.)

Thus, Schembari tries to collect damages as a result of being a shareholder of PJHK.  (Id.)  He does not have standing to do so. Specifically, in *Hilderman v. Enea TekSci, Inc*., 551 F.Supp.2d 1183, 1191-1192 (S.D. Cal. 2008), plaintiff Hilderman formed the company HighRely.  HighRely had a contract with Boeing and a potential contract with Hospira.  When HighRely lost the Boeing and Hospira accounts, both HighRely and Hilderman sued Enea, Hilderman's former employer, for intentional interference with contractual relations and prospective economic advantage.  *Ibid*.  Plaintiffs based the lawsuit on an allegation that Enea interfered with HighRely's economic relationships by telling them that Hilderman was violating his Severance Agreement with Enea and "was subject to a non-compete agreement."  *Ibid*.

The court granted Enea summary judgment against Hilderman on both interference claims.  *Id*. at 1197.  The court found that the intentional interference "claim belong[ed] to HighRely only."  *Ibid*.  The court held that "Hilderman lacks

---

[3] An additional damage is that Jet Edge paid Schembari his full salary although Schembari was not working exclusively for Jet Edge. (SUF No 4).

MEMORANDUM OF POINTS AND AUTHORITIES

standing to pursue the IPEA claim, which is based on a potential contract between HighRely and Hospira." *Ibid*. (citing *Sutter v. General Petroleum Corp.*, 28 Cal.2d 525, 530 (1946) (reasoning that a stockholder cannot maintain an action on his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock)). Thus, the individual shareholder, Hilderman, could not maintain a lawsuit. Only the company that suffered alleged damages could do so.

Based on *Hilderman* and *Sutter*, Schembari cannot maintain an action as an individual where the company PJHK suffered the alleged harm. Schembari's damages expert concludes it is ***PJHK that allegedly lost money*** due to Jet Edge's supposed conduct. (SUF No. 101.) Indeed, it was not even Schembari's relationships that he claims were allegedly interfered with – they were Andrew Svoboda's. (SUF Nos. 102-103.) The case law holds that Schembari has no standing to bring a lawsuit as merely an 18.75% shareholder of PJHK. Instead, PJHK would need to bring any such lawsuit. For this reason, the Court should grant summary judgment and dismiss Schembari's SACC in its entirety.

**B.    Schembari's SACC Is Barred by the *Noerr-Pennington* Doctrine and California's Litigation Privilege.**

Schembari's damages expert's report makes another thing clear -- Schembari claims Jet Edge's lawsuit caused PJHK's damages. Plaintiff's damages expert claimed the reason for the three-year delay and one-year cooling off period in the launch of operations of the AOC Charter Services business of PJHK was based on this lawsuit, including the fact it is set for trial in January 2019. (SUF Nos. 101 & 104.) Therefore, Schembari's – or more accurately PJHK's – alleged damages are the three years PJHK believes it missed out on profits due to Jet Edge's lawsuit. Schembari confirmed the fact that Jet Edge's lawsuit is the basis for his SACC at deposition.

Q. Okay, Now, you said this complaint disrupted your business.

A. Uh-huh, agreed. (SUF No. 105.)

1    Schembari cannot recover damages based on Jet Edge's lawsuit due to the
2    *Noerr-Pennington* doctrine and the California litigation privilege.  Both doctrines
3    apply to the current case.  "[T]he *Noerr–Pennington* doctrine applies to . . . state
4    law tortious interference with prospective economic advantage claims."  *Theme*
5    *Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).
6    "There is no reason that *Noerr–Pennington* and California privilege law cannot both
7    apply to . . . intentional interference claims, and we hold that the district court
8    properly considered both doctrines."  *Id.* at 1007 (emphasis added).

