UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-420 JGB (KSx)** | | Date | November 21, 2018 |
|---|---|---|---|---|
| Title | ***Western Air Charter, Inc. v. Paul Schembari, et al.*** | | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) GRANTING in Part Plaintiff's Motion for Summary Judgment; (2) DENYING Defendants' Motion for Summary Judgement; (3) GRANTING Plaintiff's Motions to Seal; (4) GRANTING in Part and DENYING in Part Defendants' Motions to Seal; and (5) ORDERING Defendants to Show Cause in Writing as to Why They Should Not Be Sanctioned**

Before the Court are the parties' cross-motions for summary judgment and motions to seal.  On November 19, 2018, the Court held a hearing on these motions.  After considering oral argument and papers submitted in support of, and in opposition to, the motions, the Court GRANTS in part Plaintiff's motion for summary judgment as to its claims for breach of Sections 3, 6.2, 6.4, and 7.4 of the Employment Agreement.  The Court DENIES Plaintiff's motion for summary judgment as to breach of Section 7.3 of the Employment Agreement and as to damages resulting from breaches of the Employment Agreement.  The Court DENIES Defendants' motion for summary judgment as to Plaintiff's claims for breach of section 7.2 and 7.4 of the Employment Agreement.  The Court DENIES Defendants' motion for summary judgment as to Plaintiff's requests for injunctive and declaratory relief.

The Court GRANTS Plaintiff's motion for summary judgment as to all of Defendants' counterclaims and DENIES Defendants' motion for summary judgment as to their first counterclaim.

The Court GRANTS Plaintiff's motion to seal Documents 1-22 as summarized in the parties' Joint Document.  (Dkt. No. 230.)  The Court GRANTS Defendants' motion to seal Document 23. The Court DENIES Defendants' motion to seal documents 24-27.

Finally, as explained in Section V(C), the Court ORDERS Defendants to show cause in writing as to why the Court should not issue sanctions for (1) improper designation of documents as confidential; (2) presentation of frivolous arguments to the Court; and (3) failure to comply with the Court's November 7, 2018 Order.

## I.  BACKGROUND

On December 20, 2016, Plaintiff Jet Edge filed a complaint against Paul Schembari and ACP Jet Charters, Inc. d/b/a Phenix Jet in the Superior Court for Los Angeles County.  (Dkt. No. 1-2.)  Defendants removed the action on January 18, 2017.  (Dkt. No. 1.)  On March 2, 2017, Plaintiff filed a first amended complaint.  ("FAC," Dkt. No. 26.)  On March 30, 2017, Defendants answered the FAC and filed a first amended counterclaim against Plaintiff.  (Dkt. No. 46.)  Defendants also moved to partially dismiss the FAC on March 30, 2017.  (Dkt. No. 44.)  Plaintiff then moved to dismiss Defendants' first amended counterclaim on April 20, 2017.  (Dkt. No. 51.)  On October 6, 2017, Judge Birotte granted in part and denied in part Defendants' partial motion to dismiss and granted Plaintiff's motion to dismiss Defendants' first amended counterclaim.  (Dkt. No. 89)  Plaintiff moved for reconsideration of Judge Birotte's order on July 9, 2018, which this Court granted in part on August 3, 2018.  Dkt. No. 166.

On August 6, 2018, Defendants and Plaintiff filed cross-motions for summary judgment on the complaint and counterclaims ("DMSJ," Dkt. No. 167; "PMSJ," Dkt. No. 170.)

Defendants seek summary judgment in their favor as to Plaintiff's first cause of action for breach of contract, ninth cause of action for declaratory relief, and tenth cause of action for injunctive relief.  They also seek summary judgment in their favor as to their counter-claim for violation of California's unfair competition law.  In support of the DMSJ, Defendants submitted the following documents:

- Statement of undisputed facts ("DMSJ SUF," Dkt. No. 167-2);
- Declaration of Paul Schembari and accompanying exhibits 33, AA-AF and AH (Dkt. No. 167-3);
- Declaration of Dan Terzian and accompanying exhibits 38-39, 51, 71, AH and AJ (Dkt. Nos. 167-4, 167-5).

Plaintiff opposed the DMSJ on August 20, 2018.  ("DMSJ Opp.," Dkt. No. 196.)  In support of its opposition, Plaintiff submitted the following documents:

- Statement of genuine disputes of material fact and additional material facts ("DMSJ SDMF," Dkt. No. 197);
- Objections to Defendants' evidence submitted in support of DMSJ (Dkt. No. 198);

- Declaration of William Papariella (Dkt. No. 199);
- Declaration of Robert Estrin and accompanying exhibits 1-79 (Dkt. No. 200).

Defendants replied on August 27, 2018. ("DMSJ Reply," Dkt. No. 206.) In support of their reply, Defendants submitted:

- Response to Plaintiff's DMSJ SDMF ("DMSJ SDMF Reply," Dkt. No. 207);
- Evidentiary objections to Plaintiff's DMSJ SDMF (Dkt. No. 208).

Plaintiff seeks summary judgment as to their first cause of action for breach of contract, or, in the alternative, for summary judgment that Plaintiff has established all elements of a breach of contract claim with the exception of damages. Plaintiff argues that Defendant Paul Schembari breached sections 3, 6.2, 6.4, 7.3, and 7.4 of his employment agreement. Plaintiff also seeks dismissal of Defendant Schembari's counterclaim for unfair competition. In support of the PMSJ, Plaintiff has submitted the following documents:

- Statement of undisputed facts ("PMSJ SUF," Dkt. No. 170-1);
- Declaration of Jess S. Krompier with accompanying exhibits 1-91 (Dkt. No. 171);
- Declaration of Matt Winer with accompanying exhibits 1-5 (Dkt. No 172);
- Declaration of Robert Estrin and accompanying exhibits 1-3 (Dkt. No. 173);
- Declaration of William Papariella (Dkt. No. 174);
- Declaration of Ed Frank (Dkt. No. 175).

Defendants opposed the PMSJ on August 20, 2018. ("PMSJ Opp.," Dkt. No. 190.) In support of their reply, Defendants submitted the following documents:

- Request for judicial notice and accompanying exhibits B, DG-DK (Dkt. No. 191);
- Statement of genuine disputes of material fact and additional material facts ("PMSJ SDMF," Dkt. No. 193-2);
- Exhibit DB (Dkt. No. 193-3);
- Exhibits CA-CC of Declaration of Andrew Svoboda (Dkt. No. 193-4);
- Declaration of Jonathan Ross (Dkt. No. 193-5);
- Declaration of Andrew Svoboda (Dkt. No. 193-6).

Plaintiff replied on August 27, 2018. ("PMSJ Reply," Dkt. No. 209.) In support of its reply, Plaintiff submitted:

- Declaration of Robert Estrin and accompanying exhibits 93-94 (Dkt. No. 210);
- Response to Defendants' PMSJ SDMF ("PMSJ SDMF Reply," Dkt. No. 211);
- Objections to Defendants' evidences (Dkt. No. 212).

The parties also submitted a flurry of motions to seal briefing and evidence related to their cross-motions for summary judgment. On November 7, 2018, the Court directed the parties to

meet and confer and file a joint document summarizing their motions to seal.  (Dkt. No. 226.)
On November 14, 2018, the parties filed a joint document regarding motions to seal.  ("Joint
Document," Dkt. No. 230.)  The parties' motions to seal are addressed in Section V of this
Order.

## II.   FACTS

### A.  Undisputed Facts

Except where noted, the following material facts are sufficiently supported by admissible
evidence and are uncontroverted.  They are "admitted to exist without controversy" for
purposes of the Motion.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1.  Paul Schembari's Pre-Jet Edge Employment

In 2010, Paul Schembari was hired as a pilot for Aviation Concepts, Inc. ("ACI").
(DMSJ SUF ¶¶ 20, 21.)  Schembari later worked for Jet Edge International ("Jet Edge" or
"JEI") between March 3, 2013 and March 14, 2016.  (PMSJ SDMF ¶¶ 1, 8.)

Sojitz Corporation ("Sojitz"), based in Japan, is a large corporation which currently owns
75% of the shares of Phenix Jet, making it the controlling shareholder of Phenix Jet.  (DMSJ
SDMF ¶ 135.)  (Id. ¶ 136.)  Sojitz also owns 24.9% of the aviation company ACP Jet.  (DMSJ
SUF ¶ 139.)  Cosa Di Famiglia is a company owned by Paul Shembari,[1] which own 25% of Phenix
Jet and 75.1% of ACP Jet.[2]  (DMSJ SUF ¶¶ 136, 140.)  Yohei Sakurai was a manager of Sojitz's
Aviation Division and owner of Chief Operating Officer of ACP Jet when he was "seconded" to
ACI from 2008 to 2013, during which time he held the title of Vice President of Charter Sales
and Vice President of Sales and Marketing.  (DMSJ SDMF ¶¶ 26, 27.)  This meant that, during
this period, Sakurai worked for both ACI and Sojitz.  (Id. ¶ 28.)  Sakurai and Schembari met
during the period that they were both employed by ACI.  (Id. ¶ 29.)[3]  Sakurai eventually left ACI,
in part because business relationships between ACI and Sojitz soured.  (DMSJ SDMF ¶ 40.)  In
mid- to late-2013, Schembari and Sakurai discussed going into business together outside ACI.
(DMSJ SUF ¶ 43.)  The prospective business venture they discussed would involve flight
operations, would have involved Sojitz, and would have involved aircraft owners and charter
customers.  (Id. ¶¶ 43-46.)

---

[1] It remains in dispute whether Schembari owns 100% or 25% of Cosa Di Famiglia.  (DMSJ
SDMF ¶ 137).)

[2] Plaintiff does not meaningfully dispute the ownership of Phenix Jet, citing only to
seemingly irrelevant facts related to the migration of customers to Phenix Jet.  (DMSJ SDMF ¶¶
135, 136.)

[3] Whether, Sakurai and Schembari "worked together" and the extent of their personal
and business relationship is disputed.  (DMSJ SDMF ¶¶ 30, 33.)

