SANFORD L. MICHELMAN, ESQ. (SBN 179702)
smichelman@mrllp.com
ROBERT ESTRIN, ESQ. (SBN 260402)
restrin@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA 90024
Telephone:   (310) 564-2670
Facsimile:    (310) 564-2671

MONA Z.  HANNA, ESQ. (SBN 131439)
mhanna@mllp.com
TODD H. STITT, ESQ. (SBN 179694)
tstitt@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, 10th Floor
Irvine, California 92614
Telephone: (714) 557-7990
Facsimile: (714) 557-7991

Attorneys for Plaintiff
WESTERN AIR CHARTER, INC. dba JET EDGE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN AIR CHARTER, INC., doing business as JET EDGE INTERNATIONAL, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>PAUL SCHEMBARI, an individual; ACP JET CHARTERS, INC., doing business as PHENIX JET, a Florida corporation; PHENIX JET INTERNATIONAL, LLC, a Guam Limited Liability Company, COSA DI FAMIGLIA HOLDINGS, LLC, a Guam Limited Liability Company, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-00420-JGB (KSx)<br>Hon. Jesus G. Bernal<br><br>**OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>[Declaration of Robert Estrin in support filed concurrently herewith]<br><br>Hearing Date:  June 17, 2019<br>Time:            9:00 a.m.<br>Judge:          Hon. Jesus G. Bernal<br>Ctrm.:          1 (Riverside) |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  LEGAL STANDARD ......................................................................................... 2

III.  ARGUMENT ...................................................................................................... 2

  A.  The Court Should Not Alter the Jury's Finding that Defendants Are
      Liable for Intentional Interference with Contractual Relations. ............ 2

    1.  The Court Should Reject Defendants' First Argument as
        They Did Not Raise it in Their Rule 50(a) Motion and It is
        Incorrect. ....................................................................................... 2

    2.  The Court Should Reject Defendants' Attempt to Ignore
        the Mountains of Evidence that the Jury Properly Relied
        on to Find Each Defendant Liable for Intentional
        Interference with Contractual Relations. ..................................... 3

        a.  Plaintiff Presented the Jury with Sufficient Evidence to
            Determine that Each Defendant Intentionally Interfered
            with Plaintiff's Contracts with its Customers. .................. 3

        b.  The Court Should Reject Defendants' New Argument that
            Only Defendants' Actions after Schembari Left Jet Edge
            Are Relevant. ..................................................................... 8

        c.  The Entity Defendants Cannot Escape Liability. ............. 10

  B.  The Court Should Uphold the Jury's Finding that Defendants Acted
      with Malice, Oppression or Fraud Warranting Punitive Damages. ...... 13

    1.  This Court Correctly Held that Plaintiff Introduced
        Sufficient Financial Evidence for the Jury to Award
        Punitive Damages. ...................................................................... 13

        a.  California Law Supports an Award of Punitive Damages
            Based Solely on Financial Evidence Showing Defendants'
            Profits Resulting from Their Tortious Acts. ................... 13

b.  Evidence of Defendants' Ill-Gotten Profits is the Best Financial Evidence to Determine the Proper Amount of Punitive Damages to Award Against Defendants. .......... 15

c.  Caselaw Does Not Support Defendants' Argument that the Jury Cannot Award Punitive and Compensatory Damages Exceeding Defendants' Ill-Gotten Profits. ..................... 17

2.  Defendants Cannot Complain about the Financial Evidence Presented at Trial Due to Their Deficient Productions. ................................................ 18

a.  Defendants Prevented Plaintiff from Presenting the Jury with a Full Picture of Defendants' Current Finances. ..... 18

b.  Because Defendants' 2017 Financial Information Was Outdated It Would Not Have Been Proper for the Jury to Rely Upon it in Deciding Punitive Damages. ................ 21

c.  The Court Already Rejected Defendants' Argument that Plaintiff Could Not Receive Defendants' Financial Information after the Discovery Cutoff. .......................... 21

d.  Defendants Prevented Plaintiff from Meaningfully Examining Schembari About Their Financial Condition. 22

3.  The Jury Had Sufficient Evidence to Find that Defendants Acted with Malice, Oppression, or Fraud. ............................... 23

IV.  CONCLUSION ................................................. 25

**OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) .................................................................................... 13

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
  2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ......................................... 4

*Carelli v. Matthew Scott, Gelsco, Inc.*,
  2010 WL 11597288 (C.D. Cal. June 24, 2010) ............................... 14, 17

*Commercial Union Ins. Companies v. Greene*,
  1998 WL 1661425 (C.D. Cal. Sept. 25, 1998) ............................... 14, 17

*Cone v. W. Virginia Pulp & Paper Co.*,
  330 U.S. 212 (1947) ............................................................................ 12

*E.E.O.C. v. Boeing Co.*,
  577 F.3d 1044 (9th Cir. 2009) ........................................................... 4

*E.E.O.C. v. Go Daddy Software, Inc.*,
  581 F.3d 951 (9th Cir. 2009) ................................................... 3, 8, 10

*Escriba v. Foster Poultry Farms, Inc.*,
  743 F.3d 1236 (9th Cir. 2014) ........................................................... 2

*Holley v. Crank*,
  400 F.3d 667 (9th Cir. 2005) ............................................................ 13

*Hung You Hong v. United States*,
  68 F.2d 67 (9th Cir. 1933) ................................................................. 7

*Murphy v. City of Long Beach*,
  914 F.2d 183 (9th Cir. 1990) ............................................................. 3

*Oliver & Tate Enterprises Inc. v. Found. Worldwide Inc.*,
  2014 WL 12595334 (C.D. Cal. Mar. 21, 2014) ................................. 9

*Ostad v. Oregon Health Sciences University*,
  327 F.3d 876 (9th Cir. 2003) ......................................................... 2, 8

iii

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000) ................................................................ 2

*Sanchez v. California*,
    2015 WL 2185186 (E.D. Cal. May 8, 2015)....................... 18

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) ............................................... 4

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,
    2015 WL 12746208 (C.D. Cal. Oct. 30, 2015) .................. 9

**California Cases**

*Adams v. Murakami*,
    54 Cal. 3d 105 (1991) ................................................ 14, 20

*Am. Credit Indem. Co. v. Sacks*,
    213 Cal. App. 3d 622 (1989) ............................................. 9

*In re Angelica P.*,
    28 Cal. 3d 908 (1981) ...................................................... 23

*Bankhead v. ArvinMeritor, Inc.*,
    205 Cal, App. 4th 68 (2012)............................................. 15

*Cummings v. Medical Corp. v. Occupational Medical Corp.*,
    10 Cal. App. 4th 1291 (1992)................................. 14, 15, 17

*Fernandes v. Singh*,
    16 Cal. App. 5th 932 (2017) ............................................ 20

*Green v. Laibco, LLC*,
    192 Cal. App. 4th 441 (2011)..................................... 19, 20

*I-CA Enterprises, Inc. v. Palram Americas, Inc.*,
    235 Cal. App. 4th 257 (2015)............................................ 9

*Kenly v. Ukegawa*,
    16 Cal. App. 4th 49 (1993).......................................... 14, 15

*Mike Davidov Co. v. Issod*,
    78 Cal. App. 4th 597 (2000)............................................ 20

*Nevarrez v. San Marino Skilled Nursing & Wellness Ctr., LLC*,
    221 Cal. App. 4th 102 (2013) ................................................................. 23

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ........................................................................... 2

*Pfeifer v. John Crane, Inc.*,
    220 Cal. App. 4th 1270 (2013) ............................................................... 24