9    Both doctrines protect a person or entity's First Amendment right to petition.
10   "Under the *Noerr–Pennington* rule of statutory construction, we must construe
11   federal statutes so as to avoid burdening conduct that implicates the protections
12   afforded by the Petition Clause unless the statute clearly provides otherwise."  *Sosa*
13   *v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) (affirming dismissal of lawsuit
14   alleging RICO violations based on pre-suit demand letters).  *See also Theme*
15   *Promotions, Inc.*, 546 F.3d at 1007 (affirming district court's order setting aside
16   jury verdict on interference claim based on pre-suit letters pursuant to the *Noerr-*
17   *Pennington* doctrine); *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F.
18   Supp. 3d 1092, 1114 (C.D. Cal. 2015) (granting motion to dismiss
19   counterclaimants' interference claims based on a pre-suit cease-and-desist letter).

20   Similarly, the litigation privilege provides that any "publication" or
21   "broadcast" made in any "judicial proceeding" is privileged.  *See* Cal. Civ. Code
22   Section 47(b).  "The usual formulation is that the privilege applies to any
23   communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants
24   or other participants authorized by law; (3) to achieve the objects of the litigation;
25   and (4) that ha[s] some connection or logical relation to the action."  *Silberg v.*
26   *Anderson,* 50 Cal. 3d 205, 211–12 (1990).  Therefore, a plaintiff may not maintain
27   a lawsuit based on the litigation activity, such as the filing of a complaint.  *See e.g.,*
28   *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1137 (1990)

1   (affirming demurrer of claims for intentional interference with contractual relations
2   and prospective economic advantage where plaintiff could not allege that defendant
3   had caused damages other than forcing it to defend a costly lawsuit).

4       As set forth above, there is not dispute that Schembari's SACC is based on
5   Jet Edge's decision to bring a lawsuit against him.   Therefore, the Court should
6   grant summary judgment and dismiss Schembari's SACC in its entirety.

7       **C.**   **Schembari's Last Minute Switch In His Theory Of Damages Bars**
8           **Any Recovery.**

9       Throughout this litigation, including in his SACC, Schembari claimed his
10  damages were based on the loss of his relationships with the Jet Edge Customers
11  and Sojitz.   (*e.g.,* SUF No. 106.)   In neither his initial disclosures nor his
12  interrogatory responses did Schembari mention that he had a different damages
13  theory.  (SUF Nos. 108-113.)  While Schembari testified vaguely about PHJK in
14  his May 14, 2018 deposition, Jet Edge did not know Schembari would claim
15  damages based on his interest in PJHK, and interference with Andrew Svoboda's
16  claimed relationships, until Schembari's damages expert's report.  (SUF Nos. 114-
17  117.)  By the time Jet Edge learned of Schembari's monumental shift, discovery
18  had closed, leaving Jet Edge with no time to undermine his new theory in discovery.
19  The Federal Rules of Civil Procedure prevent this type of litigation by surprise.

20      Under the Federal Rules of Civil procedure Rule 37(c)(1), "[i]f a party fails
21  to provide information or identify a witness as required by Rule 26(a) or (e), the
22  party is not allowed to use that information or witness to supply evidence on a
23  motion, at a hearing, or at a trial, unless the failure was substantially justified or is
24  harmless."   Schembari failed to update his initial disclosures and his discovery
25  responses to inform Jet Edge of his new theory.  (SUF Nos. 109, 113.)  Therefore,
26  Schembari cannot raise new evidence to support his claim "at a hearing, or at trial."

27      In *Sutrisno v. WebMD Practice Services, Inc*., 2005 WL 8154571 (C.D. Cal.
28  June 30, 2005), the court granted summary judgment for defendant in an action for

MEMORANDUM OF POINTS AND AUTHORITIES

interference with business relationships because plaintiffs had not disclosed their damages theory in their interrogatory responses or initial disclosures. 2005 WL 8154571 at *10. Plaintiffs attempted to raise a new damages theory that they had spent hundreds of hours of uncompensated time trying to undo the alleged damage caused by defendant's interference. *Id.* at *6. The court did not permit plaintiffs to advance this new undisclosed damages theory.