### 2. Relationship between Jet Edge and Sojitz

Bill Papariella is the CEO of Jet Edge. He first learned of the existence of Sojitz in early-2013 after being contacted by them through the law firm Hogan Lovells.[4] (DMSJ SUF ¶¶ 48-50.) At some point in 2013, Papariella and Jet Edge employees David Erich and Geoff Makely attended a meeting with Sojitz representatives. (Id. ¶ 52.) While the precise subject of the meeting is disputed, it appears that both parties discussed the possibility of the creation of "Jet Edge Asia," which would be an aircraft management company. (DMSJ SDMF ¶ 56.) At this meeting, it was not discussed which specific clients or aircraft Sojitz could offer Jet Edge. (Id.) At the time of this meeting, no one at Jet Edge had a relationship with SAM Cayman, Sega Sammy Holdings, Fast Retailing, or Pocket Corporation. (Id. ¶ 61.) Sojitz's relationship with these companies predated Jet Edge's relationships with them, (DMSJ SUF ¶ 57), and Sojitz introduced these companies to Jet Edge. (Id. ¶¶ 58)[5] After the meeting between their representatives, Jet Edge and Sojitz entered into a memorandum of understanding for a possible business relationship, and Sojitz referred certain clients to Jet Edge. (DMSJ SUF ¶¶ 87, 88.) At least three of the clients that Sojitz referred to Jet Edge were previously managed by ACI. (Id. ¶

---

[4] There is substantial dispute over Sojitz's motivations for initiating contact with Jet Edge. While Defendants state, in sum and substance, that Sojitz contacted Jet Edge with the goal of Jet Edge becoming a management company for aircraft owners and airplanes represented by Sojitz, Plaintiff claims that Sojitz was planning on collaborating with Schembari to "steal Jet Edge's customers from the start…" (DMSJ SDMF ¶ 51.) Plaintiff also disputes whether Sojitz in fact represented any aircraft owners or clients, pointing to evidence that other companies Fast Retailing, SAM Cayman, and Pocket Corporations represented those clients. (DMSJ SDMF ¶ 52.)

[5] It is disputed whether Sojitz maintained a relationship with these companies while they were customers of Jet Edge, and in particular whether these companies were in fact 'clients' or 'customers' of Sojitz throughout this period. (DMSJ SDMF ¶ 59.) Defendants have not pointed to evidence of such a relationship. (DMSJ SDMF ¶ 89.) While Defendants claim that Sojitz "brought aircraft owned by Sojitz's customers to Jet Edge and then brought those same aircraft to Phenix Jet," this assertion is disputed by Plaintiff, who states that there is no evidence that the aircraft owners were Sojitz's customers. (DMSJ SDMF ¶ 100.) Plaintiff also states that each of Jet Edge's aircraft management agreements were between the owners of the aircraft and Jet Edge, and that Sojitz was not a party to any of these agreements. (Id.) The Court agrees, as it is unable to find any evidence that Sojitz had a contractual relationship with these aircraft owners contemporaneous to Jet Edge's contractual relationship with them.

Defendants have certainly provided no assistance to the Court in locating relevant documents, if they exist, either here or in other portions of their briefing and appendices. In violation of the Court's Standing Order 9(b), Defendants have not submitted their voluminous exhibits in a binder, with an index and with each item of evidence separated by a tab divider. (Dkt. No. 143.) Additionally, Defendants have failed to "tab exhibits in sequential order" and to number their documents consecutively at the bottom of each page, in violation of Local Rules 11-5.2 and 11-5.3.

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG

92.)  Ultimately, Jet Edge and Sojitz did not enter into a formal business relationship.  (DMSJ SDMF ¶ 112.)

### 3.  Contractual Dispute

In October 2013, a Sojitz representative introduced Papariella, Erich, and Makely to Schembari.  (DMSJ SUF ¶ 102.)  At some point, a representative of Sojitz asked Schembari to join Jet Edge.  (Id. ¶ 105.)  On February 25, 2014, Jet Edge entered into an employment agreement ("Employment Agreement") with Schembari which became effective on March 3, 2014.  (PMSJ SDMF ¶ 1.)  Section 1 of the Employment Agreement provides, in part, the services that Schembari would provide Jet Edge.  (PMSJ SUF ¶ 2.)  Under the Employment Agreement, Jet Edge agreed to pay Schembari $220,000 annually, plus benefits, during his employment there.  (Id. ¶¶ 3-6.)  Schembari was continuously employed by Jet Edge as an at-will employee from March 3, 2014 until March 14, 2016, when he resigned.  (Id. ¶ 8; DMSJ SUF ¶ 221.)  He was initially hired as a "Lead Pilot" and eventually held the position of Assistant Director of Operations.  (DMSJ SUF ¶¶ 94, 95, 215.)  Jet Edge paid Schembari at the agreed upon rate of $220,000 annually during his employment there and provided him with the benefits set forth in Section 5 of the Employment Agreement.  (PMSJ ¶¶ 4-6.)

### a.  Employment Agreement Sections 3 and 7.4: Exclusivity and Prohibition on Planning

Section 3 of the Employment Agreement provides, in part, that "Without the prior authorization of the Company, Employee shall not, directly or indirectly, during the term of this Agreement: (a) render services to any other person or entity for compensation, or (b) engage in any activity competitive with or adverse to the Company's business, whether alone, as a partner, or as an officer, director, employee, consultant or investor."  (PMSJ SUF ¶ 7.)  Section 7.4 of the Employment Agreement provides, in part, "During Employees employment with Company, Employee will not, either alone or in combination with other employees or agents of the company, plan or organize any business, entity, organization, or activity competitive with the Company."  (PMSJ SUF ¶ 137.)

While employed by Jet Edge, Schembari prepared to form Phenix Jet, a company which would compete with Jet Edge.  (Id. ¶¶ 13, 14.)  Schembari first started planning to form an aviation management services company in or around December 2015.  (PMSJ SUF ¶ 16.)  While Schembari was employed by Jet Edge, Sojitz representatives consulted with him in an advisory capacity regarding future investments.  (DMSJ SDMF ¶ 111.)  In 2015, Sakurai and Hideto Shimooka, representatives of Sojitz, approached Schembari about forming the company that would become Phenix Jet, resulting in Schembari taking first steps to form that company.  (PMSJ SUF ¶ 10; DMSJ SUF ¶ 9; DMSJ SUF ¶ 126.)  The name "Phenix Jet" itself first surfaced as the potential name for this business endeavor between November 23, 2015 and November 30, 2015.  (PMSJ SUF ¶ 12.)  During his employment with Jet Edge, Schembari maintained communication with Sojitz regarding the Phenix Jet endeavor, which was expected to ultimately involve the company ACP Jet.  (PMSJ SUF ¶ 17.)  )  Individuals who participated in the creation

of the Phenix Jet business plan included Schembari, Sakurai, Elsie Quenga, Rodney Webb, and representatives of the Sojitz corporation. (DMSJ SDMF ¶ 127.) Rodney Webb was brought in to draft a business plan for Phenix Jet. (DMSJ SDMF ¶ 130.)

Throughout the time that Schembari was preparing to create Phenix Jet, he viewed it as at least a potential a regional competitor with Jet Edge and as offering similar services. (PMSJ SUF ¶ 18.)[6] Other individuals involved in the Phenix Jet venture, including Quenga, also considered Jet Edge to be a competitor to Phenix Jet. (PMSJ SUF ¶ 19.) On January 18, 2016, Webb emailed Schembari and Quenga notes from a January 13, 2016 meeting which stated in part that "Phenix will enter into a business relationship with the Sojitz company based in Japan. The new business will manage 6 jets on behalf of Sojitz." (Id. ¶ 15.) Quenga later confirmed that those six jets were under the management of Jet Edge at the time of the meeting. (Id.) The February 18, 2016 business plan for Phenix Jet lists the tail numbers of jets under management by Jet Edge at the time and included expected revenue from these planes in its projected revenue. (Id. ¶¶ 28, 29.)

On February 15, 2016 Schembari signed a broker agreement with Sojitz' subsidiary, Tropical Sky Investments ("TSI"), on behalf of Phenix. (PMSJ SUF ¶ 30; DMSJ SUF ¶ 128.)[7]

---

[6] Defendants argue that this is disputed. However, in his April 25, 2018 deposition, Schembari testified that, on December 5, 2015, he sent an email to Rodney Webb, a business consultant based in Guam, in which he included a list of the websites of "similar operators and regional competitors." (Krompier Decl. Exh. 2 at 215:21-24.) That list included the website of Schembari's employer Jet Edge, which Schembari agreed was "either a similar operator or a regional competitor to Phenix Jet." (Id. at 217:3-5.) Schembari also stated that in 2015 he believed that there was the "potential" that Phenix Jet was a competitor to Jet Edge. (Terzian Decl. Exh. D at 352.) This is further confirmed by a January 18, 2016 email containing the contemporaneous notes of a meeting between Schembari, Rodney Webb, and Elsie Quenga, which listed Jet Edge (Hong Kong) as a competitor of Phenix Jet in Asia, (PMSJ SUF ¶ 20), and a February 19, 2016 business plan for Phenix Jet, which lists Jet Edge as a "key competitor" in Asia. (Id. ¶ 22.)

[7] The Court notes that, while Plaintiff put forth this fact as undisputed in its own Statement of Undisputed Facts, it nevertheless disputed a nearly identical fact put forth as undisputed in Defendants' Statement of Undisputed Facts. Plaintiff argued that "the evidence does not support" the fact that "Paul Schembari entered a brokerage agreement with Sojitz for studying the possibility of purchasing a business entity that holds an air carrier certificate." (DMSJ SDMF ¶ 128.) Plaintiff's statement of disputes of material facts then continued on to make arguments which could not be understood to place this straightforward fact in dispute and which clearly belong in their memorandum of law. (Id.) This is far from the only instance in which Plaintiff improperly used its statement of disputes of material fact to advance arguments which properly belong in their memorandum of law. (See, e.g., DMSJ SDMF ¶¶ 22, 50, 56, 110, 131.) The result of this improper practice is a prolix and repetitive document well over 200 pages long. This conduct violates the Court's Standing Order, which states that the parties should

---

**CIVIL MINUTES—GENERAL**

On February 18, 2016, Schembari wrote an email to Sakurai stating that he was able to sign the broker agreement because he did not "believe the details of this agreement will become known to anyone outside of our circle." (PMSJ SUF ¶ 31; DMSJ SUF ¶¶ 3, 4.) Under the terms of the broker agreement, Schembari agreed to, inter alia, identify companies holding airline operator's certificates ("AOC") and contact their authorized representatives. (Id. ¶ 32.) In February and March 2016, Schembari corresponded and met with Bob Seidel, of JetFlite International, LLC, regarding the purchase of ACP Jet Charters, which was holder of an AOC. (Id. ¶¶ 35-37.) On March 10, 2016, Schembari informed Seidel that the aircraft he planned to bring to his new company were at the time under management by another company. (Id. ¶ 40.) Though at the time Schembari did not disclose which company this was, Seidel later learned that the company was Jet Edge. (Id.) On March 15, 2016, Phenix entered into a letter of intent with JetFlite International, LLC, to acquire ACP. (Id. ¶ 38.) Schembari received $300,000 after the closing of the ACP purchase under the terms of his brokerage agreement. (PMSJ SDMF ¶¶ D1, D2.) This payment was not made until after the termination of Schembari's employment with Jet Edge. (PMSJ SUF ¶ 39.)