*Rufo v. Simpson*,
    86 Cal. App. 4th 573 (2001) ................................................................... 16

*Seimon v. S. Pac. Transportation Co.*,
    67 Cal. App. 3d 600 (1977) ..................................................................... 24

*Southern California Disinfecting Co. v. Lomkin*,
    183 Cal. App. 2d 431 (1960) ................................................................... 24

*StreetScenes v. ITC Entertainment Group, Inc.*,
    103 Cal. App. 4th 233 (2002) ................................................................. 20

*The Ret. Grp. v. Galante*,
    176 Cal. App. 4th 1226 (2009) ............................................................... 9

*White v. Ultramar, Inc.*,
    21 Cal. 4th 563 (1999) ............................................................................ 23

**Statutes/Rules**

Federal Rules of Civil Procedure (FRCP)

    Rule 26(e) ................................................................................................ 18
    Rule 50(b) ................................................................................................ 2
    Rule 50(a) .................................................................... 1, 2, 3, 8, 10, 14
    Rule 50(b) .............................................................. 1, 3, 8, 10, 12, 14, 21
    Rule 59 .................................................................................................... 3

**Other Authorities**

CACI No. 201 ................................................................................................ 23

CACI No. 3947 .............................................................................................. 24

# I. **INTRODUCTION**

Defendants Paul Schembari ("Schembari"), Phenix Jet International, Inc. ("Phenix Jet"), ACP Jet Charters, Inc. ("ACP"), and Cosa di Famiglia Holdings, LLC ("CDF") (collectively "Defendants") employ a shotgun approach in a futile attempt to convince the Court to overturn the jury's verdict. Defendants concede the jury returned the correct verdict in finding Schembari liable for breach of contract and breach of the duty of loyalty. Defendants only attack the jury's findings on intentional interference with contractual relations and punitive damages. Defendants likely target these findings because the jury awarded most of the damages based on the intentional interference claim. Substantial evidence at trial, however, supports all the jury's findings.

Defendants' desperation to avoid paying the judgment is evidenced by the fact that Defendants have raised several new arguments in their Rule 50(b) motion. Despite having several opportunities to raise these arguments earlier (*e.g.*, motion to dismiss, summary judgment, and Rule 50(a) motion), Defendants failed to do so. Defendants' failure to raise these arguments in their Rule 50(a) motion prevents them from raising them in their Rule 50(b) motion.

The arguments Defendants did raise in their Rule 50(a) motion fail for the same reasons the Court previously rejected them. For example, Defendants argue that Plaintiff Western Air Charter, Inc. ("Plaintiff" or "Jet Edge") did not introduce direct evidence regarding why Jet Edge's customers terminated their contracts. Defendants' argument ignores that the jury could properly rely on the voluminous circumstantial evidence Plaintiff presented at trial to infer that Defendants' interference was a substantial factor (meaning "more than a remote or trivial factor") in causing Jet Edge's clients to leave for Phenix Jet. Additionally, Defendants' arguments about the jury's punitive damages award fail because (1) Plaintiff introduced financial evidence sufficient for the jury to award punitive damages; and (2) Defendants failed to produce to Plaintiff the necessary financial information that the Court ordered them to produce.

1

In sum, the Court should reject all of Defendants' arguments, new and old, because Defendants have not satisfied the difficult standard required for the Court to overturn the jury's verdict.

## II.   LEGAL STANDARD

"Judgment as a matter of law (JMOL) after trial is proper when evidence permits only one reasonable conclusion and conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Sciences University*, 327 F.3d 876, 881 (9th Cir. 2003).  In ruling on a FRCP Rule 50(b) motion "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). *See also Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) ("A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible").

## III.   ARGUMENT

### A.   The Court Should Not Alter the Jury's Finding that Defendants Are Liable for Intentional Interference with Contractual Relations.

#### 1.   The Court Should Reject Defendants' First Argument as They Did Not Raise it in Their Rule 50(a) Motion and It is Incorrect.

Defendants argue that Plaintiff cannot prevail on its intentional interference claim by showing a disruption of the contracts between Plaintiff and its customers. (Motion ("Mot.") at 3:15-4:13.)   This argument contradicts California law which clearly holds that disruption of a contract constitutes intentional interference with contractual relations.  Not only did Defendants fail to raise this argument in their Rule 50(a) motion, but they cited to *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) which contradicts Defendants' position.  Based on *Pacific Gas*, Defendants wrote in their Rule 50(a) motion that "intentional interference with contractual relations requires a plaintiff to establish, among other elements, that a defendant's 'intentional acts' caused the 'actual breach *or disruption*' of a contractual

2

relationship between the plaintiff and some third party."  (Dkt No. 277-1 at 2:9-13) (emphasis added).

Furthermore, Defendants' failure to raise this argument in their Rule 50(a) motion, prevents them from raising it now.  "Because it is a renewed motion, a proper *post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion*. Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.'"  *E.E.O.C. v. Go Daddy Software, Inc*., 581 F.3d 951, 961 (9th Cir. 2009) (emphasis added) (quotation omitted).  "For the same reasons a party may not seek a JNOV on grounds not alleged in their motion for directed verdict, a district court may not enter a JNOV on grounds not asserted in a party's motion for directed verdict."  *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990).  Since Defendants failed to raise this argument in their Rule 50(a) motion and the law contradicts their argument, the Court should reject Defendants' argument.[1]

> **2.   The Court Should Reject Defendants' Attempt to Ignore the Mountains of Evidence that the Jury Properly Relied on to Find Each Defendant Liable for Intentional Interference with Contractual Relations.**
>
> **a.   Plaintiff Presented the Jury with Sufficient Evidence to Determine that Each Defendant Intentionally Interfered with Plaintiff's Contracts with its Customers.**

Defendants' argument that the jury's verdict was speculative boils down to their mistaken belief that Plaintiff could not prevail unless the customers testified at trial that they terminated their contracts with Jet Edge due to Defendants' actions.  Of course, this is not the law.  Plaintiff presented the jury with extensive circumstantial

---

[1] Defendants believe the Court incorrectly instructed the jury on the elements of this claim. (Mot. at 4:1:13.)  Defendants expand on the argument in their Rule 59 motion. Plaintiff explains why the instruction was proper in its Opposition to that motion.

evidence upon which the jury could rely on to easily find Defendants liable.

It is well settled law that it is proper for a jury to base its verdict on circumstantial evidence.  *See, e.g.*, *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009) (holding that circumstantial evidence can support a jury verdict); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) (holding that "a jury's finding . . . may unquestionably rest on inferences drawn from circumstantial evidence"); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 831528, at *23 (N.D. Cal. Jan. 10, 2013) (affirming the jury's verdict on intentional interference based on circumstantial evidence).  Indeed, the Court instructed the jury that the "law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence."  (Dkt. 296, Jury Instruction No. 8.)  Described below is just part of the evidence Plaintiff presented to the jury, any piece of which the jury could have properly relied on to reach its verdict.