> "Because they did not include the information in their initial disclosures, omitted it from their interrogatory responses, and failed to serve a supplement to their disclosures until virtually the end of an already extended discovery period, plaintiffs failed to disclose the information "seasonably" or at an "appropriate interval" during discovery." *Id.* at *8.

*See also Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, 2013 WL 3803911, at *10 (E.D. Cal. July 19, 2013) (barring introduction of evidence to support an award because plaintiffs failed to identify the evidence during the course of discovery).

Schembari's actions in this case are worse than in *Sutrisno*. In that case, the plaintiffs did supplement their disclosures, but belatedly. Here, Schembari has never attempted to supplement his initial disclosures or interrogatory responses to include the required information that Schembari's damages stemmed from the alleged lost profits of PJHK. Schembari's discovery responses never mentioned PJHK or its claimed potential clients such as Sino Jet and Metrojet, despite Jet Edge requesting this information in discovery. (SUF Nos. 108-113.)

Since Schembari has embarked on a new damages' theory, he cannot return to his previous damages' theory based on the loss of relationships with the Jet Edge Customers and Sojitz. That ship sailed when Schembari's damages expert's report contained no mention of this previously alleged damage. Thus, the court should grant summary judgment and dismiss the SACC in its entirety.

## D.   The Undisputed Facts Show That Jet Edge's Alleged Action Has Not Caused PJHK Or Schembari Any Harm.

The fifth element of a claim for intentional interference requires "economic

harm to the plaintiff proximately caused by the acts of the defendant." *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521-522 (1996). Schembari has no evidence regarding PJHK's claimed relationships with the potential customers asserted in Schembari's damages expert's report. Schembari also has no evidence these customers failed to enter into relations with PJHK based on any action by Jet Edge.

For the same reason, Schembari's claim under the UCL fails because a UCL claim requires a causal nexus between a defendant's act and a plaintiff's harm. "In order to pursue a UCL claim, the plaintiff must show that the practices that it characterizes as unlawful *causes it to suffer an actual economic injury*." *Demeter v. Taxi Computer Servs., Inc.*, 21 Cal. App. 5th 903, 915 (2018) (affirming summary judgment on UCL claim where plaintiff musician could not establish causation) (emphasis added) (quotation omitted). *See also Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 233 Cal. App. 4th 1321, 1332 (2015) ("When a UCL action is based on an unlawful business practice, there must be a causal connection between the harm suffered and the unlawful business activity." (quotation omitted).

The undisputed facts show that Schembari cannot show causation and the Court should grant summary judgment and dismiss Schembari's SACC.

**E.      Schembari Cannot Maintain His Interference Claims Because the Undisputed Facts Show That Jet Edge Did Not Have Knowledge of PJHK's Claimed Prospective Economic Relationships.**

The undisputed facts show that Schembari has no evidence to support several of the elements necessary to establish a claim for intentional interference with prospective economic advantage. These elements are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

proximately caused by the acts of the defendant." *Westside Center Associates*, 42 Cal. App. 4th 507, 521-522 (1996) (citation omitted).   The tort of negligent interference with prospective business advantage has   many   of   the same elements as an intentional interference with prospective business advantage claim. *UMG Recording, Inc. v. Global Eagle Entertainment, Inc.* 117 F. Supp. 3d 1092, 118 (C.D. Cal. 2015).  Schembari's lack of evidence to support the elements of his intentional interference claim is also fatal to his negligent interference claim.