On January 26, 2016, Schembari emailed Sakurai regarding the management agreement for the aircraft with the tail number N2020Q, asking whether it had been decided to assign management of that jet to Jet Edge. (PMSJ SUF ¶ 41.) Schembari followed up on the status of the N2020Q management agreement on February 29, 2016, noting that he was planning on notifying Jet Edge of his decision to leave imminently. (Id. ¶ 42.) Schembari did not decide to resign from Jet Edge until he was assured that the aircraft management agreement for N2020 would be signed with ACP. (Id. ¶ 43.) ACP had N2020Q under its management in 2017. (Id. ¶ 44.)

### b. Employment Agreement Sections 6.1, 6.2, and 6.4: Restrictions on Confidential Information and Return of Property and Confidential information

Section 6.1 of the Employment Agreement defines Confidential Information. (PMSJ SUF ¶ 45.) Section 6.1 defines Confidential Information "broadly" to include "all information that has or could have commercial value or other utility in the business of the company, its clients, and all others with whom it does business," including "client contracts," "forms, policies and procedures," "legal documents," and "training materials." (Employment Agreement ¶ 6.1.) It does not include information known to the public prior to its disclosure to the employee or information that becomes generally known to the public subsequent to disclosure to the employee through no wrongful act of the employee or his representative. (Id.) Section 6.2 of the Employment Agreement provides, in part, that both during and after employment with Jet Edge, an employee is "not to acquire, disclose, or utilize any Confidential Information for

---

"briefly explain[] the dispute" and that "neither legal arguments nor conclusions constitute facts." (Dkt. No. 143 at 7.) It also violates Local Rule 11-7, which states that "Appendices shall not include any matters which properly belong in the body of the memorandum of points and authorities or pre-trial or post-trial brief."

purposes other than those purposes approved by [Jet Edge] during the course and scope of Employees employment with [Jet Edge]." (Id. ¶ 6.2.) Section 6.4 of the Employment Agreement provides, in part, "Following termination or a request to return Confidential Information, Employee will not acquire, use, maintain, copy, or disclose any materials containing Confidential Information." (PMSJ SUF ¶ 69.)

At his May 16, 2018 deposition, Schembari testified that, after leaving Jet Edge in March 2016, he retained his employment agreement and his employee handbook. (PMSJ SUF ¶ 47.) The Jet Edge employee handbook includes the forms, policies, and procedures of Jet Edge as to its employees. (Id. ¶ 52.) Schembari later shared information in the Jet Edge employee handbook in the process of drafting the Phenix Jet employee handbook. (Id. ¶ 48.) Schembari shared the handbook with Quenga, who used it as a template to draft the Phenix employee handbook. (Id. ¶¶ 49, 50.) Portions of the Phenix Jet employee handbook appears to contain passages which were copied, verbatim, from the Jet Edge employee handbook, including Section 7.1, "Restrictions on Competition." (Id. ¶¶ 51, 54, 55.)

Phenix Jet used a number of other Jet Edge documents to create its own documents. This includes the Jet Edge employment contract, which Phenix Jet used to create the Phenix jet employment contract.[8] (PMSJ SUF ¶ 56.) This also includes the Jet Edge Aircraft Management Agreement ("AMA"), which Phenix Jet used as a form documents, which it shared with Sojitz, as well as to create its own AMAs. (Id. ¶¶ 59-63.) While portions of Jet Edge's AMAs are filed with the FAA and are public records, it is undisputed that the "schedule" portions of the AMAs, which contain key terms of the agreements, including pricing, are not filed with the FAA and are not public records. (DMSJ SDMF ¶ 185.)

Phenix Jet also used Jet Edge's documents related to "initial operating experience" ("IOE") to create its own such documents. (PMSJ SUF ¶¶ 63-68.) IOE documents are training materials which set forth the procedures by which Jet Edge pilots must learn how to operate the Jet Edge fleet. (Id. ¶¶ 67, 68.) Jet Edge invested significant resources in creating its own IOE document. (DMSJ SDMF ¶ 154.) Phenix Jet employees, under Schembari's direction, simply rebranded the Jet Edge IOE documents under the Phenix Jet brand and used them for Phenix Jet's purposes. (Id. ¶ 64-68.) On August 11, 2016, Schembari emailed Elliot and Quenga stating in part "please convert the attachments to PJI branding. I need these documents ASAP." (Id. ¶ 65.) On August 12, 2016, Elliot emailed Schembari and Quenga, attaching the Jet Edge Initial Operating Experience documents rebranded as Phenix Jet documents. (Id. ¶ 66.)

### c. Employment Agreement Section 7.3: Non-Disparagement

Section 7.3 of the Employment Agreement provides, in part,

---

[8] The parties dispute whether Schembari or Quenga drafted the Phenix Jet employment agreement. (PMSJ SDMF ¶ 56.)

> Both during and after Employee's employment with Company, Employee will not make any representation of [sic] statement, whether written or oral, to any person or entity, including, but not limited to, former, current and potential clients, vendors, business partners, employees, or competitors of Company or any of Company's affiliates, which reflects any opinion, judgment, observation or representation that may defame, disparage, harm, or otherwise reflect negatively on Company or its officers, directors or employees.

(PMSJ SUF ¶ 70.)  On January 28, 2015, Schembari sent Sakurai and Shimooka a message from his personal email account that "working with [Jet Edge] ops is continually challenging due to time zone difference and their workload with US domestic fleet.  If this is the case you will become frustrated in only a short time."  (Id. ¶ 71.)  The following day, Schembari sent them another email stating "[f]lights dispatched by [Jet Edge] never go smoothly s there are always mistakes, oversights, and lack of communication…please keep my comments between us, as I don't want David to feel like I am undermining him." (Id. ¶ 72.)

### d.  Employment Agreement Sections 7.1,  7.2, and 12.1: Restrictions on Competition and Severability

Section 7.1 of the Employment Agreement provides, in part, that "Employee ... agrees not to take, promote, further or cause action that is designed to or has the effect of interfering with the Company's client, contractual, business, vender, third party, and/or employment relationships."  (DMSJ SUF ¶ 200.)  It also provides that the employee will not "during or at any time after Employee's employment, without the prior written consent of the Company, solicit any of the past, current, or prospective clients or business partners of Company," (Id. ¶ 201), and that "Employee will never use Confidential Information to compete with the Company."  (Id. ¶ 202.)  The full contents of Section 7.1 are not disputed by the parties.

Section 7.2 of the Employment Agreement provides, inter alia, that the employee "will not induce, solicit, recruit, or encourage any person employed by Company to end their employment relationship with Company" for one year after the termination of the employee's employment.  (DMSJ SUF ¶ 212.)

Section 12.1 of the Employment Agreement provides that "the provisions, sections, and/or subsections of this Agreement are separate and distinct, and if any provisions, sections, and/or subsections are determined to be unenforceable, in whole or in part, the remaining provisions, sections, and/or subsections and the enforceable parts of any partially unenforceable provisions sections and/or subsections shall nevertheless be enforceable."  (DMSJ SDMF ¶ 5.)

### 4.  Damages

In 2013, Jet Edge entered into Aircraft Charter Management Agreements with: Sam Cayman, Inc.; Fast Retailing Co., Ltd.; Sega Sammy Holdings, Inc.; Pocket Corporation; and

---

Hideyuki Busujima. (PMSJ SUF ¶ 81.) Pocket Corporation sent a termination letter to Jet Edge on March 23, 2016 and entered into a contract with Phenix Jet on June 20, 2016. (Id. ¶¶ 82, 83.) Sam Cayman, Inc. sent a termination letter to Jet Edge on October 20, 2016 and entered into a contract with Phenix Jet on December 16, 2016. (Id. ¶¶ 84, 85.) Fast Retailing sent a termination letter to Jet Edge on October 21, 2016 and entered into a contract with Phenix Jet on July 21, 2016. (PMSJ SUF ¶¶ 86, 87.) Sega Sammy Holdings, Inc. sent a termination latter to Jet Edge on October 21, 2016 and entered into a contract with Phenix Jet on December 21, 2016. (Id. ¶¶ 88, 89.) Hideyuki Busujima sent a termination letter to Jet Edge on December 21, 2016 and entered into a contact with Phenix Jet in or around late 2016 or early 2017.[9] (Id. ¶¶ 91, 92.) 90-day termination provisions are standard terms of aircraft management agreements and were included in the agreements between Jet Edge and these companies. (PMSJ SDMF ¶ D21; PMSJ SUF ¶ 37; Erich Decl., Dkt. No. 178-1, Exhs. 5, 6, 7, 8; Krompier Decl., Dkt. No. 178-6, Exh. 33.) The 90-day provision included in these contracts required that 90 days' notice be given prior to the termination of the agreements without cause. (Erich Decl., Dkt. No. 178-1, Exhs. 5, 6, 7, 8; Krompier Decl., Dkt. No. 178-6, Exh. 33.)

The addition of former Jet Edge customers to Phenix Jet's fleet has benefitted Phenix Jet monetarily. (PMSJ SUF ¶ 93.) This extent to which the loss of the business of Pocket Corporation, Sam Cayman, Inc., Fast Retailing, Sega Sammy Holdings, Inc., and Hideyuki Busujima harmed Jet Edge monetarily is disputed. (PMSJ SDMF ¶ 92.)

### 5. Jet Edge's Knowledge of Phenix Jet Hong Kong's Prospective Economic Relationships

Schembari's calculation of damages arising from his counterclaim are based on damages to Phenix Jet Hong Kong ("PJHK"), an entity of which Schembari is an 18.75% owner. (PMSJ SUF ¶ 101.) Schembari's claimed damages are based on alleged lost profits related to the three-year delay in the launch of operations of the AOC Charter Services business of PJHK. (Id.) Defendants claim that companies Sino Jet, Metro Jet, HK Bellawings, and Hongkong Jet would not continue their relationship with Andrew Svoboda, president and CEO of PJHK, due to the alleged wrongful conduct of Jet Edge. (Id. ¶ 118.) Prior to June 2018, neither Bill Papariella, Jet Edge CEO, Ed Frank, Jet Edge corporate officer, nor David Erich, former COO of Jet Edge, had heard of PJHK. (Id. ¶¶ 118-121.) Nor did Papariella, Frank, or Erich know of potential economic relationships between PJHK or Andrew Svoboda and Sino Jet, Metro Jet, HK Bellawings, or Hongkong Jet. (Id. ¶¶ 122-127.) Papariella never made statements to Metro Jet, HK Bellawings, or Hongkong jet regarding Schembari, ACP Jet Charters, Inc., Phenix jet, PJHK, or Andrew Svoboda. (Id. ¶ 128.)[10] Neither Erich nor Frank made statements to Sino Jet Metro jet, HK

---

[9] Defendant argues that Pocket Corporation, Sam Cayman, Fast Retailing, Sega Sammy Holdings, Inc., and Hideyuki Busujimm entered into a contract with ACP Jet, not Phenix Jet. (PMSJ SDMF ¶¶ 83, 85, 87, 89, 91.)