During his employment at Jet Edge, Schembari disparaged Jet Edge's operations to its customers.[2]  (Declaration of Robert Estrin ("Estrin Decl."), Exhs. A and B.)  For example, Schembari wrote: "[f]lights dispatched by JEI never go smoothly as there are always mistakes, oversights, and lack of communication," and, "[w]orking with JEI ops is continually challenging . . ."  (Estrin Decl., Exhs. A and B.)  Schembari also notified Jet Edge's customers that they could still operate their aircraft if they left Jet Edge "without any disruption."  (Estrin Decl., Exh. C.)  Based on these emails alone, a reasonable jury could find that Schembari intended to cause Jet Edge's customers to cancel their contracts and that these emails were a reason why the customers cancelled their contracts.  Schembari knew he was acting wrongfully because he asked client

_____

[2] Hideto Shimooka was a representative for Jet Edge client Hideyuki Busujima.  (Estrin Decl., Exh. D at 80:7-15, 81:2-5, 81:22-24.)  Yohei Sakurai was a Sojitz employee and, in that capacity, a representative of each of the jet owners.  (Estrin Decl., Exhs. D at 77:20-23, 79:5-10, 79:19-24; E at 10:25-11:6, 53:19-21, 74:8-11; F; G; H at 49:5-20, 68:24-70:2; and J at 23:23-25.)  Schembari admitted at trial that "I was communicating those words to a client representative, yes."  (Estrin Decl., Exh. D at 82:4-5).

representatives to "keep my comments between us, as I don't want David to feel like I am undermining him." (Estrin Decl., Exh. A and Exh. E at 58:22-25.)

In footnote 3 of their Motion, Defendants tacitly admit that the communications between Schembari and Shimooka provided the jury with evidence that Schembari sought to interfere with Jet Edge's contract with Hideyuki Busujima. However, Defendants fail to realize that Yohei Sakurai ("Sakurai") was also included on these disparaging emails. (Estrin Decl., Exhs. A and B.) Sakurai was a representative of Sojitz. (Estrin Decl., Exh. D at 23:4-9, 77:20-23, 79:8-10.) Schembari admitted "[t]hese Japanese customers that I flew for, they were all represented by the Sojitz Corporation." (Estrin Decl., Exh. D at 25:8-9.) Schembari also admitted Sakurai communicated with the customers on Schembari's behalf. (Estrin Decl., Exh. D at 24:3-21.) Therefore, the jury reasonably inferred that Schembari intended for his disparaging comments to reach the ears of Jet Edge's customers through Sakurai. The fact that Sakurai assisted Schembari in creating Phenix Jet and is currently its COO supports this inference. (Estrin Decl., Exhs. J at 35:2-7, 12-17, 65:14-20; O; P.)

Furthermore, Plaintiff presented the jury with a detailed roadmap of the steps Schembari took to create Phenix Jet (all while still employed by Jet Edge) with the intent of inducing Jet Edge's customers to switch to Phenix Jet:

- Yohei Sakurai, Elsie Quenga, and Schembari devised YEP with the intent to acquire a Part 135 AOC even though Jet Edge already had one. (Estrin Decl., Exh. E at 70:11-71:4 and Exh. K.)

- Phenix Jet sought a bank loan. (Estrin Decl., Exh. E at 75:19-22 and Exh. L.)

- Schembari formed a partnership with Sojitz to take Jet Edge's customers to Phenix Jet. (Estrin Decl., Exhs. D at 66:13-21, M, and N.)

- Rodney Webb, Elsie Quenga, Yohei Sakurai, and Schembari worked to create a business plan for Phenix Jet to compete with Jet Edge. (Estrin Decl., Exhs. D at 64:9-19, 66:13-21, 68:2-7; E at 76:8-77:3, 78:8-10; and N.)

- Defendants created financial projections based on jets under Jet Edge

5

management that eventually moved to Phenix Jet.  (Estrin Decl., Exhs. E at 85:4-86:1, 86:6-13, 86:20-23, 87:6-17; and O.)

- CDF, Schembari's wholly owned company, secretly entered into a Broker Agreement to receive payment if it acquired a Part 135 AOC for Phenix Jet to manage jets.  (Estrin Decl., Exhs. E at 99:13-18, 100:4-14; and P.)
- Schembari negotiated a Letter of Intent ("LOI") for CDF to acquire ACP, the AOC-holding company that, together with Phenix Jet, stole Jet Edge's customers.  (Estrin Decl., Exhs. D at 71:16-20, 75:16-19, 76:11-19, 79:19-24; Q and R.)  Schembari admitted he negotiated the LOI "as the managing member of Cosa Di Famiglia Holdings."  (Estrin Decl., Exh. D at 79:5-7.)
- Schembari diverted the aircraft N2020 away from Jet Edge management so that it would end up under the management of his company Phenix Jet/ACP.  (Estrin Decl., Exhs. E at 102:14-22, 104:2-10; and W.)  Schembari admitted at trial that he fully intended for Phenix Jet/ACP to manage N2020 and this occurred.  (Estrin Decl., Exhs. D at 72:5-6, 72:12-21, 73:25-74:2 and Q.)

Additionally, the testimony of Jet Edge CEO Bill Papariella ("Papariella"), David Erich, Ed Frank, Yohei Sakurai, Rodney Webb, and Bob Seidel constituted substantial evidence for the jury to conclude that Defendants acted intentionally to disrupt Jet Edge's contracts and was a substantial factor in causing that disruption. [3]

A convincing piece of evidence that Defendants' interference caused Plaintiffs harm is that all five customers terminated their contracts with Jet Edge and signed

---

[3] Jet Edge introduced testimony of Papariella, Erich, and Frank that Jet Edge's clients rarely switch to a competitor, especially without notice, supporting the jury's verdict that Defendants' interference was a substantial factor in the customers leaving for Phenix Jet.  (Estrin Decl., Exhs. H at 62:24-63:7; I at 16:18-17:17; S at 20:21-25, 22:3-23:3, 26:8-17.)  Jet Edge's industry expert Matthew Winer testified that there are several factors that make it very difficult for jet owners to change management companies, including the cost of doing so.  (Estrin Decl., Exhs. S at 53:2-55:3, 55:13-16, 56:17-57:8.)  *See also* Estrin Decl., Exhs. H at 57:1-25; I at 14:15-22, 18:19-25, 46:9-47:5, 69:2-19; J at 193:25-194:14; and T at 72:8-23, 80:6-81:25.)

**OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

contracts with ACP dba Phenix Jet.  (Estrin Decl., Exhs. DD, GG, HH, II, JJ, KK, LL, MM, and NN.)   Schembari's testimony confirmed that Defendants successfully executed their plan to take Jet Edge's customers:

> Q. Those revenue projections for your competing company were based on revenue that you would generate from the jets . . . that were then under contract with Jet Edge; isn't that true, sir?
>
> A. Yes. Those projections were based on aircraft that was currently being managed by Jet Edge.
>
> Q. That's, in fact, what happened? You created a partnership with Sojitz, correct?
>
> A. That did occur.
>
> Q. And you created Phenix Jet, correct?
>
> A. Yes, I did.
>
> Q. Every single one of those jet owners that were represented by Sojitz cancelled their contracts with Jet Edge, correct?
>
> A. That did happen, yes.
>
> Q. And they all signed contracts with Phenix Jet?
>
> A. That's also true, yes, ma'am.

(Estrin Decl., Exhs. D at 68:2-17, M, N, O, P, and Z.)

Based on this testimony alone, a jury could reasonably conclude that the five customers left Jet Edge for Phenix Jet because of Defendants' intentional interference. Defendants had the ability to rebut Jet Edge's evidence that the customers terminated their contacts with Jet Edge because of Defendants' interference, but they failed to offer any alternative explanation why the customers left Jet Edge.  Defendants had access to these customers but failed to produce them as witnesses at trial or submit their declarations in support of any motion.  "[T]he production of weaker evidence, when stronger might have been produced, lays the producer open to the suspicion that the stronger evidence would have been to his prejudice." *Hung You Hong v. United*

1 | *States*, 68 F.2d 67, 69 (9th Cir. 1933).