Here, first and foremost, Schembari has no evidence to establish element number two -- that Jet Edge knew of PJHK's relationship with its claimed potential customers.  Prior to June 2018, Jet Edge, including Bill Papariella, Ed Frank and David Erich, had never heard of PJHK.  (SUF Nos. 119-121.)  Naturally, Jet Edge had no idea that PJHK purportedly had potential economic relationships with Sino Jet, Metro Jet, HK Bellawings, or Hongkong Jet.  (SUF Nos. 122-124.)  Therefore, the undisputed facts show that Jet Edge did not know of PJHK's claimed prospective relationships, the Court should grant summary judgment with respect to Schembari's interference claims.[4]

### F.    The Undisputed Facts Show That Jet Edge Did Not Commit an Independently Wrongful Act.

"[A] plaintiff seeking to recover for interference with prospective economic advantage must also plead and prove that the defendant engaged in an independently wrongful act in disrupting the relationship." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152 (2004).  An act is not "independently wrongful merely because defendant acted with an improper motive . . . . [A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard." *Korea Supply Co.*

---

[4] Since Jet Edge did not know about PJHK's claimed economic relationships, Schembari also cannot establish the third element that Jet Edge acted intentionally to disrupt the relationships or in a manner it should have known would disrupt the relationships.  Thus, Schembari fails to establish this necessary element.

MEMORANDUM OF POINTS AND AUTHORITIES

1   *v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158–59.  *See also* CACI 2202,

2   element 3; and CACI 2204, element 4.

3         Schembari's damages expert's report (and Schembari's own testimony)

4   clearly states that Schembari has sued Jet Edge due to Jet Edge's lawsuit.  (SUF

5   Nos. 101 & 104-105.)  This is not a wrongful act, and thus, there is no

6   "independent" wrongful act that Schembari can point to.  Accordingly, Schembari

7   cannot show that Jet Edge engaged in an independently wrongful act.

8         **G.     Schembari Cannot Show That Jet Edge Engaged in Unlawful,**

9                **Unfair, or Fraudulent Conduct.**

10        To maintain a UCL claim, "a plaintiff must show either an (1) unlawful,

11  unfair, or fraudulent business act or practice, or (2) unfair, deceptive untrue or

12  misleading advertising."  *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1198

13  (N.D. Cal. 2016) (quotation omitted).  Schembari alleged that Jet Edge engaged in

14  unlawful conduct by including a non-compete clause in Schembari's contract.

15  Schembari's damages expert's report and his deposition testimony show that

16  Schembari has abandoned this theory and claims that his injury is due to Jet Edge's

17  lawsuit.  Since Jet Edge's filing of a lawsuit is protected by California's litigation

18  privilege, that activity cannot form the basis of a UCL claim.  *See e.g. Banga v.*

19  *Equifax Info. Servs. LLC*, 2016 WL 741963, at *4 (N.D. Cal. Feb. 25, 2016)

20  (granting summary judgment on UCL claim based on defendant's public filing of a

21  lawsuit, which was conduct protected by California's litigation privilege).

22        In *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993) (en banc), the California

23  Supreme Court affirmed the dismissal of plaintiff's UCL claim based on the

24  defendant law firm's solicitation of park residents to litigate against the park owner

25  over a mobile home park's condition.  The California Supreme Court determined

26  that the law firm's conduct was protected by California's litigation privilege, and

27  thus, the UCL claim could not stand.  *Id.* at 1199–1200.  Since the filing of a lawsuit

28  cannot serve as the basis for a UCL claim, Schembari has no ability to prove that

MEMORANDUM OF POINTS AND AUTHORITIES

Jet Edge engaged in unlawful, unfair, or fraudulent conduct.  Therefore, Jet Edge is entitled to summary judgment on Schembari's UCL claim.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgment finding that Schembari breached his contract with Plaintiff as set forth above, as well as finding that all of Schembari's causes of action should be dismissed as matter of law.


Dated:  August 6, 2018                    **MICHELMAN & ROBINSON, LLP**


                                          By:  */s/ Robert Estrin*
                                          Sanford L. Michelman
                                          Todd H. Stitt
                                          Robert D. Estrin
                                          *Attorneys for*
                                          *WESTERN AIR CHARTER, INC.*
                                          *dba JET EDGE INTERNATIONAL*

MEMORANDUM OF POINTS AND AUTHORITIES