[10] Defendants dispute whether Papariella made such a statement to Sino Jet, on the basis that Papariella stated, during his April 27, 2018 deposition, that he spoke with Jenny Lau, whom

Bellawings, or Hongkong jet regarding Schambari, ACP Jet Charters, Inc., Phenix jet, PJHK, or Andrew Svoboda.  (Id. ¶¶ 130, 132.)

## B. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).  See Fed. R. Civ. Proc. 56(e).  At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001).  In reaching its decision, the Court relies only on facts enumerated in the above section.  Any objections to other evidence submitted but not relied upon by the Court are not addressed.  See Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted"); Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) (A district court must rule on "evidentiary objections that are material to its ruling") (emphasis added).  Because the Court does not rely on disputed facts in reaching its decision on this Motion, it does not consider evidentiary objections raised about those facts.

Both parties have objected to numerous exhibits on the grounds that they are irrelevant, speculative, prejudicial, or misstates the evidence.  These objections are "duplicative of the summary judgment standard itself," at which the court considers whether any material facts remain in dispute.  Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Thus, the Court need not consider such objections and OVERRULES objections on these grounds.  Moreover, purported facts which are speculative, irrelevant, prejudicial, or which misstate evidence are not material and are thus "redundant" and unnecessary to consider here. Id.; see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")

### 1. Plaintiff's Objections

Plaintiff objects to DMSJ SUF ¶ 28, which states that while seconded with ACI, Sakurai worked for both ACI and Sojitz, on the grounds that it is an improper opinion under Federal Rule of Evidence 701 and that it is conclusory.  (Dkt. No. 198 ¶ 28.)  Upon review of Sakurai's deposition, the Court finds that this represents a clear and fair statement of the nature of Sakurai's work arrangement while "seconded" at ACI and is based on Sakurai's own direct knowledge.  This objection is OVERRULED.

---

he understood to be the owner of Sino Jet, about Schembari.  (PMSJ SDMF ¶ 128.)  Defendants point to Papariella's statement during his May 15, 2018 deposition that he "freely … tells[s] everybody that Paul's a thief."  (Id.)  However, this general statement is not sufficient to dispute Papariella's assertion that he has specifically not discussed Schembari with Metro Jet, HK Bellawings, or Hongkong Jet.

Plaintiff objects to DMSJ SUF ¶¶ 43 - 46, which are related to a conversation between Schembari and Sakurai in mid- to late-2013 during which they discussed going into business together outside ACI. ((Dkt. No. 198 ¶ 43 - 46.)  Statements made by Schembari during that conversation are not hearsay because they are admissions of a party-opponent.  As to statements made by Sakurai which are implicated in this conversation, this evidence is not submitted for the truth of the matter asserted and is admissible hearsay.  This objection, and all objections to statements made by Schembari on the grounds that they are inadmissible hearsay, are OVERRULED.

Plaintiff objects to DMSJ SUF ¶ 154, which states that the Initial Operating Experience Completion form is "very standard," on the grounds that Makely lacked personal knowledge or a foundation for this statement, that it is an improper opinion or legal conclusion, that it is an improper expert opinion, and that it a conclusory fact under <u>National Steel Corp. v. Golden Eagle Ins. Co.</u>, 121 F.3d 496 (9th Cir. 1997).  The Court agrees.  Defendants have not put before the Court sufficient information to judge whether Makely had the experience to judge whether this document was standard in the industry, nor has proper foundation been laid as to whether Makely closely inspected the Initial Operating Experience forms beyond what appears to be a brief review during his April 26, 2018 deposition.  (Makely Depo., Dkt. No. 167-4 at 99-100.)  Plaintiff's objection is SUSTAINED and this evidence well not be considered for the purposes of the summary judgment motions.

### 2. Defendants' Objections

Defendants object to PMSJ SUF ¶¶ 18, 19, and 21, which relate to statements made by Schembari and individuals who would later become employees of Phenix Jet to the effect that they considered Jet Edge to be a current or potential competitor of Phenix Jet.  (Dkt. No. 190-2 ¶¶ 18, 19, 21.)  The basis of this objection is that these statements call for a legal conclusion.  Defendants object on the same grounds to PMSJ SUF ¶ 32, which describes Section 4.1 of the Schembari/TSI brokerage agreement as requiring Schembari to perform certain services for TSI.  Both the term "competitor" and the term "required" can be admitted with regards to Schembari's state of mind, regardless of whether the use of those terms constitute legal conclusions.  Additionally, the text of the brokerage agreement itself is not disputed and is admissible.  Accordingly, these objections are OVERRULED.

Defendants object to PMSJ SUF ¶ 50, which states that "Schembari used Jet Edge's Employee Handbook to create the Phenix Jet Employee Handbook," on the grounds that it lacks foundation or personal knowledge under Federal Rule of Evidence 602.  The Court finds that this fact is adequately supported by the testimony of Schembari and Quenga, both of whom directly participated in the drafting of the Phenix Jet Employee Handbook.  Accordingly, this objection is OVERRULED.  Defendants object to PMSJ SUF ¶ 56, which states that Schembari used his Jet Edge employment contract to create the Phenix Jet employment contract.  While it is disputed whether Schembari or Quenga personally drafted the employee contract, this fact is adequately supported by the deposition testimony of Quenga, who played a direct role in drafting the document.  This objection is OVERRULED.  Defendants' objections to PMSJ SUF ¶ 66, related

to the transmission of the Jet Edge IOE, on the grounds of lack of personal knowledge and lack of foundation are also OVERRULED, as they are adequately supported by printouts of the email in question as well as its attachment.

## III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   DISCUSSION

### A. Breach of Contract Claims

The parties seek summary judgment as to Plaintiff's first claim for breach of contract. Plaintiff seeks summary judgment that Schembari breached Sections 3, 6.2, 6.4, 7.3, and 7.4 of his employment contract ("Employment Agreement"). Defendants oppose summary judgment on these claims and seek summary judgement in their favor as to whether Schembari breached Sections 7.2 and 7.4 of the Employment Agreement.

#### 1.   Validity of Employment Agreement and Plaintiff's Performance

Under California law, to be entitled to damages for breach of contract, Plaintiff must show "(1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." Walsh v. W. Valley Mission Cmty. Coll. Dist., 66 Cal. App. 4th

1532, 1545 (1998).  It is undisputed that in February 25, 2014, Schembari signed the Employment Agreement with Jet Edge, which became effective on March 3, 2014.  (PMSJ SDMF ¶ 1.)  It is also undisputed that Jet Edge performed its obligations to (1) pay Schembari at the rate of $220,000 per year during his employment, pursuant to Section 4.1 of the Employment Agreement and (2) to provide Schembari with the benefits set forth in Section 5 of the Employment Agreement.  (PMSJ SUF ¶¶ 4-6).

Before proceeding to the substantive provisions of the Employment Agreement, the Court must first address Defendants' argument that the entirety of the Agreement is void because portions of it violate California Business and Professions Code Section 16600 ("Section 16600").  (DMSJ at 10-14.)  Whether specific provisions of the Agreement violate Section 16600 will be addressed in greater detail in the following subsections; here the Court only addresses Defendants' arguments as to the invalidity of the entire Agreement.  The Court finds that Defendants' argument is unsupported by the plain language of Section 16600, the text of the Agreement, or any case law cited by either party.

Defendants argue the "the primary 'object' of the Employment Agreement is to restrict lawful competition in violation of section 16600…" (DMSJ at 13.)  This is plainly not the case. Upon reviewing the text of the Agreement, the Court agrees with Plaintiff that the primary object of the Employment Agreement is to establish the terms of Schembari's employment by Jet Edge, such that Schembari would perform certain services for Jet Edge in exchange for payment and other benefits. (DMSJ Opp. at 1.)  Defendants themselves acknowledge that Sections 1, 2, 4, and 5 of the Agreement describe "Schembari's job, compensation and benefits," and yet in the same breath argue that the "<u>only</u> discernable purpose" of the Agreement is to prevent lawful competition.  But under any reasonable reading, the provisions of the Agreement which restrict competition are secondary to the central purpose of the contract: hiring Schembari to do a job. Defendants' preferred interpretation is contrary not only to a common-sense reading, but also to the facts presented by Defendants themselves: in their Statement of Undisputed Facts, Defendants state that "Sojitz introduced Schembari to Jet Edge because Schembari would make Jet Edge's operations more dependable," (DMSJ SUF ¶ 103), and that "Sojitz asked Schembari to join Jet Edge." (<u>Id.</u> ¶ 105.)  These facts, which the Court accepts as undisputed, are directly contrary to Defendants' theory that Jet Edge sought to employ Schembari principally to restrict his ability to lawfully compete.

Not only do Defendants fail to cite a single case which supports their argument that an employment contract may be rendered completely invalid by provisions which violate Section 16600, they also misleadingly rely on <u>Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.</u>, 630 F. Supp. 2d 1084, 1091 (N.D. Cal. 2009) and <u>Kolani v. Gluska</u>, 64 Cal. App. 4th 402, 406 (1998).  But in both of those cases, the language relied on by Defendants contemplates voiding only the non-compete provisions of the employment contract in dispute, not the entire contract.  As a Northern District of California court found in a case which Defendants themselves cite, "nowhere does the <u>Kolani</u> court even suggest that the entire agreement must be voided.  The <u>Kolani</u> court's analysis was focused only upon enforcement of section 6 of the agreement, the covenant

not to compete." Thomas Weisel Partners LLC v. BNP Paribas, Case No. 07-cv-6198, 2010 WL 546497, at *7 (N.D. Cal. Feb. 10, 2010). Nor does the Court find any language in the text of Applied Material which suggests that the entire agreement in question must be voided, and the clear language of the decision indicates otherwise. See Applied Materials, Inc 630 F. Supp. 2d at 1091 (" In light of this finding, the Court must consider whether, as an unlawful non-compete provision, the Assignment Clause can be reformed or must be declared invalid and unenforceable") (emphasis added). These holdings are consistent with the language of Section 16600, which states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Emphasis added.) Thus, neither the language of the statute nor any cited precedent supports Defendants' argument that the entire Agreement should be voided.

Finally, the portions of the Agreement which Defendants contend are unlawful are quarantined from the rest and may be severed. This is consistent both with Section 12.1 the contract itself, which includes a severability provision, as well as established California law favoring the severance of contractual provisions which unlawfully restrain trade. See Zajicek v. Kool Vent Metal Awning Corp. of America, 283 F.2d 127, 133 (9th Cir. 1960).