2 |     Defendants cannot obtain judgment as a matter of law unless the evidence

3 | permits only one reasonable conclusion.  Based on the evidence presented at trial, it

4 | was reasonable for the jury to find Defendants' liable for intentional interference.

5 |               **b.**    **The Court Should Reject Defendants' New Argument**

6 |                   **that Only Defendants' Actions after Schembari Left Jet**

7 |                   **Edge Are Relevant.**

8 |     Confronted with the overwhelming evidence of Defendants' intentional

9 | interference while Schembari was still employed by Jet Edge, Defendants speciously

10 | claim that the jury should have ignored all this evidence.  The Court should reject

11 | Defendants' argument for at least three reasons.

12 |     First, Defendants failed to raise this argument in their Rule 50(a) motion or at

13 | any time prior to the jury's verdict.  Defendants had several opportunities to raise this

14 | legal argument, including at summary judgment, in a motion in limine, or in their Rule

15 | 50(a) motion.  They failed to do so and cannot do so here.  "Because it is a renewed

16 | motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in

17 | the pre-deliberation Rule 50(a) motion."  *E.E.O.C.*, 577 F.3d at 961.

18 |     Second, Defendants' argument is solely based on a distorted view of a single

19 | statement made by Plaintiff's counsel during closing argument.  (Mot. at 4:22-25.)

20 | Counsel's statement during closing argument is not evidence, and a Rule 50(b) motion

21 | challenges the sufficiency of the evidence.  *Ostad*, 327 F.3d at 881.  The Court properly

22 | instructed the jury that "[a]rguments and statements by lawyers are not evidence."

23 | (Dkt. No. 296, Jury Instruction No. 7.)  Defendants cite no authority to support their

24 | contention that counsel's statement during closing argument prevents the jury from

25 | considering the evidence it heard about Defendants' intentional interference during

26 | Schembari's employment with Jet Edge.  Defendants cannot draw an arbitrary line in

27 | the sand on the date Schembari resigned and preclude the jury from considering the

28 | evidence regarding Defendants' interference before Schembari's resignation.

Third, even if Plaintiff could only rely on Defendants' conduct after Schembari resigned, the jury still had sufficient evidence to find Defendants liable.  Defendants mistakenly argue that any conduct they took after Schembari resigned was permissible competition.  However, the competition privilege does not apply to interference with contractual relations claims.  *See, e.g.*, *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 2015 WL 12746208 at *21 (C.D. Cal. Oct. 30, 2015) ("California courts have applied the competition privilege only to interference with prospective advantage claims, not intentional interference with contractual relations claims").  Defendants' cases are inapposite.  Both *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226 (2009) and *Am. Credit Indem. Co. v. Sacks*, 213 Cal. App. 3d 622 (1989) are about trade secret misappropriation, not interference with contractual relations.

Moreover, the competition privilege only applies when there is "no evidence that the competitor . . . engaged in any wrongful or illegitimate conduct."  *I-CA Enterprises, Inc. v. Palram Americas, Inc.*, 235 Cal. App. 4th 257, 293 (2015).  In *I-CA Enterprises, Inc.*, the Court of Appeals affirmed the jury's verdict for plaintiff on its intentional interference claim because the defendant importer and manufacturer secretly discussed working together, the manufacturer exercised the termination provision of its contract, and the defendant and manufacturer made up a story that the plaintiff did not achieve its sales goals.  *I-CA Enterprises, Inc.*, 235 Cal. App. 4th at 290, 293.  The Court of Appeals rejected defendant's fair competition argument, holding that "the jury was entitled to infer that [the buyer] engaged in intentional acts designed to disrupt the relationship between [the importer] and [the manufacturer]—and in fact, successfully carried out such a disruption."  *Id.* at 291.  *See also Oliver & Tate Enterprises Inc. v. Found. Worldwide Inc.*, 2014 WL 12595334 at *7 (C.D. Cal. Mar. 21, 2014) (denying summary judgment on intentional interference with contract claim based on defendant's emails to plaintiff's customer that plaintiff's product was unsafe).

Like *I-CA Enterprises, Inc.* and *Oliver & Tate Enterprises Inc.*, there was ample evidence for the jury to infer that Defendants engaged in wrongful conduct after

9

Schembari resigned.  As just a few examples of wrongful competition after Schembari resigned, Defendants copied Jet Edge's Aircraft Charter Management Agreements ("ACMAs") nearly verbatim to lure Jet Edge's customers and stole Jet Edge's Initial Operating Experience ("IOE") training documents.  (Estrin Decl., Exhs. CC; DD; EE; and FF.)  Defendants also purchased ACP so Phenix Jet could steal Jet Edge's customers, and lied to Jet Edge's CEO about why Pocket Corporation terminated its contract with Jet Edge.  (Estrin Decl. Exhs. E at 120:25-121:3; F; X; Y; DD; GG; II; JJ; KK; and MM.)  These wrongful actions, along with others, culminated in the customers leaving Jet Edge for Defendants' competing business.

### c.     The Entity Defendants Cannot Escape Liability.

The entity Defendants raise a new meritless argument to shield themselves from the actions of their founder and owner Schembari.  However, the jury had substantial evidence to find the entity Defendants liable for intentional interference as well as Schembari.  Defendants argue that because Schembari incorporated Phenix Jet the day he resigned that Phenix Jet cannot be held liable for any actions Schembari took before that date.  Such a loophole would lead to an injustice, especially if the entity Defendants are the only ones who can pay the judgment.

Once again, Defendants cannot raise this new argument in a Rule 50(a) motion.  Defendants had many opportunities to raise this argument before forcing the Court, jury, and the parties to incur the time and expense of trial, but they failed to do so.  Defendants' failure to raise this argument earlier bars them from raising it here.  "[A] proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion."  *E.E.O.C.,* 577 F.3d at 961.

Additionally, the evidence cited in Section III(A)(2)(a) entitled the jury to find the entity Defendants liable.  With the assistance of Sakurai and Elsie Quenga ("Quenga") (respectively the COO and General Manager of Phenix Jet/ACP[4])

---

[4] Yohei Sakurai testified that he is the COO of Phenix Jet and ACP, which are "one

**OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Schembari created the entity Defendants with the sole purpose for Defendants to steal Jet Edge's clients.  Although Schembari did not incorporate Phenix Jet until the day he resigned, Schembari represented himself to others as a Phenix Jet representative.[5]  For example, during the winter of 2016, Schembari negotiated on behalf of CDF to purchase ACP, an AOC certificate that Phenix Jet needed to manage Jet Edge's planes.  Schembari admitted that the purpose of these communications was to compete with Jet Edge through Phenix Jet/ACP.  (Estrin Decl., Exh. E at 109:1-6.)  On March 10, 2016, Schembari wrote to Bob Seidel that "our aircraft are currently under management at another company," which Schembari admitted meant Jet Edge.  (Estrin Decl., Exhs. E at 109:1-18, 109:22-110:1; and Z.)  Schembari's use of the word "our" shows this was not just Schembari acting in a vacuum, but instead on behalf of the entity Defendants.

Not only did Schembari, Quenga, and Sakurai ensure Phenix Jet was prepared to steal Jet Edge's customers, but Schembari explicitly held himself out as working for Phenix Jet by developing logo designs, obtaining office space, setting up a website, and obtaining quotes from software and office suppliers.  (Estrin Decl., Exhs. E at 79:17-80:6, 81:1-10; AA and BB.)  Also, as described above, Schembari diverted N2020 from Jet Edge to ensure it was managed by Phenix Jet/ACP.  (Estrin Decl., Exhs. D at 72:5-6, 72:12-21, 73:25-74:2; E at 102:14-22, 104:2-10; Q and W.)