In light of the above, the Court does not find that the entirety of the Employment Agreement is void. The Court cautions Defendants that future misleading citations to contrary authority before this Court will result in sanctions.

### 2. Employment Agreement Section 3: Exclusivity

Plaintiff seeks summary judgment as to Schembari's breach of Section 3 of the Employment Agreement. Section 3 of the Employment Agreement provides, in part, that "Without the prior authorization of the Company, Employee shall not, directly or indirectly, during the term of this Agreement: (a) render services to any other person or entity for compensation, or (b) engage in any activity competitive with or adverse to the Company's business, whether alone, as a partner, or as an officer, director, employee, consultant or investor." (PMSJ SUF ¶ 7.) The Court finds that Defendants have not shown that there is a dispute of material fact as to whether Schembari breached sections 3(a) and 3(b) of the Employment Agreement. Defendants argue, however, that Section 3 of the Employment Agreement is void for two reasons: first, because some courts have found that in-term non-compete provisions such as this one are void and, second, because "preparations to compete" are permitted under California law. Judge Birotte previously found that Section 7.4 of the Employment Agreement, which precludes planning a business entity competitive with Jet Edge during the term of employment, is enforceable despite Section 16600. (Dkt. No. 89 at 14.) The Court finds that this holding is both consistent with California law and applicable to Section 3 of the Employment Agreement.

California "has a settled public policy in favor of open competition" such that the "general rule is that covenants not to compete are void." Kelton v. Stravinski, 138 Cal. App. 4th 941, 946 (2006). Furthermore, California courts have found that "[a]n employee does not breach his duty of loyalty by preparing to compete with his employer." Mamou v. Trendwest Resorts, Inc., 165 Cal. App. 4th 686, 719 (2008). However, while California law does not forbid an employee from seeking other employment or making preparations to compete before resigning, it "does not authorize an employee to transfer his loyalty to a competitor" during the term of his employment. Angelica Textile Servs., Inc. v. Park, 220 Cal. App. 4th 495, 509, as modified (Oct. 29, 2013), as modified on denial of reh'g (Nov. 7, 2013); see also Mintz v. Mark Bartelstein & Assocs. Inc., 906 F. Supp. 2d 1017, 1037–38 (C.D. Cal. 2012) ("While some preparation is permitted, California law does not authorize an employee to transfer his loyalty to a competitor.") (Internal citation omitted). Therefore, notwithstanding Section 16600, Section 3 of the Employment Agreement is enforceable insofar as it prohibited Schembari from transferring loyalty to a competitor while employed by Jet Edge.

Under Section 3(a) of the Employment Agreement, Schembari agreed that he would not render services to other persons or entities while employed by Jet Edge. It is undisputed that, on February 15, 2016, while employed by Jet Edge, Schembari signed a broker agreement with TSI in which he agreed to identify AOC holding companies, research their suitability, and contact their authorized representatives. (PMSJ SUF ¶ 31-32.) That same month, performing his obligations under the broker agreement, Schembari met with Bob Seidel of JetFlite International, LLC and entered into negotiations regarding the purchase of an AOC. (Id. ¶¶ 35-37.) Consistent with the broker agreement, TSI paid Schembari $300,000 for his brokerage services after the termination of his employment with Jet Edge. (Id. ¶ 39.) Defendants argue that there is a dispute of material fact here because Schembari was paid for his brokerage services after he left Jet Edge, but the language of Section 3(a) does not hinge on the timing of Schembari's compensation for the services performed for other persons or entities. Moreover, the undisputed record suggests that Schembari was aware that his actions violated the Employment Agreement at the time he took them, as he wrote to a Sojitz representative that he was able to sign the brokerage agreement because he did not "believe the details of this agreement will become known to anyone outside of our circle." (PMSJ SUF ¶ 31; DMSJ SUF ¶¶ 3, 4.) The Court therefore finds that Schembari's performance of services for TSI while employed by Jet Edge breaches Section 3(a) of his Employment Agreement.

Section 3(b) of the Employment Agreement prohibited Schembari from engaging in activities competitive with or adverse to Jet Edge while employed by Jet Edge. The details of Schembari's actions while employed by Jet Edge are set forth in greater detail above in Section II(A)(3)(a), supra. In sum, while employed by Jet Edge, Schembari took steps to plan the formation of Phenix Jet, a company which he and his business partners viewed as a potential competitor to Jet Edge. (PMSJ SUF ¶¶ 15, 18, 19.) Part of Phenix Jet business plan involved plans to acquire the management contracts of at least six airplanes which, at the time of the planning, were being managed by Schembari's employer, Jet Edge. (Id. ¶¶ 15, 28, 29.) Schembari's communications with Seidel demonstrate that he was aware that the aircraft that Phenix Jet would manage were at the time managed by Jet Edge. (Id. ¶ 40.) Thus, Schembari

took steps to establish a company which was directly competitive with Jet Edge and to divert planes managed by Jet Edge to his new company.  As Plaintiff points out, the most compelling evidence that Phenix Jet was set up to compete with Jet Edge is that after Schembari's departure a number of Jet Edge customers cancelled their Aircraft Management Agreements with Jet Edge and entered into Aircraft Management Agreements with Phenix Jet almost immediately after Schembari departed Jet Edge for Phenix Jet.  (PMSJ SUF ¶¶ 81-92.)  The Court finds that Schembari's actions were in violation of Section 3(b) of the Employment Agreement.

There is no ironclad rule as to the type of conduct which constitutes permissible "preparations to compete" and that which constitutes a "transfer of loyalty" during the terms of employment, since "the spectrum of activities in this regard is as broad as the ingenuity of man itself." Bancroft-Whitney Co. v. Glen, 64 Cal. 2d 346, (1966).  However, courts have found that permissible preparations to compete does not include actively competing with employers, including "taking action on behalf of or otherwise assisting the employer's competitors," Blackbird Technologies, Inc. v. Joshi, Case No. 15-CV-04272, 2015 WL 5818067, at *4 (N.D. Cal. Oct. 6, 2015).  Nor does it include taking actions which are "inimical to the best interests of the employer." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 414 (2007).  Thus, while "merely preparing and submitting forms to create a new corporation" will likely be seen as permissible planning, soliciting of a present employer's customers will not. Mamou, 165 Cal. App. 4th at 509.  Nor will using the employers "time, facilities, or proprietary secrets to build the competing business." Youngevity Int'l v. Smith, Case No. 16-CV-704, 2018 WL 4691272, at *2 (S.D. Cal. Sept. 28, 2018).

The Court finds that the actions taken by Schembari to establish another aviation management company based on a business plan of managing aircraft currently under the management of his employer constituted a transfer of loyalty from Jet Edge to Phenix Jet.  Schembari's conduct went far beyond taking the logistical steps necessary to prepare a competing corporation because, in addition to making such logistical preparations, Schembari actively worked with representatives of the Sojitz corporation to plan to divert aircraft under the management of his then-employer, Jet Edge, to the company he was preparing to launch, Phenix Jet.  This "transfer of loyalty" is further evidenced in Schembari's March 10, 2016 email to Seidel, in which he stated that "Our aircraft are currently under management at another aircraft management company and require 90 days notification for termination of the management contracts."  (PMSJ SUF ¶ 37.)  As Seidel later learned, this "other company" was in fact Jet Edge, which, at the time, was still Schembari's employer.  Not only does this language evidence a complete shift in loyalty from Jet Edge to Schembari's new venture, actively seeking to divert aircraft from the management of Jet Edge to Phenix Jet was also directly inimical to the interests of Jet Edge.  Accordingly, the Court GRANTS Plaintiff's motion for summary judgment and finds that Schembari violated Section 3 of his Employment Agreement.

### 3.   Employment Agreement Section 6.2 : Restrictions on Confidential Information

Plaintiff seeks summary judgment on its claim that Schembari breached Section 6.2 of the Employment Agreement, which states that both during and after employment with Jet Edge, Schembari was "not to acquire, disclose, or utilize any Confidential Information for purposes

other than those purposes approved by [Jet Edge] during the course and scope of Employees employment with [Jet Edge]." What constitutes "Confidential Information" is defined in Section 6.1 of the Agreement.

Defendants argue that Section 6.2 is void under Section 16600 of the Business & Professions code, relying on Judge Birotte's December 14, 2017 order denying Plaintiff's motion to dismiss Schembari's counterclaims. (Dkt. No. 96 at 7-8.) There, Judge Birotte found that the definition of "Confidential Information" under Section 6.1 so broad that, when read in conjunction with Section 7.1, it rendered the non-compete provisions of Section 7.1 void under Section 16600. Judge Birotte found that the restrictions on competition designed to protect an employer's trade secrets must be "carefully limited" and "narrowly tailored" to that purpose. (Dkt. No. 96 at 7.) However, Judge Birotte's order did not address Section 6.2 of the Employment Agreement, which does not limit Schembari's ability to compete but only restricted the use of confidential information disclosed to him in the course of his employment.

The Court finds that Judge Birotte's previous order did not extend to Section 6.2, which does not violate Section 16600 and is enforceable. "Employment restrictions that serve to protect a former employer's trade secrets, proprietary information, and confidential information are valid in California." Latona v. Aetna U.S. Healthcare Inc., 82 F. Supp. 2d 1089, 1096 (C.D. Cal. 1999). Section 16600 does not invalidate such provisions. Fowler v. Varian Assocs., Inc., 196 Cal. App. 3d 34, 44 (Ct. App. 1987). While courts require that these provisions be carefully drafted and not be so broadly worded as to restrain competition, provisions which are construed only to bar the use of "confidential source code, software, or techniques developed for … products or clients" are enforceable, as are clauses protecting a company's technological methods and technical "know-how." Richmond Techs., Inc. v. Aumtech Bus. Sols., Case No. 11-CV-2460, 2011 WL 2607158, at *18 (N.D. Cal. July 1, 2011) (quoting Dowell v. Biosense Webster, Inc., 179 Cal. App. 4th 564 (2009); see also Whyte v. Schlage Lock Co., 101 Cal.App.4th 1443, 1456 (2002).

It is undisputed that, after leaving Jet Edge, Schembari retained his employment agreement and employee handbook, which was later used as a template in the process of drafting the Phenix Jet employee handbook. (PMSJ SUF ¶¶ 47, 48 52.) Passages which appear in the Jet Edge employee handbook appear, verbatim, in the Phenix Jet employee handbook. (Id. ¶¶ 51, 54, 55.) Schembari also used his employment contract with Jet Edge to create nearly identical employment contracts for Phenix Jet employees. (Id. ¶ 56.) Finally, Phenix Jet used Jet Edge's Aircraft Management Agreements, both unaltered as form documents and as the template from which to create its own AMAs. (Id. ¶ 59-63.)