Furthermore, Phenix Jet was a mere continuation of YEP – a company Schembari devised nearly a year before his resignation from Jet Edge.  Along with Sakurai and Quenga, Schembari planned the creation of YEP, a global aircraft operations company, with the intent to acquire a 135 certificate even though Jet Edge already had one.  (Estrin Decl., Exhs. E at 70:11-71:4 and K.)  Sakurai and Quenga are

_____

and the same company." (Estrin Decl., Exh. J at 65:14-20.)

[5]  Schembari, on behalf of his company CDF, signed the Articles of Organization for Phenix Jet on March 14, 2016, while still employed by Jet Edge.  (Estrin Decl., Exh. U at 144-5.)  At trial, Schembari attempted to hide this fact, testifying that "maybe the notary had the date wrong."  (Estrin Decl., Exh. D at 86:20-22.)

OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

now the COO and General Manager of Phenix Jet.  (Estrin Decl., Exh. E at 67:7-68:8.)  On behalf of YEP/Phenix Jet, Schembari, Sakurai, and Quenga (1) purchased an AOC to compete with Jet Edge; (2) created a business plan for Phenix Jet containing financial projections based on Jet Edge customers; and (3) copied Jet Edge's confidential information to operate Phenix Jet, including Jet Edge's employee handbook and ACMAs.  (Estrin Decl. Exhs. D at 66:13-21, 68:2-17; E at 89:11-21, 99:13-18, 100:4-14, 106:16-18, 106:21-22, 108:6-8; M; N; O; P; V; X; and Y.)

This evidence (which is just a sample of the evidence the jury heard) shows that Schembari created and operated Phenix Jet while employed by Jet Edge.  The fact Schembari waited until the day he resigned from Jet Edge to sign Phenix Jet's Articles of Incorporation should not absolve Phenix Jet/ACP from liability.  If this were the law, an individual could commit all the tortious acts he or she wanted, then create a company which made all the profits from the tortious acts, and not pay any damages to the plaintiff because the company – not the individual – had the money to pay the judgment.   Such a result is contrary to the purpose of the judicial system whose goal is to provide justice and fairness to those aggrieved.  *See, e.g.*, *Cone v. W. Virginia Pulp & Paper Co.*, 330 U.S. 212, 215 (1947) (holding that the trial court is required to exercise its discretion under Rule 50(b) to "serve the ends of justice").

Moreover, the entity Defendants engaged in improper interference after Phenix Jet's incorporation.  Defendants copied Jet Edge's ACMAs nearly verbatim to lure Jet Edge's customers.  (Estrin Decl., Exhs. CC and DD.)  Additionally, in August 2016, Defendants stole Jet Edge's IOE training documents which Defendants needed to operate their competing business.  Schembari admitted that these documents were "copied [and] rebranded with Phenix Jet branding."  (Estrin Decl. Exhs. E at 120:25-121:3; EE and FF.)  Additionally, on March 15, 2016 (after Phenix Jet's incorporation) Schembari, on behalf of CDF, signed the LOI to acquire ACP so that Phenix Jet could steal Jet Edge's customers.  (Estrin Decl., Exh. D at 75:20-22.)

Importantly, the Jet Edge customers all gave their termination notices to Jet Edge

12

after the incorporation of Phenix Jet on March 14, 2016.  (Estrin Decl., Exhs. GG, II, JJ, KK, and MM.)  Thus, Phenix Jet was incorporated by the time the most important actions in this case occurred – the departure of Jet Edge's customers for Phenix Jet.  The jury therefore had substantial evidence to conclude that Phenix Jet, or one of its officers of employees, said something to these Jet Edge customers after Phenix Jet's incorporation that resulted in Jet Edge's customers terminating their contracts with Jet Edge and moving to Phenix Jet.  Any actions by Schembari, Sakurai, or Quenga are imputed to Phenix Jet, thus making Phenix Jet liable.  "Principals are liable for the torts of their agents committed within the scope of their agency." *Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005).  This doctrine applies even if the agent acts solely to benefit himself, so long as the agent acts with "apparent authority." *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982).

The jury had substantial evidence to find all Defendants liable for intentional interference based either on the actions of their founders before Phenix Jet's incorporation or on Defendants' actions after Phenix Jet's incorporation.[6]

**B.**     **The Court Should Uphold the Jury's Finding that Defendants Acted with Malice, Oppression or Fraud Warranting Punitive Damages.**

**1.**     **This Court Correctly Held that Plaintiff Introduced Sufficient Financial Evidence for the Jury to Award Punitive Damages.**

**a.**     **California Law Supports an Award of Punitive Damages Based Solely on Financial Evidence Showing Defendants' Profits Resulting from Their Tortious Acts.**

Plaintiff introduced at trial the most important financial information regarding the Defendants – the amount of profits they would make from their tortious acts.

---

[6] Defendants concede that Schembari created his wholly owned company CDF, while employed by Jet Edge and that CDF engaged in "blameworthy" conduct by obtaining payment for brokering the deal for the Part 135 AOC held by ACP that Phenix Jet used to manage Jet Edge's former customers.  (Mot. at 5:26-6:1.)  While CDF engaged in other blameworthy conduct, this fact alone supports the jury's verdict against CDF.

1   (Estrin Decl., Exhs. O, PP, and QQ.)   On January 23, 2019, the Court rejected
2   Defendants' argument that Plaintiff did not put on evidence of Defendants' financial
3   condition reasoning that "there is evidence of the financial conditions, at least, you
4   know, regarding the plan or the projected profits of the planes.  So, you know, there is
5   some basis from which the jury could find what the general financial condition is of
6   Phenix Jet . . . ."  (Estrin Decl., Exh. OO at 15:19-23.)  As discussed below, California
7   law supports the Court's decision to deny Defendants' Rule 50(a) motion.  The Court
8   should once again reject Defendants' argument and deny their Rule 50(b) motion.

9        California courts have explicitly recognized a defendant's ill-gotten profits as
10   an appropriate measure of punitive damages, even after the decision that Defendants
11   rely on so heavily, *Adams v. Murakami*, 54 Cal. 3d 105, 112 (1991) ("*Adams*").  In
12   *Cummings v. Medical Corp. v. Occupational Medical Corp.*, 10 Cal. App. 4th 1291,
13   1298 (1992) (post-dating *Adams*) the Court of Appeals held that "where the defendant
14   has been guilty of fraud, punitive damages may properly be based on evidence of the
15   profitability of defendant's misconduct."  The Court of Appeals reasoned that "[t]he
16   defendant's profits from misconduct are objectively based and uniquely appropriate as
17   the basis for punitive damages."  *Id* at 1299.  *See also Commercial Union Ins.*
18   *Companies v. Greene*, 1998 WL 1661425 at *5 (C.D. Cal. Sept. 25, 1998) (affirming
19   award of punitive damages because "courts may base punitive damages on evidence
20   of the defendant's profitability from the fraud"); *Carelli v. Matthew Scott, Gelsco, Inc.*,
21   2010 WL 11597288 at *9 (C.D. Cal. June 24, 2010) (awarding punitive damages based
22   on ill-gotten profits).

23        These three cases do not contradict the holding of *Adams*, as *Adams* provided a
24   flexible approach for what evidence is sufficient to show a defendant's ability to pay a
25   punitive damages award.  The California Supreme Court in *Adams* even recognized
26   that the Association for California Tort Reform advocated "the profitability of the
27   defendant's misconduct as the proper measure."  *Adams*, 54 Cal. 3d at 116, fn. 7.