These undisputed facts establish that Schembari breached Section 6.2 of the Employment Agreement. Defendants' arguments are largely unavailing. Their argument that Plaintiff waived Section 6.2 by failing to deactivate Schembari's company email account ignores that Section 6.4 of the Employment Agreement separately required that Schembari, "upon termination or a request to return Confidential Information" not "acquire, use, maintain, copy, or disclose" any materials containing Confidential Information. (Employment Agreement ¶ 6.4.) The obligation

to cease to use or maintain these files therefore lay with Schembari upon his termination, and Jet Edge's actions did not waive the provisions of either Section 6.2 or 6.4.

Defendants' arguments that the employment agreement, employee handbook, and aircraft management agreements are not confidential information are also unavailing. First, it is not disputed that Jet Edge invested significant resources in the production of these documents, (DMSJ SDMF ¶ 154), and they therefore have "commercial value or other utility in the business of the Company" under Section 6.1 of the Employment Agreement. With regards to the AMAs, while it appears that some portions of them are filed with the FAA, it is also undisputed that the "schedule" portions of the AMAs, which contain key terms of the agreements, including pricing, are not filed with the FAA and are not public records. (DMSJ SDMF ¶ 185.) With regards to the employee handbooks, the mere fact that they were distributed to employees of Jet Edge who were also presumably bound by confidentiality agreements does not constitute a disclosure to the public which would waive their confidential status. Nor does the inclusion of portions of the employment agreement in a public legal complaint filed bear on whether that document was confidential at the time of Schembari's breach.

For these reasons, the Court GRANTS Plaintiff' Motion for summary judgment as to Schembari's breach of Section 6.2 of the Employment Agreement.

### 4.   Employment Agreement Section 6.4: "Return of Property and Confidential Information"

Plaintiff seeks summary judgment on its claim that Schembari breached Section 6.4 of the Employment Agreement. Section 6.4 of the Employment Agreement provides, in part, "Following termination or a request to return Confidential Information, Employee will not acquire, use, maintain, copy, or disclose any materials containing Confidential Information." (PMSJ SUF ¶ 69.) As discussed above in Section IV(A)(3), supra, it is undisputed that Schembari maintained, used, and disclosed materials containing Confidential Information as defined in Section 6.1 of the Employment Agreement after the termination of his employment with Jet Edge. The Court finds that the facts establishing that Schembari breached Section 6.2 of the Employment Agreement also establish that he breached Section 6.4. Because Defendants raise no arguments or disputes of fact separate from those raised regarding the breach of Section 6.2, the Court GRANTS Plaintiff's motion for summary judgment with regards to Schembari's breach of Section 6.4 of the Employment Agreement.

### 5.   Employment Agreement Section 7.2: Non-solicitation

Defendants seek summary judgment with regards to Schembari's alleged violation of Section 7.2 of the Employment Agreement. That section provides, inter alia, that the employee "will not induce, solicit, recruit, or encourage any person employed by Company to end their employment relationship with Company" for one year after the termination of the employee's employment. (DMSJ SUF ¶ 212.) Defendants argue that this provision is in effect a "no hire" provision which is illegal and unenforceable under Section 16600.

Courts have consistently held that Section 16600 renders unenforceable contractual provisions which broadly restrain a person from hiring his former colleagues after the cessation of his employment with their employer. See <u>SriCom, Inc. v. EbisLogic, Inc.</u>, Case No. 12-CV-904, 2012 WL 4051222, at *4 (N.D. Cal. Sept. 13, 2012); <u>Thomas Weisel Partners LLC</u>, 2010 WL 546497, at *6; <u>VL Sys., Inc. v. Unisen, Inc.</u>, 152 Cal. App. 4th 708, 718 (2007). However, courts have distinguished between "no hire" provision and "non-solicitation agreements," finding that the latter may be permissible under Section 16600 so long as it is "does not have an overall negative impact on trade or business." See <u>Gartner, Inc. v. Parikh</u>, Case No. 07-cv-2039, 2008 WL 11336333, at *9 (C.D. Cal. Oct. 10, 2008); <u>Loral Corp. v. Moyes</u>, 174 Cal. App. 3d 268, 276 (Ct. App. 1985). Employers have a "strong and legitimate interest in keeping current employees from raiding the employer's other employees for the benefit of an outside entity." <u>Thomas Weisel Partners LLC v</u>, 2010 WL 546497, at *6. Thus, contractual provisions which restrain former employees from contacting a company's current employees to induce them to leave that company are not prohibited by Section 16600 so long as they do not restrain those employees from leaving the company and seeking employment with a third party. <u>Loral Corp.</u>, 174 Cal. App. 3d at 279.

The Court finds that Section 7.2 of the Employment Agreement does not prevent Jet Edge employees from contacting Schembari regarding employment or from leaving Jet Edge to work for Schembari or any other third party. Rather, it only prevents Schembari from taking actions to "induce, solicit, recruit, or encourage" those employees to leave. Thus, Section 7.2 is a permissible non-solicitation provision and not an impermissible "no hire" provision. The Court therefore DENIES Defendants' motion for summary judgement as to Schembari's breach of Section 7.2 of the Employment Agreement.

### 6. Employment Agreement Section 7.3: Non-Disparagement

Plaintiff seeks summary judgment that Schembari violated Section 7.3 of the Employment Agreement. Section 7.3 provides, in part,

> Both during and after Employee's employment with Company, Employee will not make any representation of statement [sic], whether written or oral, to any person or entity, including, but not limited to, former, current and potential clients, vendors, business partners, employees, or competitors of Company or any of Company's affiliates, which reflects any opinion, judgment, observation or representation that may defame, disparage, harm, or otherwise reflect negatively on Company or its officers, directors or employees.

It is undisputed that, while employed by Jet Edge, Schembari sent Sakurai and Shimooka a message from his personal email account stating that "working with [Jet Edge] ops is continually challenging due to time zone difference and their workload with US domestic fleet. If this is the case you will become frustrated in only a short time." (PMSJ SUF ¶ 71.) The following day, Schembari sent them another email stating "[f]lights dispatched by [Jet Edge] never go smoothly s there are always mistakes, oversights, and lack of

communication…please keep my comments between us, as I don't want David to feel like I am undermining him." (Id. ¶ 72.)

Defendants argue that Section 7.3 is of the Employment Agreement is unenforceable because it would significantly impede Jet Edge employees' ability to exercise their rights under Section 7 of the National Labor Relations Act. However, the Court sees no clear precedent for the defensive assertion of violations of the NLRA in a contract dispute. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [§ 7]." Lechmere, Inc. v. N.L.R.B., 502 U.S. 527, 532 (1992). Congress entrusted the National Labor Relations Board with the implementation of Sections 7 and 8(a)(1) of the Act and with "determining, in the first instance, when an employer's workplace rules run afoul of those provisions." Quicken Loans, Inc. v. Nat'l Labor Relations Bd., 830 F.3d 542, 548 (D.C. Cir. 2016).

Under the primary jurisdiction doctrine, which is grounded in Congress's intent that unfair practices should be left in the first instance to the NLRB, federal courts may be preempted from deciding whether a violation of the NLRA occurred. Glaziers & Glassworkers Local Union No. 767 v. Custom Auto Glass Distributors, 689 F.2d 1339, 1342 (9th Cir. 1982). However, in Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83–84, (1982), the Supreme Court held that, because a federal court "has a duty to determine whether a contract violates federal law before enforcing it," the primary jurisdiction doctrine did not preclude federal courts from determining whether a contract clause was illegal under Section 8(e) of the Act, which declared it an unfair labor practice to enter an agreement containing a hot-cargo clause such that any agreement containing such a clause would be "unenforceable and void." Kaiser Steel Corp. 455 U.S. at 84.

Some courts have extended the Kaiser Steel holding beyond Section 8(e)'s prohibition on hot cargo agreements to review whether an arbitration agreement violates the NLRA. See Johnmohammadi v. Bloomingdales, Inc., Case No. 11-cv-6434, 2012 WL 13036845, at *6 (C.D. Cal. Jan. 26, 2012); Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Int'l Printing & Graphic Commc'ns Union of N. Am., 702 F.2d 273, 276 n.6 (1st Cir. 1983). However, neither party has provided the Court with any briefing as to whether this exception to the primary jurisdiction doctrine extends so far that the Court may review contractual provisions which do not facially violate the NRLA, such as Section 7.3 of the Employment Agreement. Indeed, parties do not even acknowledge the primary jurisdiction doctrine. The Court therefore declines to wade further into these waters without further briefing. And it need not do so, because Defendants have demonstrated that there is a dispute of material fact as to whether Schembari's actions violated Section 7.3 of the Employment Agreement. Plaintiff points to only a single email exchange between Schembari and Jet Edge clients Hideto Shimooka and Yohei Sakurai as the basis of the alleged breach. Additional context supplied by Defendants, however, suggests that Schembari's statements may have been intended to assist Jet Edge clients in deciding whether to use the dispatch service of own their vender or of Jet Edge. (PMSJ SDMF ¶ D35). There is thus a dispute as to whether these statements were in fact disparaging or, rather, meant to provide clients with superior customer service. The Court therefore DENIES Plaintiff's motion for summary judgment as to Schembari's alleged breach of Section 7.3.

### 7. Section 7.4: Prohibition on planning

Both parties seek summary judgment as to whether Schembari breached Section 7.4 of the Employment Agreement.  Section 7.4 of the Employment Agreement provides, in part, "During Employees employment with Company, Employee will not, either alone or in combination with other employees or agents of the company, plan or organize any business, entity, organization, or activity competitive with the Company."  (PMSJ SUF ¶ 137.)  Defendants argue that Section 7.4 violates Section 16600.  However, this Court has already found that Section 7.4 is valid: in Denying Defendants' motion to dismiss, Judge Birotte ruled that "section 7.4 is a provision that is necessary to protect Plaintiff's trade secrets.  An employee who creates a competing business during their employment is capable of taking advantage of their authorized access to a company's confidential information.  Therefore, provision 7.4 of the contract is enforceable despite section 16600, because it serves to protect trade secrets, and confidential or proprietary information." (Dkt. No. 89 at 13-14.)

Defendants have since brought to the Court's attention cases clarifying that California courts have recognized that employees may "prepare to compete" during the course of their employment.  Mamou, 165 Cal. App. 4th at 719.  As discussed in greater detail above, Section IV(A)(2), supra, the line between permissible  an impermissible "preparations to compete" lies in whether Schembari "transferred loyalty" to a competitor during the course of his employment with Jet Edge.  Also as discussed in Section IV(A)(2), supra, Schembari's actions clearly crossed this line and constituted an transfer of loyalty to Phenix Jet, which may properly be prohibited in the terms of an employment agreement.