28        Defendants rely on *Kenly v. Ukegawa*, 16 Cal. App. 4th 49 (1993).  *Kenly* does

14

not overturn *Cummings*.  The court in *Kenly* held that defendant's liabilities should be presented to the jury to ensure a defendant can pay a punitive damages award.  *Id*. at 57.  This logic does not achieve the purpose of punitive damages.  A defendant subsidiary may pass ill-gotten profits to its parent or distribute them to shareholders.  Defendants' refusal to produce documents showing their income streams to Plaintiff supports an inference that this may have happened in this case.  By focusing on a defendant's liabilities, the *Kenly* court effectively gave tortfeasors a license to steal without fear of punitive damages.  All a defendant needs to do is move ill-gotten gains out of the company in a legal manner.  Even reinvesting the ill-gotten gains into the company will create debts that a defendant can claim prevent it from paying a judgment.  The law should not, and does not, condone such behavior.

> **b.     Evidence of Defendants' Ill-Gotten Profits is the Best Financial Evidence to Determine the Proper Amount of Punitive Damages to Award Against Defendants.**

This case is particularly suitable for basing punitive damages on Defendants' improper gains because Defendants' business is in its infancy.  California law recognizes that relying on the net worth of a company is not always the best measure for punitive damages because "net worth is probably one of the least reliable financial metrics or statistics you can use, because there are a number of financial or accounting transactions in which a company can engage to lower its net worth while remaining profitable." *Bankhead v. ArvinMeritor, Inc*., 205 Cal, App. 4th 68, 854 (2012).  Net worth is especially unreliable in the case of a new company like Phenix Jet – a company that was built on the theft of Jet Edge's customers.  Since Phenix Jet has recently begun operations, it likely has incurred a lot of start-up costs and will increase its profits in the future.  Defendants' current net worth is a far cry from where it will likely be in 5 years.  Therefore, a punitive damages award based on Defendants' current net worth does not achieve the goal of deterring improper behavior because Defendants will earn profits from the planes they stole from Plaintiff for years to come.  These amounts are

15

not reflected in Defendants' current net worth.  Thus, it is more appropriate to rely on
Defendants' improper gains to determine punitive damages than Defendants' current
net worth.

Supporting Plaintiff's position, the court in *Rufo v. Simpson*, 86 Cal. App. 4th
573 (2001) held that a jury can rely on future income streams to determine punitive
damages.  In *Rufo*, the jury awarded $8.5 million in compensatory damages and $25
million in punitive damages.  *Id.* at 581.  On appeal, defendant argued the punitive
damages award was improper because it exceeded defendant's $7 million net worth.
*Id*. at 618-19.  The Court of Appeals rejected defendant's argument that the punitive
damages exceeded his net worth reasoning that defendant's future income was relevant
to "whether the damages will ruin him or be absorbed by him."  *Id*. at 622, 625.
Similarly, Defendants' future income from the stolen jets was appropriate for the jury
to rely upon in determining the punitive damages award.

Defendants argue Plaintiff should not be permitted to use Defendants'
projections because "business plans are notoriously rosy."  (Mot. at 9:25.)  This is not
the true here.  Defendants created their projections with the help of Sojitz, who
represented the customers Defendants stole.  (Estrin Decl., Exhs. E at 81:23-82:8,
82:20-83:3, 85:4-86:1, 86:20-23, 87:6-17; and O.)  Thus, Sojitz knew how much these
customers would pay Defendants to manage and charter their jets.  Sojitz also had
information about Jet Edge's profits and costs which it could use to accurately create
the financial projections.  Thus, Defendants' projections were not "rosy," but accurate.

Evidencing this point, Phenix Jet's financial projections show that it intended to
make a profit of nearly $2.5 million from the stolen jets in 2017.  (Estrin Decl., Exh. O
at PHX006425.)  Phenix Jet's 2017 financial statement shows approximately $2.5
million in profits for 2017.  (Estrin Decl., Exh. ZZ at PHX042752.)  The accuracy of
Phenix Jet's projections provides more support that it was proper for the jury to base
punitive damages on Phenix Jet's profits from the stolen jets.  Phenix Jet refused to
produce its 2018 income statement despite Plaintiff's request that it do so, perhaps

16

because profits had increased for 2018 and Phenix Jet did not want the jury to see the increased profits when determining compensatory and punitive damages.   In sum, Phenix Jet's projected profits from the stolen jets (which nearly match its actual profits) constitute reliable information on which the jury could properly base its punitive damages award under *Cummings*, *Commercial Union Ins. Companies*, and *Carelli*.

**c.     Caselaw Does Not Support Defendants' Argument that the Jury Cannot Award Punitive and Compensatory Damages Exceeding Defendants' Ill-Gotten Profits.**

Defendants' argument that *Cummings* supports a reduction in the jury's punitive damages award is meritless.   The court in *Cummings* reasoned that "[o]f course a gain-based measure of punitive damages may not always adequately serve the deterrent function."   *Cummings* at 1300.   The court explained, "[b]ut even taking away the defendant's ill-gotten gains may sometimes not be enough to deter similar conduct, it is never too much."   *Ibid.*   Clearly, the court in *Cummings* did not view ill-gotten gains as a cap on punitive damages and compensatory damages combined.   Instead, it reasoned it was a floor.   This must be the law because if a plaintiff could not recover more than the defendant's ill-gotten gains then the defendant would not be deterred from wrongful behavior since it could only lose what it improperly gained.

The court's award of punitive damages in *Commercial Union Ins. Companies*, 1998 WL 1661425 at *6 confirms this is the law.   The court reasoned that the ill-gotten gains amounted to approximately $200,000 and awarded over $247,000 in compensatory damages and $200,000 in punitive damages.   *Id*. at *1, *6.   This award of $447,000 far exceeded the ill-gotten gains of $200,000.   *Ibid*.   Similarly, in *Carelli*, 2010 WL 11597288 at *9, the court held that the defendant's fraudulent scheme cost the plaintiffs approximately $2.5 million.   The court awarded plaintiffs $2.5 million in compensatory damages and an additional $2 million in punitive damages.   Again, the combined award of $4.5 million far exceeded the ill-gotten gains of $2.5 million.   Thus, Defendants' argument on pages 10:23-11:13 of their motion is contrary to law.

17

### 2. Defendants Cannot Complain about the Financial Evidence Presented at Trial Due to Their Deficient Productions.

#### a. Defendants Prevented Plaintiff from Presenting the Jury with a Full Picture of Defendants' Current Finances.

The Court should not accept the excuses offered by Defendants for their failure to produce adequate financial information. On June 8, 2017, Plaintiff requested that Defendants produce financial documents. (Estrin Decl., Exh. RR at RFP No. 61.) Over a year later, Defendants produced a few 2017 financial statements. (Mot. at 11:22-24.) Recognizing that Defendants would not have 2018 financial statements until the end of 2018, Plaintiff waited to request updated financial statements. On December 13, 2018, Plaintiff asked Defendants to produce updated financial statements, including an update to Phenix Jet's 2017 consolidated financial statement. (Estrin Decl., Exh. SS.) Despite having an obligation to update their document production under the FRCP, Defendants refused to do so. (Estrin Decl., Exh. TT.) *See, e.g.*, *Sanchez v. California*, 2015 WL 2185186 at *13 (E.D. Cal. May 8, 2015) ("Further Plaintiff indicated that she is not required to supplement discovery since we are within thirty days of trial in this action. However, Rule 26(e) provides a continuing duty to supplement or correct discovery responses").