Defendants dispute whether these activities were competitive with or adverse to Jet Edge's business.  (PMSJ OPP at 18.)  As discussed in Section IV(A)(2), supra, the Court finds that there is not a meaningful dispute as to this question.  Schembari and his colleagues in the Phenix Jet venture viewed Phenix Jet as a competitor to Jet Edge and planned to take over the management of at least six aircraft currently managed by Jet Edge.  (Id. ¶¶ 15, 18, 18, 28, 29.) And, in fact, these Jet Edge clients did ultimately depart for Phenix Jet.  (PMSJ SUF ¶¶ 81-92.) Defendants have pointed the Court to no admissible evidence to support their claim that these clients "had already decided to part ways" with Jet Edge, as asserted in their opposition.  (PMSJ Opp. at 18).  Their claim that "defendants and Jet Edge operate[d] in different markets," (id.), is clearly contracted by the fact that Jet Edge maintained clients which later departed to Phenix Jet.

In light of the above, the Court finds that there is no dispute as to whether Schembari breached Section 7.4 of his employment agreement.  The Court therefore GRANTS Plaintiff's motion for summary judgment and DENIES Defendants' motion for summary judgment as to Schembari's breach of Section 7.4

### 8. Damages

If a contract is breached, the non-breaching party may recover "only those damages, including lost future profits, which are 'proximately caused' by the specific breach."  St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co., 101 Cal. App. 4th 1038, 1061

(2002).  The test for causation in breach of contract cases is whether the breach was a "substantial factor" in causing the damages.  Haley v. Casa Del Rey Homeowners Assn., 153 Cal. App. 4th 863, 871, (2007).

Defendants argue that the undisputed facts are not sufficient to establish a causal link between Schembari's breaches of the Employment Agreement and the harm suffered.  The Court agrees.  There is a plausible story of causation between Schembari's breaches and the alleged harms – for example, it appears unlikely that Plaintiff's clients would have left at the time they did had it not been for the existence of Phenix Jet, and it is unlikely the Phenix Jet could have become operational at the time it did without Schembari's brokerage of a deal leading to the securing of an AOC for Phenix Jet.  However, Plaintiff has put little evidence before the Court as to the nature and extent of the connection between Schembari's breaches and the alleged damages.  Therefore, while the Court grants summary judgment to Plaintiff as to all other elements of their breach of contract claim for breach of section 3, 6.2, 6.4, and 7.4 of the Employment Agreement, the Court declines to grant summary judgment as to the question of causation and damages as to any of these breaches.

## B.  Injunctive and Declaratory Relief

Plaintiff has sought a declaration as to the rights, duties, and obligations of the parties and the issuance of an injunction of ongoing violations of the Employment Agreement between Jet Edge and Schembari.  (FAC ¶¶ 91 – 102.)  Defendants now seek summary judgment as to Plaintiff's claims for declaratory and injunctive relief.

With regards to Plaintiff's cause of action for declaratory relief, Defendants' argument hinges on their claim that the Employment Agreement may not lawfully bar Schembari from using information he obtained while employed at Jet Edge.  (DMSJ at 6.)  However, as discussed in Section IV(A)(3), supra, the Court finds that Section 6.2 does not violate Section 16600 of the Cal. Bus. & Prof. Code and is therefore enforceable.  Also, the Court has declined to grant summary judgment as to the damages caused by Schembari's breach of the Employment Agreement.  Thus, since declaratory relief may be appropriate to prevent ongoing harm, Sackman v. City of Los Angeles, 2015 WL 13357952 at *3 (C.D. Cal. May 8, 2015), there remains a dispute as to whether Schembari's breach of the Employment Agreement continues to cause ongoing harm to Plaintiff.  Summary judgment as to Plaintiff's cause of action for declaratory relief is therefore not warranted and Defendants' motion is DENIED.

Defendants also seek summary judgment as to Plaintiff's claim for injunctive relief, based solely on the grounds that injunctive relief is "not a standalone cause of action, but a remedy tied to a cause of action."  While Defendants are obviously correct that a prayer for injunctive relief is not a stand-alone cause of action, it is quite unclear what they intend to accomplish here.  Plaintiff's tenth cause of action "realleges and incorporates … by reference" all prior allegations in the First Amended Complain, which includes, in part, their cause of action for breach of contact discussed in depth in section IV(A) of this order.  Defendants provide no argument in their opening brief as to why injunctive relief would not be proper as to this or any other remaining causes of action, and the Court will not consider the cursory arguments raised for the

first time in their reply brief.  (DMSJ Reply at 8-9.)  See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (district courts need not consider arguments raised for the first time in a reply brief).  Defendants' motion for summary judgment as to Plaintiff's claims for injunctive relief is therefore DENIED.

## C.  Defendants' Counterclaims

Plaintiff and Schembari seek summary judgment as to Schembari's second amended counterclaims.  ("SACC," Dkt. No. 91.)  Schembari's SACC includes three counterclaims: (1) unfair, unlawful, and fraudulent competition under Cal. Bus. & Prof. Code § 17200; (2) intentional interference with prospective economic advantage; and (3) negligent interference with prospective economic advantage.  (SACC ¶¶ 166-199.)  Each of these claims is premised on the same conduct: the inclusion of Sections 6.1 and 7.1 in the Employment Agreement.  Schembari alleges that the inclusion of these provisions resulted in injury, including loss of money, reputation, good will, and/or potential business, as well as disrupting already existing economic relationships.

### 1.  First counterclaim: violation of California Unfair Competition Law

Schembari seeks summary judgement only as to his first counterclaim, for unfair, unlawful, and fraudulent competition.  As with all of his counterclaims, this claim is based on harm arising from the fact that Plaintiff included Sections 6.1 and 7.1 the Employment Agreement.  In his Order denying Plaintiff's Motion to Dismiss Schembari's counterclaims, Judge Birotte held that Schembari had standing to bring these claims because he had at least "incurred some costs" as a result of Plaintiff's attempted enforcement of Section 7.1 through litigation.  Responding, in dicta, to Plaintiff's argument that Schembari's allegations of harm resulting from Plaintiff's violation of the UCL were implausible, Judge Birotte also noted that Plaintiff had sued Schembari in order to enforce this action.  (Dkt. No. 96 at 9.)

Consistent with Judge Birotte's order, the Court finds that the inclusion of Section 7.1 in the Employment Agreement was unlawful.[11]  Under the UCL a claimant must show that the respondent engaged in a practice that violated a law and establish that it has standing to assert the claim.  Section 7.1 was overbroad and not narrowly tailored to protect trade secrets, in violation of Section 16600.  The inclusion of this clause was therefore itself an unlawful act under the UCL.  See Dkt. No. 96 at 6; Dowell v. Biosense Webster, Inc., 179 Cal. App. 4th 564, 575 (2009).  The Court has also already found that Schembari has standing to bring this claim.  (Dkt. No 96 at 8-9.)

Schembari has not, however, pointed to any undisputed facts showing that the inclusion of Section 7.1 itself caused any damages.  Rather, all of the harms that Schembari alleges result not from the inclusion of this provision in the contract but Plaintiff's attempts to enforce it

---

[11] Section 6.1 merely defines 'confidential information' and so does not, standing alone, violate Section 16600.

through litigation. But the undisputed facts do not support summary judgment for damages based on litigation costs. Where standing to bring a UCL claim is predicated on the filing of a lawsuit seeking enforce anti-competitive contract provisions, a party must also show that the defendant engaged in the "strategic use of litigation and threatened litigation to achieve its anticompetitive purpose." Robinson v. U-Haul Co. of California, 4 Cal. App. 5th 304, 318 (Ct. App. 2016). Schembari has pointed to no evidence tending to show that this lawsuit was strategically filed for an anti-competitive purpose. Additionally, Schembari's DSUF does not distinguish between general litigation expenses incurred while defending against Plaintiff's other, meritorious claims and litigation expenses arising from Plaintiff's efforts to enforce Section 7.1. Even a meritorious UCL claim based on this litigation would not entitle Schembari to full litigation costs from this action, as this Court has found many of Plaintiff's claims to be meritorious. At best, Schembari could be entitled to the marginal litigation cost of defending against enforcement of Section 7.1 alone. Schembari's motion for summary judgment as to his first counterclaim for violation of the UCL is therefore DENIED.

The Court finds that Plaintiff has not shown that the Noerr-Pennington doctrine or California litigation privilege bar Schembari's first counterclaim. A UCL claim based on litigation activity may proceed where a claimant demonstrates that the opposing party engaged in the "strategic use of litigation and threatened litigation to achieve its anticompetitive purpose." Robinson v. U-Haul Co. of California, 4 Cal. App. 5th 304, 318 (2016). Thus, while Schembari has not demonstrated that summary judgment is warranted as to whether Plaintiff engaged in such strategic, anticompetitive litigation, such a claim would not be barred by law. Plaintiff's briefing does not address the applicability of Noerr-Pennington in cases where a litigant strategically undertakes litigation to achieve an anticompetitive purpose, and, given the dearth of undisputed facts on this question, the Court does not decide this issue here.

Nevertheless, Plaintiff has shown that there is no dispute of material fact that Schembari's violation of the UCL did not cause him harm. In order to pursue a UCL claim, a plaintiff must show that "the practices it characterizes as unlawful cause[d] it to suffer an actual economic injury." Demeter v. Taxi Computer Servs., Inc., 21 Cal. App. 5th 903, 915 (2018). Thus, summary judgment against the claimant is warranted if they have failed to show a causal connection between the unlawful business activity and the injury suffered. Here, Schembari has pointed to no evidence of harm caused by Plaintiff's violation of the UCL other than costs arising from litigation. However, in order to claim damages arising from the litigation of this case, Schembari would need to demonstrate that Plaintiff filed this litigation strategically and for an anti-competitive purpose. But Schembari points to no such facts and points to no damages other than those arising from costs borne by Schembari in litigating this case. See Celotex, 477 U.S. at 324 (once moving party has identified the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact, the burden shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial). Plaintiff's motion for summary judgment as to Schembari's first counterclaim is therefore GRANTED.

## 2. Second and third counterclaims: intentional and negligent interference with prospective economic advantage

Plaintiff seeks summary judgment as to Schembari's counterclaims on the grounds the Schembari lacks standing under the Noerr-Pennington doctrine and the California Litigation Privilege. The Noerr-Pennington doctrine derives from the First Amendment's guarantee of the right to petition the Government for redress of grievances, and stands for the proposition that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. Sosa v. DIRECTV, Inc., 437 F.3d 923, 929 (9th Cir. 2006). This doctrine has been extended to bar claims for tortious interference with prospective economic advantage claims arising from conduct incidental to the filing and litigation of lawsuits. Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d 991, 1006-1007 (9th Cir. 2008). Similarly, the California litigation privilege is meant to assure "free access to the courts" without "fear of being harassed subsequently by derivative tort actions," including derivative actions for interference with prospective economic advantage. Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1132–33, (1990).