Due to Defendants' refusal to produce financial records, Plaintiff served trial subpoenas on each Defendant. (Estrin Decl., Exh. UU.) Each Defendant objected to producing any documents claiming the trial subpoenas were untimely. (Estrin Decl., Exh. VV.) At the January 7, 2019, pre-trial conference, the Court rejected Defendants' argument and ordered them to comply with the trial subpoenas stating, "I do think that they have a right to know something about the present financial condition of the defendant . . . ." (Estrin Decl., Exh. WW at 28:5-7.) Later that day, the parties exchanged e-mails concerning financial documents. (Estrin Decl., Exh. XX.) Plaintiff generously narrowed the scope of its trial subpoenas recognizing the lack of time Defendants had to produce documents before trial. However, Plaintiff still needed (and

18

requested) documents showing the current financial status of the Defendants, including Schembari.  (*Id.*)  Despite the Court's order that Defendants produce current financial information, Defendants produced only two pages.  (Estrin Decl., Exhs. DDD and EEE.)  Plaintiff sent an e-mail to confirm what Defendants had produced and asking again when it would receive Schembari's financial information.  (Estrin Decl., Exh. YY.)  Defendants did not agree to produce any of Schembari's financial records. (Estrin Decl., ¶ 53.)  It is implausible that Schembari had no documents evidencing his net worth as Defendants' counsel claimed.  (Estrin Decl., Exh. XX.)  Defendants also never produced an update to Phenix Jet's 2017 consolidated financial statement which Plaintiff requested on December 13, 2018.  (Estrin Decl., Exhs. SS, XX, and Estrin Decl., ¶ 54.)  In sum, Defendants did not produce any financial information concerning Schembari, any 2018 financial information concerning ACP, or an update to Phenix Jet's 2017 consolidated financial statement.  (Estrin Decl., ¶¶ 53-54.)

Defendants put Plaintiff in an impossible position with regard to introducing Defendants' financial information.  Defendants only provided Plaintiff with one-page balance sheets for Phenix Jet and CDF.  (Estrin Decl., Exhs. DDD and EEE.)  Since Defendants did not produce 2018 financial information for ACP or ***any*** of Schembari's financial information Plaintiff could only show the jury part of Defendants' financial condition.  All the Defendants are interconnected, so the money they earned could be held by any of them.  (Estrin Decl., Exhs. U and BBB.)  This is why Plaintiff's trial subpoenas sought documents showing how money was distributed and divided between the Defendants and requested Phenix Jet's updated financial statement.

Defendants should not benefit from their refusal to produce documents showing their present financial condition.  Indeed, the Court of Appeals in *Green v. Laibco, LLC*, 192 Cal. App. 4th 441, 453 (2011), rejected a defendant's argument that the jury did not have enough evidence about defendant's net worth as "***the height of absurdity***" because defendant's stonewalling caused the lack of financial evidence.  The defendant in *Green* failed to produce current financial statements, instead producing balance

**OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

sheets and profit and loss statements, which defendant's CEO struggled to read. *Id.* at 454. Due to defendant's conduct, and because there was some financial evidence admitted, the Court of Appeals directed the trial court to affirm the jury's award of punitive damages. *Id.* at 456.

In *StreetScenes v. ITC Entertainment Group, Inc.*, 103 Cal. App. 4th 233 (2002), the court also prevented the tactic that Defendants try to employ here. In *StreetScenes*, the plaintiff served notices to appear on defendants requesting financial records. *Id.* at 241. In response to a court order, Defendants only brought two unaudited income statements to court. *Ibid.* The court marked the documents next in order, and the jury awarded punitive damages. *Ibid.* On appeal, defendants argued plaintiff failed to carry its burden to prove defendants net worth under *Adams.* The Court of Appeals upheld the trial court's decision to permit the jury to award punitive damages. *Id.* at 244. The appellate court reasoned that due to defendant's failure to produce documents, it was "in no position to complain." *Id.* at 243. *See also Fernandes v. Singh*, 16 Cal. App. 5th 932, 942 (2017) ("A number of cases have held that noncompliance with court order to disclose financial condition precludes a defendant from challenging the sufficiency of the evidence of a punitive damages award on appeal").

The Court of Appeals in *Mike Davidov Co. v. Issod*, 78 Cal. App. 4th 597, 610 (2000) came to the same conclusion. The Court of Appeals rejected defendant's argument that the court should vacate a punitive damages award since the plaintiff had not presented sufficient evidence of defendant's financial condition due to the fact the defendant had failed to produce sufficient documentation of its financial condition. The Court of Appeals affirmed the punitive damages award reasoning that it did not matter that the plaintiff failed to (1) conduct pretrial discovery of financial information; (2) subpoena documents or witnesses at trial; or (3) bifurcate liability from damages. *Id.* at 608. The Court should follow the holding of *Mike Davidov Co.*, (as well as the holdings in *Green* and *StreetScenes*) especially since Plaintiff requested Defendants' financial records in pretrial discovery and again through trial subpoenas.

b. **Because Defendants' 2017 Financial Information Was Outdated It Would Not Have Been Proper for the Jury to Rely Upon it in Deciding Punitive Damages.**

Defendants give the impression that they provided Plaintiff with a plethora of financial information to tell the jury about. The financial information provided was out of date except for two pages representing the balance sheets for Phenix Jet and CDF. Yet in their Rule 50(b) motion, Defendants emphasize Phenix Jet's 2017 consolidated financial statement as evidence Plaintiff should have introduced at trial. As the Court noted, Plaintiff needed to know "about the ***present*** financial condition" of the Defendants. (Estrin Decl., Exh. WW at 28:5-7.) Accordingly, as discussed above, Plaintiff repeatedly asked for an update to Phenix Jet's consolidated financial statement. Defendants refused to provide this update even after the Court's order.

The financial condition of Defendants in 2017 is irrelevant to the issue of punitive damages in a trial commencing in 2019. This is especially true since 2017 was Phenix Jet's first year of operation so their 2018 financial condition would likely be better than their 2017 financial condition. The documents support this statement. For example, as of March 2017, Phenix Jet had a net worth of $321,000. (Estrin Decl., Exh. AAA.) By September 2018, Phenix Jet's net worth had grown to $2.6 million. (Estrin Decl., Exh. DDD.) Defendants refusal to produce 2018 financial documents supports the notion that Defendants wanted to force Plaintiff to present outdated financial information to the jury which understated Defendants' wealth, thus prejudicing Plaintiff's ability to collect an appropriate damages award.

c. **The Court Already Rejected Defendants' Argument that Plaintiff Could Not Receive Defendants' Financial Information after the Discovery Cutoff.**

Defendants' argument that Plaintiff's trial subpoenas were too late ignores several facts. First, Plaintiff requested the documents in discovery. Second, Plaintiff needed Defendants' 2018 financial documents which did not exist until after the close

21

1  of discovery. Defendants should have produced updated financial documents pursuant

2  to the FRCP, but they refused. Thus, the trial subpoenas were proper as they sought

3  documents not in existence during the discovery period.