The Court finds that both Noerr-Pennington and the California litigation privilege apply to Schembari's second and third counter-claims. However, in certain cases these bars to interference with prospective economic advantage lawsuits derivative from litigation activity may be overcome. To overcome the California litigation privilege, a claimant seeking damages for intentional interference with prospective economic advantage based on litigation conduct must allege that the litigation was brought without probable cause and that the litigation concluded in the plaintiff's favor. Id. at 1137. Similarly, to overcome the Noerr-Pennintgon Doctrine, a claimant must show that the litigation-related activity on which his claim is based is "sham litigation." Theme Productions, Inc., 546 F.3d at 1007. This requires a showing that (1) the litigation activity was so baseless that "no reasonable litigant could reasonably expect success on the merits" and (2) the litigant had a subjective intent to interfere with the business relationship. Id. The Court finds no facts supporting either that Plaintiff's litigation activity was sufficiently baseless or that Plaintiff was motivated by the subjective intent of interfering with Schembari's business relationship. Additionally, the Court has found no precedent for litigation-derived interference with economic advantage claims derived from a single causes of action in cases where a litigants other causes of action were found to be meritorious. The Court therefore finds that, to the extent that Schembari's second and third claims are based on Plaintiff's litigation activity in this case, they are barred by Noerr-Pennington. The Court need not reach whether Schembari overcame the lower bar of the California litigation privilege.

The only wrongful conduct by Jet Edge alleged in Schembari's SACC is the inclusion of Section 6.1 and 7.1 in the Employment Agreement. (SACC ¶¶ 185, 195.) Schembari now argues that his counterclaims are not based on Plaintiff's litigation activity but, rather, on defamatory statements about Schembari made by Jet Edge CEO Bill Papariella. (PMSJ Opp. at 21.) But this theory is unsupported by Schembari's pleadings, which make no mention of defamatory statements made by Papariella and are insufficient to give Plaintiff notice of the grounds upon which this claim rests. See Twombly, 550 U.S.at 555. The Court has already found that amending the SACC to add a counterclaim for defamation would cause undue prejudice to

Plaintiff.  (Dkt. No. 226.)  Consistent with that order, the Court will not entertain this theory of liability here.  Even if the Court did consider this defamation claim, the Court can find nothing beyond speculation supporting Schembari's claim that Papariella's statements caused him harm.

The only damages asserted by Schembari arise from the costs and expenses associated with litigating this matter.  Because recovery for such costs is barred under Noerr-Pennington, the court GRANTS Plaintiff's motion for summary judgment as to Schembari's second and third counterclaims.

## V.   MOTIONS TO SEAL

In connection with their cross-motions for summary judgment, the Parties submitted numerous filings seeking the sealing of documents.  (Dkt. Nos. 168, 169, 178, 179, 182, 183, 184, 187, 188, 192, 193, 205.)  On November 14, 2019, in order to facilitate the efficient resolution of these motions, the Court ordered the parties to meet and confer and file a joint document regarding motions to seal.  (Dkt. No. 226.)  The Court directed the parties to include in the joint document, for each document which a party seeks to keep under seal, the following information:

- a description of the document for which sealing is sought;
- the party seeking sealing of the document;
- the docket number or numbers under which the document for which sealing is sought was filed;
- whether the sealing of that document is opposed;
- a summary of arguments made in support of and, if applicable, in opposition to sealing that document.

(Id.)  On November 14, 2018, the parties submitted a joint document regarding motions to seal.  ("Joint Document," Dkt. No. 230.)  The Court will address the parties' motions to seal here.

### A.  Standard for sealing

There is a strong presumption of public access to judicial records and documents.  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 n. 7 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 677 (9th Cir. 2010).  The presumption applies to pleadings filed with the court and extends to discovery material attached to those pleadings.  Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1134 (9th Cir. 2003).  Although a request to seal judicial records offends the presumption in favor of public access, the right of access "is not absolute."  Id. at 1135.

Generally, two standards govern requests to seal documents: the "compelling reasons" standard and the "good cause" standard.  Pintos, 605 F.3d 665 at 677.  When the documents sought to be sealed are only "tangentially related" to the underlying cause of action, the court applies a "good cause" standard.  Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092,

1097 (9th Cir. 2016).  All other documents must meet the "compelling reasons" standard.  Id. at 1099 (citations omitted); see also Miotox LLC v. Allergan, Inc., 2016 WL 3176557, at *1 (C.D. Cal. June 2, 2016) (examining whether the documents were tangentially related to the cause of action).  A party must articulate compelling reasons supported by specific factual findings that "outweigh the general history of access and the public policies favoring disclosure . . . ." Kamakana v. City and Cty. of Honolulu, 447 F.3d 1172, 1178-79 (9th Cir. 2006).

Examples of compelling reasons for sealing include cases where a court record might be used for "improper purposes such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." Kamakana, 447 F.3d at 1179 (internal quotations omitted).  Even where records do not include trade secrets, they may still be sealed where they could be a "source[] of business information that might harm a litigant's competitive standing." Ctr. for Auto Safety, 809 F.3d at 1097.  In such circumstances, district courts have "broad latitude to grant protective orders to prevent disclosure of materials for many types of information, including, but not limited to, trade secrets or other confidential research, development, or commercial information." Phillips ex rel. Estates of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1211 (9th Cir. 2002).

## B.  Plaintiff's sealing requests

Plaintiff seeks the sealing of five categories of documents: (1) aircraft charter management agreements ("AMAs"), document numbers 1-9; (2) Plaintiff's initial operating experience documents, document numbers 9-10; (3) Plaintiff and Defendant's employee handbooks, documents number 12 and 13; (4) Plaintiff's and Defendants' employee contracts, document numbers 14-20; and (5) Matthew Winer's expert reports, document numbers 21-22.  The Court finds that Plaintiff has presented compelling reasons to seal all of these documents.

The Court finds that the AMAs contain key financial terms of agreements between jet companies and their clients.  As discussed in Section II(A)(3)(c), supra, the Court finds that the "schedule" portions of the AMAs, which contain sensitive information, have not been filed with the FAA and thus have not been disclosed to the public.  Disclosure of these AMAs could compromise Jet Edge's commercial advantage.  The Court finds that Plaintiff's Initial Operating Experience Documents, which set forth the procedures by which pilots learn how to operate the Jet Edge fleet, required the significant investment of Jet Edge resources to develop and are not generally known to the public.  Disclosure of these documents could harm Jet Edge's commercial advantage.  The Court also finds that the production of the Jet Edge employee handbooks required the investment of significant resources by jet Edge and contains confidential information related to employee benefits and compensation which could be used to harm Jet Edge's competitive standing.  Phenix Jet's employee handbooks are nearly identical documents which appear to have been based on Jet Edge's employee handbooks and could similarly prejudice parties through its disclosure.  The disclosure of Jet Edge and Phenix Jet's employment contacts could also harm Jet Edge and Phenix Jet by allowing competitors to know what they pay their employees and the terms by which Jet Edge and its employees are bound.  The expert report of Matthew Winer provides details of Jet Edge's unique operations model and discussion of its competitive advantages while also quoting from documents designated by the Parties as

confidential or highly confidential, including Phenix Jet's business plan.  Public disclosure of such document could be harmful to Jet Edge and other companies.

Because Plaintiff has shown compelling reasons to file these documents under seal, the Court GRANTS Plaintiff's motion to seal documents 1 through 22.

## C.  Defendants' sealing requests

As an initial matter, the Court notes that Defendants have failed to comply with the Court's instruction to include, "for each document for which a party seeks to file under seal … a description of the document for which sealing is sought…"  Defendants have instead listed several exhibits without accompanying descriptions of those exhibits.  Additionally, in the Joint Document Plaintiff has made unrefuted representations to the Court that Defendants have designated numerous documents as "Confidential" and "Highly Confidential" during the course of discovery only to now oppose the sealing of those documents before this Court.  Because of these apparently contradictory positions, the Court is concerned that Defendants have either violated the Protective Order by their improper and unjustified designation of documents as confidential, (Dkt. No. 91 § 6.1), or are now presenting frivolous arguments to the Court.  Defense counsel is therefore ORDERED to show cause in writing as to why they should not be sanctioned for this and for their failure to comply with the Court's November 7, 2018 order by no later than **Tuesday, November 29, 2018.**

Defendant has requested sealing of (1) email correspondence referencing the identify of a particular customer, document number 23; (2) paragraphs  6-15 and exhibits CA, CB, and CC of the Declaration of Andrew Svoboda; (3) excerpts from the deposition of Paul Schembari; (4) Defendant's statement of genuine disputes of material fact ¶¶ D64, D65, D67-70; and (5) Defendant's opposition to Plaintiff's motion for summary judgment at 24:24-27 and 29:12-16.  The Court has already held that compelling reasons exists for the redaction of document 23.  (Dkt. No. 153 at 2-3.)  Accordingly, Defendants' motion to seal document 23 is GRANTED.  While Defendants' motion to seal documents 24-27 is unopposed, the Court finds that neither party has presented compelling reasons to seal these documents.  Not only do Defendants fail to describe the contents of these documents, their arguments in favor of sealing them are general, vague, and conclusory.  Accordingly, Defendants' motion to seal documents 24-27 is DENIED.

## VI.    CONCLUSION

The Court GRANTS in part Plaintiff's motion for summary judgment as to its claims for breach of Sections 3, 6.2, 6.4, and 7.4 of the Employment Agreement.  The Court DENIES Plaintiff's motion for summary judgment as to the breach of Section 7.3 of the Employment Agreement and as to damages resulting from breaches of the Employment Agreement.  The Court DENIES Defendants' motion for summary judgment as to Plaintiff's claims for breach of section 7.2 and 7.4 of the Employment Agreement.  The Court DENIES Defendants' motion for summary judgment as to Plaintiff's requests for injunctive and declaratory relief.

The Court GRANTS Plaintiff's motion for summary judgment as to all of Defendants' counterclaims and DENIES Defendants' motion for summary judgment as to their first counterclaim.

The Court GRANTS Plaintiff's motion to seal Documents 1-22 as summarized in the parties' Joint Document.  (Dkt. No. 230.)  The Court GRANTS Defendants' motion to seal Document 23.  The Court DENIES Defendants motion to seal documents 24-27.

The Court ORDERS Defendants to show cause in writing as to why they should not be sanctioned for (1) improper designation of documents as confidential; (2) presentation of frivolous arguments to the Court; and (3) failure to comply with the Court's November 7, 2018 Order.

**IT IS SO ORDERED.**