4        Third, and most importantly, Defendants already raised their timeliness

5  argument at the January 7, 2019 pre-trial conference. Defendants told the Court that

6  their "position is that discovery's closed." (Estrin Decl., Exh. WW at 27:22-23.) The

7  Court considered Defendants' argument and correctly ruled that "I do think that they

8  have a right to know something about the present financial condition of the defendant"

9  for punitive damages. (Estrin Decl., Exh. WW at 28:5-7.) Thus, Defendants' argument

10  that Plaintiff was too late in requesting financial information has already been rejected

11  by the Court. Defendants refused to comply with the Court's order by providing

12  Plaintiff with only two pieces of paper about only two of the Defendants.

13        **d.**    **Defendants Prevented Plaintiff from Meaningfully**

14               **Examining Schembari About Their Financial Condition.**

15        Finally, both of Defendants' motions make a big deal out of nothing with respect

16  to Plaintiff's objection to Defendants improper question to Schembari about his ability

17  to pay a judgment in the millions. (Mot. at 16:5-7.) Specifically, Defendants' counsel

18  asked Schembari if he and his companies could pay a judgment in the "millions and

19  millions of dollars." (Estrin Decl., Exh. D at 60:18-23.) Schembari's answer to this

20  question would have provided no guidance to his financial condition for the purposes

21  of punitive damages. Schembari simply would have answered "no" without any

22  explanation of his company's profits or net worth. At this point, no one even knew

23  what the judgment would be, so the question was irrelevant.

24        For similar reasons, Defendants' argument that Plaintiff could have asked

25  Schembari questions about his financial condition is misplaced. Defendants already

26  told Plaintiff that incredibly Schembari did not have a single document showing his

27  financial condition. Thus, how would Schembari know anything about his financial

28  condition? Also, without any documents to impeach Schembari or refresh his

recollection, Plaintiff would have to accept anything Schembari said as true. Defendants cannot refuse to produce any financial information and then claim Plaintiff should have just asked the witness questions at trial as a substitute.

### 3. The Jury Had Sufficient Evidence to Find that Defendants Acted with Malice, Oppression, or Fraud.

Defendants concede that Schembari and CDF acted with malice, oppression or fraud. (Mot. at 16:12-14 only discusses ACP and Phenix Jet.) As discussed in Section III(A)(2) above, the malicious and fraudulent actions of Schembari and CDF were all for the benefit of Phenix Jet/ACP. Furthermore, Schembari, Quenga, and Sakurai (all officers or managers of Phenix Jet) acted on behalf of Phenix Jet/ACP to interfere with Jet Edge's contracts before and after Phenix Jet's incorporation. Corporations are liable for punitive damages attributable to "managing agents," which are "employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999) (holding that the conduct of a supervisor who fired plaintiff could lead to punitive damages against the company). For these reasons, and others, the jury properly determined that punitive damages were appropriate against all Defendants.

Defendants misstate the "clear and convincing" evidence standard to require "no substantial doubt" and be "sufficiently strong to command the unhesitating assent of every reasonable mind" based on a quote from *In re Angelica P.*, 28 Cal. 3d 908, 919 (1981) which has been heavily criticized in more recent cases. (Mot. at 16:26-17:3.) "Neither *In re Angelia P., supra,* 28 Cal.3d 908 . . . nor any more recent authority mandates that augmentation [to CACI No. 201], and **the proposed additional language is dangerously similar to that describing the burden of proof in criminal cases.**" *Nevarrez v. San Marino Skilled Nursing & Wellness Ctr., LLC*, 221 Cal. App. 4th 102, 114 (2013) (emphasis added). The Court properly instructed the jury on the standard for punitive damages without any objection from Defendants. (*See* Dkt. No 265 at Instruction No. 3; and Dkt. No. 296 at Jury Instruction No. 4.)

"Malice, oppression, or fraud" means that (i) the defendant acted with intent to cause injury or knowing disregard of the rights of another, *or* (ii) that the defendant's conduct was despicable, *or* (iii) that the defendant intentionally misrepresented or concealed a material fact intending to harm the plaintiff.  *See* CACI No. 3947; and Dkt. No. 296, Jury Instruction No. 36.  The jury could determine malice from the circumstantial evidence introduced.  "Malice may be proved either expressly through direct evidence or by implication through indirect evidence from which the jury draws inferences." *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1299 (2013).  In fact, malice is "[m]ost often . . . proven by circumstantial evidence alone." *Seimon v. S. Pac. Transportation Co.*, 67 Cal. App. 3d 600, 607 (1977)

Defendants incorrectly argue there was "no evidence at all" of why Jet Edge's customers decided to terminate their contracts and move to ACP and Phenix Jet.  (Mot. at 17:20-25.)  In Section III(A)(2), Plaintiff set forth some of the substantial evidence presented at trial which the jury could properly rely on to find Defendants' liable.

Contrary to Defendants' assertions, their coordinated theft of Jet Edge's customers was not permissible "commercial competition."  Instead, the evidence at trial, including the evidence described in Section III(A)(2), shows that Defendants engaged in a year-long malicious and fraudulent scheme to steal Jet Edge's Asian clients.  Defendants used Schembari's position at Jet Edge to execute their scheme. Since Schembari made disparaging comments to Jet Edge's customers during his employment with Jet Edge, the jury could infer that these malicious comments had a pronounced impact on the customers' decisions to leave.  (Estrin Decl., Exhs. A, B, C, and E at 58:22-25.)  Further, Defendants copied and used Jet Edge's confidential information, including ACMAs, employee handbooks, and IOE training documents. (Estrin Decl. E at 106:16-18, 106:21-22, 120:25-121:3; X; Y; CC; DD; EE; and FF.) Furthermore, Schembari diverted N2020 away from Jet Edge's management.  (Estrin Decl., Exhs. E at 102:14-22, 104:2-10; and W.)  Defendants' actions in this case are very similar to the defendant's actions in *Southern California Disinfecting Co. v.*

24

*Lomkin*, 183 Cal. App. 2d 431, 451 (1960) where the Court of Appeals affirmed an award of punitive damages because the defendant executed a scheme to use confidential documents to steal plaintiff's customers.

Even worse, Defendants executed their plan in secret to inflict maximum harm on Jet Edge.[7]  After the first Jet Edge customer terminated its contract, Sakurai (Phenix Jet's COO) lied to Jet Edge's CEO Bill Papariella, telling him the Asian jet owners were happy, despite knowing they would all terminate their contracts with Jet Edge. (Estrin Decl., Exhs. F, GG, II, JJ, KK, and MM.)  Consequently, Jet Edge had no opportunity to cure or mitigate its sudden loss of these customers and was forced to shut down its entire operation in Asia forcing Jet Edge to layoff five percent of its work force.   (Estrin Decl., Exhs. H at 68:24-73:20, 73:24-74:2, 75:12-76:20; and I at 16:7-17, 36:23-37:1.)  Defendants contend that Sakurai's e-mail was not made on behalf of the Defendants but ignore that, as discussed in Section III(A)(2), Sakurai helped Schembari form Phenix Jet and was working with Phenix Jet when he sent the e-mail.[8] Therefore, the jury could reasonably infer that Sakurai lied to Papariella regarding the intentions of Defendants and Jet Edge's clients so that Jet Edge could not take any steps to keep these jet owners as customers.

The jury's finding that Defendants acted with malice, oppression or fraud by stealing Jet Edge's customers is supported by substantial evidence.  Therefore, the jury's punitive damages award should be upheld.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Renewed Motion for Judgment as a Matter of Law and uphold the jury's verdict.

---

[7] *See, e.g.*, Estrin Decl., Exhs. A; F; J at 148:10-17, and 165:24-166:4; O; P; T at 80:15-81:25, and 143:25-144:24; W; Z; and CCC.

[8] Defendants' argument that Jet Edge's customers did not move to Phenix Jet until October 2016 is immaterial because they had to wait until the acquisition of ACP. (Estrin Decl., Exh. BBB.)

1 | Dated: May 2, 2019

**MICHELMAN & ROBINSON LLP**

By  */s/Mona Z. Hanna*
   Sanford L. Michelman
   Mona Z. Hanna
   Todd H. Stitt
   Robert D. Estrin
   Attorneys for Plaintiff
   Western Air Charter, Inc.

26